## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **DOMINEQUE RAY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 11-0543-WS-N** |
| | ) | |
| **KIM THOMAS, Commissioner,** | ) | |
| **Alabama Department of Corrections, *et al.*,** | ) | |
| | ) | |
| **Respondents.** | ) | |

### ORDER

This death-penalty habeas corpus action comes before the Court on petitioner Domineque Ray's Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence (doc. 32-1), filed pursuant to 28 U.S.C. § 2254.[1]  The respondent has filed a comprehensive Answer (doc. 15), and both sides have submitted detailed merits briefs (docs. 31 & 36) elaborating on their respective legal positions as to the eight grounds and dozens of subgrounds for relief presented in the Petition.[2]  After careful review of these materials, as well as relevant portions of the 30-volume record of state-court proceedings, the Court finds that the Amended Petition is ripe for disposition.

---

[1]     There is some confusion in the record as to the proper spelling of petitioner's first name.  Respondents and many record documents recite his first name as "Dominique"; however, petitioner's own filings spell the name "Domineque."  The Court adopts the latter convention for purposes of this Order; however, it is understood that "Dominique Ray" and "Domineque Ray" refer to the same person.

[2]     With regard to the merits briefs, the undersigned's Order (doc. 22) of February 24, 2012 authorizing such briefs wrote that "[t]he parties are admonished to avoid redundancy in their merits briefs" and that "[m]erits briefs are <u>not</u> properly used as a vehicle for" restating arguments and allegations from the pleadings.  (*Id.* at 3.)  Notwithstanding that admonition, petitioner's merits brief cuts and pastes large swaths of text (full paragraphs, or even full pages) from his § 2254 Petition, in derogation of these instructions.

I.      **Background.**

  *A. **The Offense.***

  On the evening of July 29, 1995, 15-year old Tiffany Harville went missing from her home in Selma, Alabama.  Her mother filed a missing person's report, and family members posted flyers around the community.  As days went by, no information surfaced concerning Harville's whereabouts.  On August 16, 1995, however, a man operating a tractor and bushhog at a cotton field off County Road 62 in Dallas County, Alabama discovered human skeletal remains, which he immediately reported to law enforcement officials.  A medical examiner with the Alabama Department of Forensic Science used dental records to identify the remains as Harville's.  Upon examining the remains, the medical examiner observed a dozen defects in the skull consistent with stab wounds caused by a knife.  Three of those defects were of sufficient severity that the weapon had penetrated the skull and entered the brain area, inflicting fatal trauma.  Other marks on the bones of the hands and wrist were consistent with defensive-type wounds.

  Tiffany Harville's murder went unsolved for more than two years.  During this time, the Selma Police Department and Dallas County Sheriff's Department conducted an ongoing homicide investigation and fielded countless leads and tips pointing in numerous different directions.  At the end of 1995, a suspect named Rod Suttle was taken into custody and ultimately indicted on charges of capital murder in connection with Harville's death; however, those charges were later dismissed.

  On April 18, 1997, Domineque Ray (a 20-year old male then in custody in a local jail facility on another matter) initiated contact with Lt. Roy Freine, the Dallas County Sheriff's Department investigator who was in charge of the Harville investigation.  Pursuant to that contact, Lt. Freine interviewed Ray, at which time Ray announced that he possessed information concerning Harville's death.  After Lt. Freine read Ray his *Miranda* rights, Ray volunteered that he was an eyewitness to Harville's murder.  Ray elaborated that Suttle (whom Ray knew by the name "Tie") had killed Harville, and that three other females (Erica Powell, Latonya Simmons, and Pat Simmons) had been present and complicit in the crime.  On April 24, 1997, Ray picked Suttle out of a police lineup in Mobile, Alabama, as Harville's killer.  Ray signed a statement that afternoon confirming that Suttle "is the same individual that murdered Tiffany Harville by cutting her throat and stabbing her several times in the head with a knife."  (Vol. 4, R-13 at 546.)

The Harville investigation's big break occurred on August 18, 1997.  On that date, Marcus Owden voluntarily approached law enforcement after experiencing a spiritual awakening.[3]  Owden gave a statement to Lt. Freine implicating both himself and Ray in Harville's murder.  On the strength of this new information, Ray was taken into custody and questioned on August 19, 1997.  (Vol. 4, R-13 at 548.)  Ray agreed to waive his *Miranda* rights, and proceeded to give a statement that differed markedly from those he had made in April 1997.  Specifically, Ray stated that he and Owden were alone with Harville on the night of the murder, that Owden had raped Harville, that Ray had pretended to rape her (without actually performing sexual intercourse), and that both of them had stabbed her.  (*Id.* at 552.)  Ray admitted that his earlier statements had been false, but stated that it had been Owden's idea to implicate Suttle since they knew Suttle had been arrested for the crime anyway.  (*Id.*)  In a tape-recorded statement played to the jury at trial, Ray said that Harville voluntarily went with Owden and Ray that evening, that Owden made sexual advances toward Harville, that Harville told Owden to stop, that Owden proceeded to have sex with Harville, that Ray then acted like he had sex with her (but did not), that Owden had sex with Harville again even though she told him she did not want him to do it, that Harville threatened to report the sexual assault to her mother, and that Owden then produced a knife that primarily Owden (but also Ray) used to stab Harville to death.  (*Id.* at 555-60.)

Ray's story deviated in certain particulars from that which Owden had given to Lt. Freine.  For instance, Owden indicated that he and Ray had planned on raping Harville all along, that Ray had cut Harville first, that Ray had slashed Harville's throat, and that approximately 10 of the stab wounds were inflicted by Ray.  (*Id.* at 577-78.)  According to Owden, while he was raping her, she cried out for help, "God, God, help me.  Please help me, God."  (*Id.* at 594.)  Owden also stated that the two of them had robbed Harville of her money (roughly $7 in cash) and her underwear after they killed her.  (*Id.* at 578.)  Owden testified in substantially this manner at trial, including specific testimony that both of them had engaged in "raw brutal"

---

[3]      At trial, Owden offered the following explanation for his decision to come forward two years after the fact to confess his role in Harville's death:  "I began to read my Bible, and I began to seek the Lord.  And my heart started to hurting because of what we had did, because of what God put in my heart.  And that's what brought me forward because my heart was hurting."  (Vol. 5, R-13 at 612.)

sexual intercourse with Harville against her will, that Ray had cut Harville in the neck first and stabbed her some more before Owden joined in, and that when they drove away from the murder scene, Ray possessed the murder weapon, Harville's money and her clothes.  (*Id.* at 603-10.)[4]

**B.    Indictment, Trial, and Death Sentence.**

In September 1997, Ray was indicted in the Circuit Court of Dallas County, Alabama, and charged with capital murder in the death of Tiffany Harville, pursuant to Alabama Code § 13A-5-40(a)(3).  (Vol. 1, R-1 at 14-15.)  The final iteration of the indictment charged Ray with two counts of capital murder, including one count of murdering Harville while engaging or attempting to engage in sexual intercourse with her by forcible compulsion (Count 1) and one count of murdering Harville while committing a theft of her money or property (Count 2).  (*Id.* at 84-85.)  Selma attorneys Alston Keith and George Jones were appointed to represent Ray.  On September 15, 1997, the trial judge granted the parties' joint request that Ray receive a mental examination.  (*Id.* at 18-20.)  In the spring and summer of 1998, defense counsel filed a series of motions, including motions for discovery, a motion requesting funds to hire an investigator to assist the defense, multiple motions for change of venue, a motion to suppress Ray's statement, and a motion seeking funds to hire an expert in forensic neuropsychology.

On August 31, 1998, Attorneys Keith and Jones filed their first motion to withdraw from the case, for the stated reason that Ray "refuses to cooperate with counsel in negotiating a plea agreement," despite the fact that the State had "proffered a very favorable plea offer."  (Vol. 1, R-1 at 72-74.)  The motion also reflected that Ray had repeatedly expressed a lack of trust and confidence in his attorneys, such as complaining in open court that they were not "representing [him] right."  (*Id.*)  The attorney-client relationship continued to deteriorate thereafter, with counsel filing an amended motion setting forth additional facts on September 3, 1998.  (*Id.* at 80-82.)  Yet another iteration of the motion to withdraw followed on September 9, 1998, based on an incident in which Ray informed counsel that he knew of witnesses who could provide favorable testimony, but refused to provide their names or to disclose the substance of their

---

[4]        The jury also heard that Owden had entered a plea of guilty to Harville's murder, and that he was serving a sentence of life without parole for that offense.  (*Id.* at 614.)

-4-

anticipated testimony.  (*Id.* at 89-90.)[5]  On or about October 1, 1998, the trial court relieved Keith and Jones of their representation of Ray, and appointed William Whatley to represent him instead.  (*Id.* at 139-40.)  On March 1, 1999, the trial judge granted a defense motion by appointing Juliana Taylor to serve as co-counsel for Ray in connection with the Harville trial.  (*Id.* at 146.)

Jury selection was conducted on July 26, 1999, and the trial commenced the following morning in Selma, with Circuit Judge Thomas ap R. Jones presiding.  At the end of the day on July 28, 1999, the jury returned a unanimous verdict finding Ray guilty on both Count 1 (murder during the commission of rape, first degree) and Count 2 (murder during the commission of robbery, first degree).  (Vol. 2, R-2 at 277.)  On July 29, 1999 (four years to the day after Harville's disappearance), the penalty phase of the trial took place, at the conclusion of which the jury returned a recommendation by a vote of 11 to 1 that Ray be sentenced to death.  (*Id.* at 276.)

After a separate sentencing hearing at which both sides had the opportunity to present additional testimony and argument, Judge Jones entered a Sentencing Order on September 27, 1999.  (Vol. 2, R-2 at 284-92.)  In that Order, the trial judge found that the following statutory aggravating circumstances had been proven beyond a reasonable doubt: (i) Ray had previously been convicted of another capital offense;[6] (ii) Ray committed the capital offense while engaged

---

[5]     At a hearing on September 10, 1998, attorneys Keith and Jones expounded on their concerns, including new information that Ray had informed them just days earlier that the version of the facts he had given them (and the facts undergirding their trial preparations) were all lies, a complete fabrication designed as a "prank" to elicit grounds for a false imprisonment lawsuit against the State.  (Vol. 2, R-6 at 49-54.)  Given Ray's drastically changing story to his own attorneys at the eleventh hour, defense counsel stated to the trial judge, "we cannot meaningfully work with this client after he's lied to us for so long on such an important case where his life is at stake."  (*Id.* at 53.)

[6]     In particular, on February 25, 1999, Ray had been convicted of capital murder in connection with the February 4, 1994 slaying of two children, Earnest and Reinhard Mabins, who were shot to death inside their home.  Marcus Owden was Ray's co-defendant in the Mabins case, just as he was Ray's co-defendant in the Harville case.  Owden confessed to the Mabins killings at the same time and under the same circumstances that he confessed to his role in the rape, robbery and murder of Tiffany Harville.  Ray went to trial in the Mabins case, and was represented by attorneys Whatley and Taylor.  The jury found him guilty and, on April 30, 1999, Ray was sentenced to serve a term of life imprisonment without parole for his capital murder convictions in the Mabins case.  (Vol. 2, R-2 at 345-50.)

in or attempting to commit the crime of rape in the first degree; and (iii) Ray committed the capital offense while engaged in or attempting to commit the crime of robbery in the first degree. With respect to mitigating circumstances, the trial judge found that the only statutory mitigator present was Ray's young age (19) at the time of the offense, and that weak non-statutory mitigating circumstances included Ray's "unfortunate family life;" character evidence that he was easygoing, willing to help others, and had a child of his own; evidence of good behavior during his "single cell" incarceration; and evidence that certain witnesses professed to believe that life without parole was the appropriate sentence.  After weighing the aggravating and mitigating circumstances, Judge Jones sentenced Ray to death.

### C. *Direct Appeal.*

Attorneys Whatley and Taylor continued to represent Ray in connection with his direct appeal to the Alabama Court of Criminal Appeals.  In their initial appellate brief, defense counsel raised the following eight assignments of error: (i) the trial court erred during the penalty phase by admitting evidence of Ray's conviction in the Mabins trial; (ii) prosecutorial misconduct based on the State's purported comment on Ray's failure to testify and its remarks to the jury that their decision in the penalty phase was not final; (iii) failure to arraign Ray on the final iteration of the indictment from September 1998 charging him with two counts of capital murder (one in connection with rape, the other in connection with robbery), rather than just one; (iv) error in denying defense's challenge of particular veniremembers for cause; (v) error in trial court's denial of defense challenge to method of execution; (vi) *Miranda* violation in connection with Ray's custodial statement to law enforcement on August 19, 1997; (vii) admission of inflammatory photographs of the victim; and (viii) denial of motions for judgment of acquittal. (Vol. 6, R-32.)

On January 12, 2001, the Alabama Court of Criminal Appeals entered a written opinion overruling Ray's assignments of error and confirming his conviction and death sentence.  *See Ray v. State*, 809 So.2d 875 (Ala.Crim.App. 2001) ("*Ray I*").  Subsequent petitions for rehearing in the Alabama Court of Criminal Appeals, for writ of certiorari in the Alabama Supreme Court, and for writ of certiorari in the United States Supreme Court were all denied.  (Vol. 30, R-62 through R-64.)

### D. *Rule 32 Proceedings.*

Having completed his direct appeal, Ray subsequently commenced state post-conviction proceedings.[7]  On February 14, 2003, petitioner filed his initial Rule 32 petition in Dallas County Circuit Court.  (Vol. 8, R-40.)  On or about November 21, 2003, Ray filed a 73-page Amended Rule 32 Petition.  (Vol. 9, R-45.)  In its final form, the Amended Petition alleged 13 grounds (and numerous subgrounds) for postconviction relief, including the following: (i) ineffective assistance of counsel at guilt and penalty phases, and on direct appeal (split into literally dozens of subclaims); (ii) ineffective assistance of counsel at the sentencing hearing; (iii) a claim that five jurors and one alternate juror failed to disclose material information during voir dire; (iv) prosecutorial misconduct (mischaracterizing the law and presenting factual assertions unsupported by evidence); (v) withholding of favorable evidence by the State (*i.e.*, a *Brady* claim); (vi) *Caldwell* violation in judicial and prosecutorial statements to jury that their penalty-phase verdict was not final; (vii) improper admission of defendant's custodial statements; (viii) pretrial publicity precluded a fair trial in Dallas County; (ix) sufficiency of evidence; (x) admission of irrelevant and prejudicial evidence; (xi) "extensive misconduct" by the prosecutor (redundant of item (iv), *supra*); (xii) a *Ring* violation as to jury findings of aggravating circumstances; and (xiii) an *Atkins* violation predicated on Ray's alleged mental retardation. (Vols. 9 & 10, R-45.)

On September 27 – 29, 2006, the trial judge conducted a lengthy evidentiary hearing on Ray's Amended Rule 32 Petition.  (Vol. 23 – 26, R-52.)  Indeed, the Rule 32 hearing was comparable in duration to that of the underlying trial.   During that hearing, Judge Jones received testimony from, among others, Ray's family members (including his brother and cousin), both of the attorneys who represented Ray at trial and direct appeal, multiple mental health professionals, and a social worker.  On August 6, 2007, Judge Jones entered a 107-page order denying Ray's Amended Rule 32 Petition in its entirety.  (Vol. 30, R-65.)  The Alabama Court of Criminal Appeals affirmed that ruling via an extensive written order entered on February 4, 2011.  *See Ray v. State of Alabama*, 80 So.3d 965 (Ala.Crim.App. 2011) ("*Ray II*").  Ray's

---

[7]        During state collateral review, Ray was represented by a new legal team, consisting of Peter Racher and Donna Marron from the Indiana law firm of Plews Shadley Racher & Braun, as well as Montgomery attorney Thomas Goggans.  All of these lawyers, plus others from the Plews Shadley firm, are counsel of record for Ray in his federal habeas corpus proceedings.

petition for rehearing was denied on May 13, 2011.  (Vol. 30, R-66.)  And the Alabama Supreme Court denied Ray's petition for writ of certiorari on September 16, 2011, effectively bringing the Rule 32 proceedings to a close.  (*Id.*, R-67.)

> E.    *Federal Habeas Corpus Petition.*

On September 19, 2011, Ray timely filed in this District Court his § 2254 Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence.  In its amended and final form, the 141-page petition invokes eight grounds for federal habeas corpus relief (along with dozens of embedded sub-grounds and sub-issues), under the following headings: (i) violation of *Brady v. Maryland* via improper withholding of exculpatory evidence; (ii) ineffective assistance of counsel in preparation and presentation of mitigation evidence; (iii) ineffective assistance of counsel at trial and on direct appeal in myriad respects; (iv) violation of *Ring v. Arizona* because the jury did not make a finding of penalty-phase aggravation, and did not reach a unanimous verdict; (v) denial of impartial factfinder where Rule 32 trial court adopted prosecutors' proposed order in its entirety; (vi) prosecutorial misconduct where prosecutor commented on Ray's decision not to testify; (vii) prosecutorial misconduct where prosecutor informed jurors that their penalty-phase verdict was not final; and (viii) unconstitutional admission of Ray's custodial statements.

The undersigned has carefully examined Ray's Amended Petition for Writ of Habeas Corpus (doc. 32-1), the State's 106-page Answer (doc. 15), Ray's 60-page merits brief (doc. 31), the State's 25-page merits brief (doc. 36), and all relevant portions of the 30-volume record of the underlying proceedings.  Upon conclusion of that review, the Court finds that Ray's § 2254 Petition is ripe for adjudication at this time.

## II.    Standard of Review.

Ray's federal habeas petition was filed long after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under the highly deferential AEDPA standard, a federal court may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's determination "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Harrington v. Richter*, --

- U.S. ----, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011) ("Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision was contrary to federal law then clearly established in the holdings of this Court, … or that it involved an unreasonable application of such law … or that it was based on an unreasonable determination of the facts in light of the record before the state court") (citations and internal quotation marks omitted).

 "[T]he obstacles that a habeas petitioner faces under § 2254(d)(1) are daunting." *Evans v. Secretary, Florida Dep't of Corrections*, 699 F.3d 1249, 1267 (11th Cir. 2012).  Under this standard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011) (citation omitted); *see also Evans*, 699 F.3d at 1269 ("The question is not how the [federal] court … would rule if presented with the issue for the first time and not whether we think the state court decision is correct, but whether its decision is contrary to or an unreasonable application of clearly established federal law."); *Hill v. Humphrey*, 662 F.3d 1335, 1355 (11th Cir. 2011) ("A federal court may not grant habeas relief on a claim a state court has rejected on the merits simply because the state court held a view different from its own.").[8]  Rather, "[t]o obtain habeas relief a state prisoner must show that the state court's ruling on the claim being presented in the federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Evans v. Secretary, Dep't of Corrections*, 703 F.3d 1316, 1326 (11th Cir. 2013) (citations omitted). "[O]nly if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents may relief be granted." *Johnson v. Secretary,*

---

[8] "Clearly established federal law" for purposes of an AEDPA analysis is confined to extant Supreme Court decisions at the time of the state-court ruling.  *See, e.g., Booker v. Secretary, Florida Dep't of Corrections*, 684 F.3d 1121, 1123 (11th Cir. 2012) ("Clearly established Federal law under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.") (citation and internal marks omitted); *Evans*, 699 F.3d at 1266 ("It is hornbook AEDPA law that the only Supreme Court decisions against which a state court decision is to be measured are those on the books at the time the state court decision was issued.").  Stated differently, "[i]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court.  *Harrington*, 131 S.Ct. at 786.

*DOC*, 643 F.3d 907, 910 (11th Cir. 2011) (citation and internal quotation marks omitted); *see also Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) ("if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied") (citation omitted).  "If this standard is difficult to meet, that is because it was meant to be."  *Holsey*, 694 F.3d at 1257 (citation omitted); *see also Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[T]he deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.").[9]  "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington*, 131 S.Ct. at 786 (citation and internal quotation marks omitted).

Also of critical importance to the § 2254 analysis are notions of procedural default and exhaustion.  "A state court's rejection of a petitioner's [federal] constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim."  *Borden v. Allen*, 646 F.3d 785, 808 (11th Cir. 2011); *see also Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("[u]nder the doctrine of procedural default, a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment").  "[A] habeas petitioner may overcome a procedural default if he can show adequate cause and actual prejudice, or, alternatively, if the failure to consider the merits of his claim would result in a fundamental miscarriage of justice."  *Borden*, 646 F.3d at 808 n.26; *see also Conner*, 645 F.3d at 1287 (to overcome procedural default, petitioner must "show cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice").

---

[9]     With respect to findings of fact by the state court, the standard of review is narrower and more daunting still.  It is black-letter law that "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1); *see also Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1249 (11th Cir. 2013) ("[f]ederal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence") (citation omitted); *Sochor v. Secretary Dep't of Corrections*, 685 F.3d 1016, 1028 (11th Cir. 2012) ("Our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review.") (citation omitted).

Section 2254 also generally requires petitioners to exhaust all available state-law remedies. In that regard, "[a] petitioner must alert state courts to any federal claims to allow the state courts an opportunity to review and correct the claimed violations of his federal rights." *Lamarca v. Secretary, Dep't of Corrections*, 568 F.3d 929, 936 (11th Cir. 2009). "[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Lucas v. Secretary, Dep't of Corrections*, 682 F.3d 1342, 1352 (11th Cir. 2012) (citations omitted); *see also Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) (to satisfy exhaustion requirement, "we do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's … specific factual foundation") (citation omitted). It is not sufficient "that a somewhat similar state-law claim was made." *Kelley v. Secretary, Dep't of Corrections*, 377 F.3d 1317, 1344-45 (11th Cir. 2004). What is necessary is that "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted). That said, "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance." *Kelley*, 377 F.3d at 1344. Such clarifications cannot alter the nature or legal theory of the claim. *See, e.g., Pietri v. Florida Dep't of Corrections*, 641 F.3d 1276, 1289 (11th Cir. 2011) (affirming dismissal of unexhausted claim of ineffectiveness of appellate counsel, which was separate and distinct from substantive claim that petitioner had raised in state court).

## III.     ***Brady* Claim.**

### A.     ***Substance of Petitioner's Claim.***

Ray devotes more than 20 pages of his Amended § 2254 Petition to a claim that the State unconstitutionally failed to disgorge multiple categories of exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. As pleaded in the habeas petition, the specific items that Ray claims the State wrongfully withheld are as follows: (i) witness statements from Allen Nettles, Curtis Muse, Michael Muse, and Kelvin Williams taken by law enforcement in November 1995 or early 1996 implicating Rod "Tie Dye" Suttle in the Harville murder (doc. 32-1, at 21-25); (ii) a letter from the Dallas County Sheriff's Office to the New York State Police dated August 23, 1995, and indicating that the DCSO "believe[d] the murder occurred somewhere else and the body was transported to this

-11-

area" and "the victim may have got into a vehicle with a New York license plate the day she disappeared" (*id.* at 28-29); and (iii) "evidence casting doubt on Ray's involvement in the murder of Reinhard and Ernest Mabins" (*id.* at 30), of which Ray had been convicted after jury trial in February 1999 and on which convictions the State relied as an aggravating factor in the penalty phase of Ray's trial for the Harville murder.[10]  A brief description of each type of evidence, and how petitioner claims it would have aided his defense, follows.

During the Rule 32 evidentiary hearing, petitioner's present counsel questioned trial counsel William Whatley at length as to whether the State did or did not provide the defense with certain purportedly exculpatory materials.  Whatley testified that he had never seen notes of four witness interviews conducted by the Dallas County Sheriff's Department.  One such set of notes concerned an interview with Allen Nettles on November 21, 1995, in which Nettles related that a person named Kelvin Williams had told him that Tie Dye (*i.e.*, Rod Suttle) admitted to killing Harville because she "smoked his dope and refused to have sex."  (Vol. 25, R-52 at 349-50.)  Another set of interview notes related to an interview with Curtis Muse on January 10, 1996, reflecting that Muse told law enforcement officers that Tie Dye had referred to Harville as "a bitch, whores, things like that," that he "was acting strange" in conversations with Muse about Harville's death, and that Tie Dye seemed nervous after Harville's body was discovered.  (*Id.* at 350-52.)  The third set of notes that Whatley reported not having seen related to an interview of Michael Muse dated November 30, 1995, in which the interviewee related the following: "Tie Dye told me what happened to Tiffany.  …  He said he smoked the blunt with that bitch, and she wouldn't give up that ass. … So [he] stabbed her in the head."  (*Id.* at 353.)  According to petitioner, the notes from the Michael Muse interview continued by insinuating that Tie Dye had pointed out to Muse the location of Harville's body before law enforcement discovered it.  (*Id.* at

---

[10]        This is so, despite the fact that before trial, all appearances were that the State was being fully cooperative and making all of its files available to the defense.  For example, at a pretrial hearing on August 31, 1998, the State expressly agreed to make available Suttle's case file, and acknowledged that, "I think they have a right to look at everything."  (Vol. 2, R-6 at 45.)  Likewise, on July 19, 1999, just one week before trial, Attorney Whatley acknowledged in a pretrial hearing that "[t]he DA's had an open file policy, and we have been able to get whatever information they have."  (Vol. 2, R-8 at 62.)  Petitioner's present *Brady* claim stands in stark contrast to these remarks.

353-54.)[11]  The fourth set of notes concerned an interview with Kelvin Williams dated November 21, 1995, in which Williams related that Tie Dye had admitted to murdering Harville because she smoked his dope and did not want to have sex.  (*Id.* at 354-55.)[12]  With respect to all of these statements, Whatley's testimony was emphatic, "I know I never saw those."  (*Id.* at 364.)[13]  In his habeas petition, Ray insists that these witness statements would have enabled him to show the jury at trial (through cross-examination of Lt. Freine and/or subpoenaing those witnesses) that someone else had committed the Harville murder.

Also included amidst the witness statements that petitioner says were suppressed is a search warrant affidavit signed by Lt. Freine on August 19, 1995, in which he indicated that a witness named Dolly Jackson had reported that her boyfriend, Willie James Smiley, had come to her house at around 4:00 a.m. "around the time Tiffany Harville became missing;" asked her the

---

[11]  The notes tell a different story on this point.  What they reflect is that Michael Muse told law enforcement officers that "[a]bout a month and a half **after** Tiffany's body had been found, I was with TI-DI in the Sardis area.  He carried me to an area and pointed toward a cotton field and told me that Tiffany[] … was found on the side of the road."  (Vol. 19, R-47 at 2365 (emphasis added).)  The discrepancy mitigates any exculpatory value this statement might otherwise have had.

[12]  The Michael Muse and Kelvin Williams statements further indicated that Tie Dye had bragged and made jokes about killing Harville (usually when he was high and/or intoxicated), and that he commented that Harville had pleaded "help me – somebody please help me" before he killed her.  (*Id.* at 353-55.)

[13]  The Amended § 2254 Petition also identifies a fifth set of notes concerning an interview with a witness named Charles Evans.  (Doc. 32-1, at 33.)  Petitioner's counsel never asked Whatley about the Evans statement during the Rule 32 hearing, so there is absolutely no evidence that this statement was not disclosed to the defense before trial.  Even if it had not been disclosed, Evans' statement is of negligible exculpatory value because its says only that Evans was a former cellmate of Kelvin Williams, and that Williams had told Evans that his (Williams') understanding was that Tie-Dye and someone named Labarry had murdered Harville.  (Vol. 19, R-47 at 2367.)  Such hearsay stacked atop speculation stacked atop idle jailhouse chitchat could not meaningfully have assisted defense counsel at trial or satisfy the "materiality" threshold of *Brady*.  *See generally Bradley v. Nagle*, 212 F.3d 559, 567 (11th Cir. 2000) (no *Brady* violation where statements implicating other suspects were mere "hearsay leads" that would not have been admissible, petitioner offers only "speculation" that he would have uncovered admissible evidence from those leads, and even if the jury had "heard evidence of the existence of these tenuous and ultimately fruitless police suspicions," it was not reasonably probable that they would have reached a different conclusion).

next morning "how he could get blood out of his car;" and complained "that nigger got blood in my car," which was a burgundy Delta 88 Oldsmobile.  (Vol. 20, R-47 at 2427.)  Whatley testified during Rule 32 proceedings that he had never seen this document before.  (Vol. 25, R-52 at 358-59.)

The next category of evidence is a letter from Brett Howard, an investigator at the Dallas County Sheriff's Office ("DCSO"), to the New York State Police dated August 23, 1995.  In that letter, Howard recited the basic facts of Harville's disappearance, the discovery of her remains and the condition of same.  Howard also wrote, "At this point we believe the murder occurred somewhere else and the body was transported to this area.  Our investigation has revealed that the victim may have got into a vehicle with a New York license plate the day she disappeared." (Vol. 20, R-47 at 2431.)[14]  The latter does not recite any factual or evidentiary foundation for law enforcement's theory that Harville's body might have been transported to the cotton field postmortem.  At the Rule 32 hearing, Whatley testified that he did not think he had seen that document before.  (Vol. 25, R-52 at 358.)[15]  In his habeas petition, Ray theorizes that this evidence would have been useful at trial because it "casts doubt on the reliability of the custodial statements given by Ray and Owden, both of which stated Harville had been killed precisely where her remains had been found."  (Doc. 32-1, at 29.)

The third category of suppressed evidence relates to Ray's guilt or innocence in the Mabins case.  Again, just five months before the Harville trial, Ray had been convicted in Dallas County Circuit Court of murdering the Mabins boys.  The State introduced evidence of that conviction as an aggravating factor in the penalty phase of Ray's trial in the Harville matter.  During the Rule 32 hearing, petitioner's current counsel asked attorney Whatley if he had seen certain records showing that the Mabins' brothers' mother had purchased $10,000 insurance

---

[14]     An accompanying exhibit shows that on August 31, 1995, the New York State Police reported that a 1985 brown Oldsmobile Regency Ninety-eight had been examined, that stains had been observed on the left side of the driver's front seat and the driver's front shoulder harness, and that a screening test for the presence of blood was positive on those items.  (Vol. 20, R-47 at 2432.)

[15]     Whatley also testified that this evidence flew in the face of all other information he had during his representation of Ray, to-wit:  "Everything else that I had ever even heard about was that it all took place at that location other than wherever they met her and she rode with them from the location out to that point."  (*Id.* at 360.)

policies on their lives just two months before they were murdered; that their mother submitted claims for benefits on those policies after her sons' deaths; and that the DCSO at one point viewed the Mabins' father (who lived in Nevada) as a suspect.  Whatley testified that he had not, but equivocated that "[t]here exists the possibility in all honesty" that he might have seen some of those items and that, as to certain of them, "I can't say that I wouldn't have this."  (Vol. 25, R-52 at 364.)  He also stated that he did not "recall or have any recollection as to seeing" other documents related to the Mabins issues of insurance or alternative suspects.  (*Id.* at 366, 429.)  In his Amended § 2254 Petition, Ray theorizes that if he had been provided these documents before the Harville trial, such evidence "would have blunted the impact of the State's use of Ray's conviction in the Mabins case (then on appeal) as an aggravating factor."  (Doc. 32-1, at 34.)

>    **B.**    **Treatment of Ray's Brady *Claim by Rule 32 Court.***

Everyone agrees that Ray did not raise his *Brady* claim at trial or on direct appeal.   He did, however, pursue a *Brady* claim in his Amended Rule 32 Petition.  (Vol. 9, R-45 at 394-97.)  As presented in the Rule 32 pleadings, this claim contained few specifics.  Ray alleged that the State had "failed to provide a wealth of exculpatory evidence" to him, and described such materials in the following terms:  (i) "documents relating to suspects who had been investigated by law enforcement;" (ii) "information related to his jailhouse confession and information that led the State to include Ray as a suspect;" (iii) "information related to Kelvin Williams, Kevin Hogan, and Frederick Irby[,] individuals who Ray had told police were trying to induce him to make false statements to police;" and (iv) "all the relevant forensic and scientific testing reports."  (*Id.* at 395.)  No other specific information or types of information were cited in the petition concerning either the nature of the exculpatory evidence or whether/when/how petitioner had become aware of it.[16]

The Rule 32 trial court rejected Ray's *Brady* claim as procedurally barred under Alabama law.  In that regard, the trial court observed that "Ray failed to allege in his amended Rule 32

---

[16]    Petitioner's rejoinder to this fact is that he lacked further details about the contours of the *Brady* materials until the State provided discovery during the Rule 32 proceedings themselves.  According to petitioner, then, he did not identify the exculpatory materials on which his *Brady* claim relied in his Amended Rule 32 Petition because he did not yet know what those materials were.  Petitioner does not explain why he did not seek to amend his Rule 32 petition a second time when he did learn of the specifics of the alleged *Brady* materials.

petition that these alleged *Brady* violations are based on newly discovered evidence.  Therefore, this Court finds these allegations are procedurally barred because they could have been but were not raised at trial and because they could have been but were not raised on appeal."  (Vol. 30, R-65, at 96-97, ¶ 196.)  The trial court's order is clear that in the absence of any allegation of newly discovered evidence in the Rule 32 petition, Ray's *Brady* claim was barred from collateral review pursuant to Rules 32.2(a)(3) and (a)(5) of the Alabama Rules of Criminal Procedure. (*Id.*)[17]  Alternatively, the trial court made a factual finding based on testimony presented in the Rule 32 hearing and review of the trial transcript that it was "obvious to this Court that Whatley received the statements from Nettles and Muse and he simply forgot it or he received the information in the statements from the prosecutor or another source," such that "no *Brady* violation occurred" and "Ray's *Brady* claim is without merit."  (*Id.* at 98, ¶ 199.)[18]

On appeal, the Alabama Court of Criminal Appeals affirmed the Rule 32 trial court's procedural bar determination, reasoning that it was "consistent with Alabama law."  *Ray II*, 80 So.3d at 973.  According to the appellate court, "[t]he circuit court correctly held that this claim was barred in Ray's postconviction proceeding because Ray failed to plead and prove that the claim was based on newly discovered evidence."  *Id.* at 974.[19]  The appeals court also affirmed the trial court's alternative disposition of this claim on the merits, on the grounds that the trial record confirms "that counsel had knowledge of statements made by Muse and Williams that

---

[17]     The Alabama Rules of Criminal Procedure provide that, on collateral review, "[a] petitioner will not be given relief under this rule based on any ground: … Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or … Which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b)."  Rule 32.2(a)(3), (5), Ala.R.Crim.P.

[18]     In so finding, Judge Jones placed particular weight on a portion of the trial transcript in which Ray's trial counsel cross-examined Lt. Freine about the statements of Nettles and Muse.  (*Id.* at 97-98.)  The trial court also was persuaded by Lt. Freine's testimony in the Rule 32 hearing that he had been present when Whatley and the prosecutor had reviewed his file and that Whatley could have as long as the prosecutor agreed to review such file.  (*Id.*)

[19]     In this regard, the Alabama Court of Criminal Appeals noted that "[n]ot only did Ray fail to plead in his postconviction petition that his *Brady* claim was based on newly discovered evidence, but when the State alleged that this claim was barred based on the above grounds Ray asserted that he was not required to show that this claim met the requirements of newly discovered evidence."  *Id.*

-16-

implicated Suttle in Harville's murder," such that "this claim was also due to be denied on its merits." *Id.* at 975. As for the portions of Ray's *Brady* claim relating to the New York letter and information suggesting that someone else was responsible for the Mabins murders of which Ray had been convicted, the appellate court rejected them because Ray's Amended Rule 32 Petition did not raise "specific claims" that "the State failed to furnish other exculpatory evidence," such that those specific claims could not be raised for the first time on appeal of the denial of his Rule 32 petition. *Id.*

     **C.**    *Ray's* **Brady** *Claims Are Procedurally Barred.*

        *1.*    *Petitioner's Failure to Plead and Prove "Newly Discovered Evidence."*

As noted, the Alabama Court of Criminal Appeals rejected Ray's *Brady* claim in its entirety "because Ray failed to plead and prove that the claim was based on newly discovered evidence." *Ray II*, 80 So.3d at 974. The notion that, as a matter of Alabama law and procedure, a petitioner must both plead in his Rule 32 petition and prove to the satisfaction of the court that the *Brady* claim was based on newly discovered evidence – so as to excuse the petitioner's failure to present such claim at trial or on direct appeal – is not novel and was not fashioned from thin air by Alabama courts to frustrate Ray's claim. In fact, a long line of Alabama appellate authorities recognize, adopt and apply this rule to Rule 32 petitioners' *Brady* claims. *See, e.g., Yeomans v. State*, --- So.3d ----, 2013 WL 1284361, *26-27 (Ala.Crim.App. Mar. 29, 2013) (under Alabama law, a Rule 32 petitioner bringing a *Brady* claim for the first time "must still plead facts indicating that his claim could not have been raised at trial or on direct appeal to avoid being procedurally barred under Rule 32.2(a)(3) and 32.[2](a)(5)," such that petitioner must plead "that the State's alleged concealment … was not known, and could not reasonably have been discovered, at trial or in time to raise the issue in a motion for new trial or on appeal") (citations omitted).[20] Where, as here, a Rule 32 petitioner fails to make the requisite pleading

---

[20]    *See also Washington v. State*, 95 So.3d 26, 57 (Ala.Crim.App. Apr. 27, 2012) ("The circuit court did not abuse its discretion in finding that Washington's *Brady* claim was procedurally barred because he failed to plead that this claim was based on newly discovered evidence."); *Jackson v. State*, --- So.3d ----, 2009 WL 3805808, *38 (Ala.Crim.App. Nov. 13, 2009) ("This Court has repeatedly held that in order to assert a *Brady* claim in a postconviction petition the petitioner must plead and prove the requirements for newly discovered evidence."); *Davis v. State*, 44 So.3d 1118, 1144 (Ala.Crim.App. 2009) (in Rule 32 proceedings where petitioner raised *Brady* claim, "Davis failed to plead and to prove the requirements for newly (Continued)

and proof showing, Alabama courts routinely refuse to consider the *Brady* claim on the merits pursuant to Rules 32.2(a)(3) and 32.2(a)(5) of the Alabama Rules of Criminal Procedure.

In light of these authorities, the Alabama courts' rejection of Ray's *Brady* claims for this state-law, procedural reason appears to be an independent and adequate state law ground that bars the § 2254 federal habeas review that petitioner now seeks.[21] This conclusion is bolstered by the Eleventh Circuit's decision last year in *Boyd v. Commissioner, Alabama Dep't of Corrections*, 697 F.3d 1320 (11th Cir. 2012). In *Boyd*, the Alabama Court of Criminal Appeals held, like it did in Ray's Rule 32 proceedings, "that the *Brady* claims were procedurally barred because Boyd could have, but did not raise these claims at trial or on direct appeal," in derogation of Rules 32.2(a)(3) and 32.2(a)(5). *Boyd*, 697 F.3d at 1329. In his § 2254 petition, Boyd again raised the *Brady* claim, but the Eleventh Circuit found it to be procedurally barred, observing, "We have squarely held that claims barred under Rule 32.2(a)(3) and (a)(5) are procedurally defaulted from federal habeas review." *Id.* at 1335 (citations omitted).[22] Because the state courts found petitioner's *Brady* claims to be procedurally barred on an adequate and

---

discovered evidence. Thus, this claim was barred in this Rule 32 proceeding."); *Madison v. State*, 999 So.2d 561, 570 (Ala.Crim.App. 2006) ("Because Madison proffers no fact in his Rule 32 petition showing the *Brady* claim … is based on newly discovered evidence, the Court finds it is procedurally barred from postconviction review" under Rules 32.2(a)(3) and (a)(5)).

[21]    *See, e.g., Borden v. Allen*, 646 F.3d 785, 808 (11th Cir. 2011) ("A state court's rejection of a petitioner's [federal] constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim."); *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("[u]nder the doctrine of procedural default, a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment").

[22]    Federal district courts in Alabama have hewed to the same approach. *See Williams v. Alabama*, 2012 WL 1339905, *110 (N.D. Ala. Apr. 12, 2012) (where Alabama courts in Rule 32 proceedings rejected *Brady* claim because petitioner did not assert that it was based on newly discovered evidence, finding that "[t]his ruling by the Rule 32 court was based on independent and adequate state grounds, namely Rule 32.2(a)(3) and (a)(5)"); *Anderson v. Patterson*, 2011 WL 7999791, *7 (S.D. Ala. May 5, 2011) ("under Alabama law, when (as here) a *Brady* claim is first presented in a Rule 32 petition, the petitioner may only obtain relief under Rule 32 if the claim involves newly discovered evidence").

independent state ground, Ray cannot pursue those claims in his § 2254 Petition and this Court cannot address their merits.[23]

Notwithstanding the foregoing, Ray asserts that this adequate and independent state ground should be struck down because it conflicts with *Brady* and other Supreme Court precedent. In that regard, petitioner maintains that the Supreme Court has cautioned against testing *Brady* claims by the same standard for state-law claims based on newly discovered evidence, and argues that the Alabama Court of Criminal Appeals wrongfully referenced and relied on the Rule 32.1(e) standard for newly discovered evidence as establishing the threshold a petitioner must meet. (*See* doc. 32-1, at 35-37; doc. 31, at 32-33, 39-45.) Ray's focus on Rule 32.1(e) and the particulars of the "newly discovered evidence" standard is misplaced. As the State correctly points out, a fair reading of the Alabama Court of Criminal Appeals' decision in the Rule 32 proceedings is that Ray's *Brady* claims were barred "because they could have been but were not raised at trial and because they could have been but were not raised on appeal." *Ray II*, 80 So.3d at 973. This is the language of Rule 32.2(a)(3) and (a)(5), not the language of Rule 32.1(e). Although the appellate court's discussion also recited the Rule 32.1(e) standard for "newly discovered evidence," its ruling reflects that newly discovered evidence matters precisely because it would excuse Ray's failure to raise the claim at trial (as required by Rule 32.2(a)(3)) and his failure to raise the claim on direct appeal (as required by Rule 32.2(a)(5)).[24] This is

---

[23]    In his merits brief on his federal habeas petition, Ray argues that the "independent and adequate state ground" doctrine has no application here because the Alabama Court of Criminal Appeals made an alternative ruling that did consider the merits of the claim. This is not an accurate statement of law. *See Ferguson v. Secretary for Dep't of Corrections*, 580 F.3d 1183, 1212 (11th Cir. 2009) ("though the court discussed the merits of Ferguson's *Corbett* claim, we can still apply the state procedural bar since it couched its discussion of the procedural bar in the alternative"); *Thompson v. Secretary for Dep't of Corrections*, 517 F.3d 1279, 1282 n.5 (11th Cir. 2008) ("That the court alternatively rejected Petitioner's claims on the merits does not disturb the procedural bar."); *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim."). Under any reasonable reading of the Alabama appellate court's decision, the merits discussion of Ray's *Brady* claims was framed in the alternative to the state procedural bar.

[24]    The Alabama Court of Criminal Appeals expressly quoted, approved and affirmed the following passage from the Rule 32 trial court: "Ray failed to allege in his amended Rule 32 petition that these alleged *Brady* violations are based on newly discovered evidence. Therefore, (Continued)

-19-

entirely consistent with Alabama law.  *See, e.g., Yeomans*, 2013 WL 1284361, at *26 ("although McWhorter does not have to prove that his *Brady* claim is based on 'newly discovered material facts' as defined under Rule 32.1(e)(1)-(5), he must still plead facts indicating that his claim could not have been raised at trial or on direct appeal to avoid being procedurally barred under Rule 32.2(a)(3) and 32.[2](a)(5)").  Again, the key point is that Ray failed to plead and prove that he satisfied Rule 32.2(a)(3) and 32.2(a)(5), not that he failed to plead and prove that he satisfied Rule 32.1(e).

State courts are plainly allowed to create and enforce their own procedural rules governing the timing of constitutional claims and objections.[25]  Alabama courts have consistently applied Rules 32.2(a)(3) and 32.2(a)(5) to bar *Brady* claims where the Rule 32 petitioner has not pleaded and proved that he could not have raised those claims at trial or on direct appeal.  Here, the state courts applied those rules in just this fashion to find that Ray had not met his pleading or proof burden to show why he did not raise those claims sooner.  As discussed by the Eleventh Circuit in *Boyd*, this is an adequate and independent state ground that bars consideration of petitioner's *Brady* claims on the merits in these § 2254 proceedings.[26]

---

this Court finds these allegations are procedurally barred ***because they could have been but were not raised at trial and because they could have been but were not raised on appeal***."  *Ray II*, 80 So.3d at 973 (emphasis added).

[25]    "Neither can there be any doubt that state courts are free to fashion and enforce their own procedural rules to require that defendants make contemporaneous objections to preserve constitutional claims."  *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1247 (11th Cir. 2013).  "The appropriateness in general of looking to local rules for the law governing the *timeliness* of a constitutional claim is, of course, clear."  *Id.* (citation omitted).

[26]    In an attempt to establish cause and prejudice for this procedural default, Ray maintains that he "could not have asserted his *Brady* claims [sooner than he did] because his counsel did not know that the State was suppressing evidence until long after Ray's trial."  (Doc. 31, at 49.)  This argument is unpersuasive.  Even accepting petitioner's version of the facts, his trial counsel knew no later than the trial that law enforcement had multiple statements implicating Suttle in Harville's murder.  Lt. Freine testified on direct examination at trial that he had "received various statements from numerous individuals concerning his possible involvement in her death."  (Vol. 4, R-13 at 475.)  On cross-examination at trial, Lt. Freine testified at length about "statements from other individuals" (including Michael Muse, Kelvin Williams, and Curtis Muse) that Suttle was the killer, and recounting details from those statements.  (*Id.* at 578-79, 588-89.)  Even if (as Ray contends) his lawyers had not been (Continued)

## 2.    *Failure to Raise Specific Claim in Rule 32 Petition.*

With regard to Ray's *Brady* claims concerning the New York police letter and evidence about the Mabins investigation, the Alabama Court of Criminal Appeals found that they were barred under another state-law procedural rule.  In particular, that court reasoned that "these specific claims were not raised in Ray's amended petition," and that under Alabama law "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition."  *Ray II*, 80 So.3d at 975 (citations omitted).  This is clearly an independent and adequate state procedural ground.  In Alabama, a Rule 32 petitioner who does not raise a specific claim in his petition cannot present it on appeal.  *See, e.g., Kelley v. State*, 985 So.2d 972, 976 (Ala. Crim. App. 2007) (reciting rule).

Ray manifestly did not satisfy this requirement because his Amended Rule 32 Petition made no mention of these aspects of his *Brady* claim, such that they were addressed for the first time on collateral appeal.  By all appearances, the Rule 32 trial court was not even aware that Ray was asserting *Brady* claims based on the New York letter and Mabins investigative materials.  Nothing in the Amended Rule 32 Petition would have given the trial court notice of those claims.[27]  And the Rule 32 trial court's opinion addressed only the statements concerning

———————————————

furnished those statements, they were on notice as of no later than Lt. Freine's trial testimony that the statements existed.  They could (and should) have made a *Brady* objection during trial and on direct appeal.  In short, petitioner's contention that he could not have raised his *Brady* claim at trial or on direct appeal because he was unaware of the suppressed statements, thereby establishing cause for his procedural default, is demonstrably incorrect and unavailing.

[27]    Again, the <u>only</u> categories of evidence referenced in Ray's *Brady* claim as pleaded in his Amended Rule 32 Petition are the following: (i) "documents relating to suspects who had been investigated by law enforcement;" (ii) "information related to his jailhouse confession and information that led the State to include Ray as a suspect;" (iii) "information relating to Kelvin Williams, Kevin Hogan, and Fredrick Irby;" (iv) "individuals who Ray had told police were trying to induce him to make false statements to police;" and (v) "all the relevant forensic and scientific testing reports."  (Vol. 9, R-45 at 395.)  Nothing about those enumerated categories would reasonably put the trial court on notice that Ray sought to litigate *Brady* claims relating to police theories about where the crime was committed, or relating to other suspects in an entirely different criminal case in which Ray had been convicted.  Petitioner does not suggest that he ever attempted to amend his Rule 32 petition to include references in the *Brady* claim to the New York Police letter or the Mabins suspects, nor does he identify any principle of law or Alabama procedure that would have precluded him from doing so once he became aware of this allegedly suppressed evidence.

Suttle, without even referencing the other *Brady* claims.  (Vol. 30, R-65 at 96-98.)  As petitioner never apparently notified the trial court of these particular *Brady* claims (but instead expected the Court to connect the dots based on testimony from the Rule 32 evidentiary hearing that Ray was asserting *Brady* claims relating to categories of evidence to which his Amended Rule 32 Petition never alluded), the Alabama Court of Criminal Appeals properly applied the independent and adequate state procedural rule to deem those claims barred on collateral appellate review.

Federal habeas courts do not review questions "decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("[u]nder the doctrine of procedural default, a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment").  Such is the case here.  Ray sought to inject new *Brady* claims into his collateral appeal that he never presented to the Rule 32 trial court.  The Alabama Court of Criminal Appeals rebuffed that effort pursuant to an adequate and independent state law procedural rule.  That petitioner may have a beef with the Alabama rule or the state's application of same does not give rise to a proper basis for federal habeas review, particularly where (as here) petitioner has shown neither cause and prejudice for, nor manifest injustice arising from, the procedural bar.

### D.     Alternatively, Ray's **Brady** *Claims Fail on the Merits.*

As discussed *supra*, petitioner's claims for relief under *Brady* are procedurally barred, and he has not shown cause and prejudice or a fundamental miscarriage of justice to overcome that default.  Even if Ray had done so (which he has not), habeas relief would remain inappropriate because each component of his *Brady* argument fails on the merits.

### 1.     Legal Standard for a **Brady** *Analysis.*

"To establish a *Brady* violation, a defendant must show three elements: (1) that the evidence at issue is favorable to the accused; (2) that the State suppressed the evidence, either willfully or inadvertently; and (3) that the evidence is material to the guilt or punishment of the defendant such that the defendant suffered prejudice as a result."  *Blanco v. Secretary, Florida Dep't of Corrections*, 688 F.3d 1211, 1238 (11th Cir. 2012); *see also Boyd*, 697 F.3d at 1334 ("A *Brady* violation has three components: [1] The evidence at issue must be favorable to the

accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.") (citation and internal quotation marks omitted).  "The prejudice or materiality requirement is satisfied if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Allen v. Secretary, Florida Dep't of Corrections*, 611 F.3d 740, 746 (11th Cir. 2010) (citations and internal quotation marks omitted); *see also Boyd*, 697 F.3d at 1334-35 ("Materiality is determined by asking whether the government's evidentiary suppression undermines confidence in the guilty verdict.").[28]  And, of course, "[e]vidence is not considered to have been suppressed if the evidence itself … proves that the petitioner was aware of the existence of that evidence before trial."  *Boyd*, 697 F.3d at 1334 (citation and internal marks omitted).

### 2.      *Purportedly Suppressed Witness Statements.*

During Rule 32 proceedings, Alabama state courts made a finding of fact that, with respect to the undisclosed witness statements implicating Rod "Tie Dye" Suttle in Harville's murder, Ray's trial counsel actually did receive those materials "and he simply forgot it or he received the information in the statements from the prosecutor or another source."  Under the deferential AEDPA standard of review, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e); *see also Reese v. Secretary, Florida Dep't of Corrections*, 675 F.3d 1277, 1287 (11th Cir. 2012) ("In a habeas proceeding, our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review.") (citation and internal marks omitted).

---

[28]      Where, as here, a petitioner alleges that multiple items of evidence were improperly suppressed, a court evaluating materiality must consider both the individual and the cumulative effects of the undisclosed evidence.  *See Hammond v. Hall*, 586 F.3d 1289, 1313 (11th Cir. 2009) (explaining that materiality analysis works by sizing up each piece of evidence before aggregating it and considering cumulative impact, then weighing "cumulative impact against the inculpatory evidence presented at trial to decide whether our confidence in the guilty verdict is undermined") (citations omitted).  The Supreme Court has clarified that, notwithstanding this principle of cumulative impact, first "[w]e evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality separately …."  *Kyles v. Whitley*, 514 U.S. 419, 437 n.10, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

In his § 2254 petition and accompanying merits brief, Ray rails at this finding of fact. Petitioner insists that "[t]here is no evidence that Ray's attorneys knew the contents of the withheld witness statements" and theorizes that attorney Whatley's cross-examination of Lt. Freine concerning these statements was simply a game of follow-the-leader in which Lt. Freine provided brand-new information to the defense during trial and Whatley played along, adapting on the fly by asking follow-up questions about documents of whose existence he had heretofore been unaware. (Doc. 32-1, at 25.) Petitioner flatly states, "There is no evidence to support the conclusion that Whatley had received or was aware of these witness statements." (*Id.* at 26.)

Petitioner is wrong. Under any reasonable reading of the trial transcript, much less one taken through the lens of AEDPA's presumption of correctness, the state court's finding of fact was well grounded in the evidence. Far from simply cross-examining Lt. Freine in general, vague terms about witness statements implicating Suttle, Whatley asked very pointed, direct, focused, detailed questions that (by all appearances) relied heavily on facts Whatley had learned via the subject statements. A partial recitation of those questions is as follows: (i) "Who were the individuals that told you that Rod Suttle had raped and killed Tiffany Harville?"; (ii) "Were there other individuals [aside from Michael Muse and Kelvin Williams] that overheard him making incriminating statements that you took to be about Tiffany Harville?"; (iii) "And you had at least two individuals that made a sworn statement to you that Rod Suttle had stabbed Tiffany Harville?"; (iv) "There were witnesses as I understand it that told you that Rod Suttle had a lock blade knife that he used possibly with this case?"; (v) "Well, which one of them [Michael Muse or Curtis Muse] was the one that said they heard Tie Dye mimicking the voice of Tiffany as she was murdered saying oh, please don't do this, please? Who said that?"; (vi) "Was he [Michael Muse] the only person that said that, or was there more than –" (witness interrupted to acknowledge that Kelvin Williams had also said that). (Vol. 5, R-13 at 579, 586-87, 589.)

The series of questions about the lock blade knife provides a particularly illuminating example. In cross-examining Lt. Freine at trial, attorney Whatley asked a series of precise leading questions about the knife's description (*i.e.*, "Gold in color?"; "With a hole in the end?"; "A stain that was allegedly blood?"), marshaling facts that had not been elicited on direct examination. Obviously, Whatley had prepared his cross-examination of Lt. Freine with full knowledge that a witness or witnesses had told law enforcement officials about the knife in these specific terms. Where is that description of the knife found? In the November 21, 1995

-24-

statements from Kelvin Williams and Allen Nettles that form a crucial component of Ray's *Brady* claim. The Nettles statement includes text that "Nettles has also seen TI-DI with a brown handle lock blade knife. … The knife had redish [*sic*] brown stains on the handle and blade." (Vol. 19, R-47 at 2354.) The Williams statement reflects that Williams told law enforcement officers that "I have seen TI-DI with a lock blade knife. … I seen a redish [*sic*], brown stain at the base of the blade. … Gold and brown handle." (Vol. 19, R-47 at 2372.) Similar conclusions can be drawn from Whatley's questions about Tie Dye mimicking Harville's pleas for help as he killed her. Petitioner does not explain where and how Whatley would have obtained this information if not from the subject witness statements.[29]

The Rule 32 trial court observed Whatley's demeanor and evaluated his credibility when he testified that he had never seen the Nettles, Muse and Williams statements before trial.[30] The Rule 32 trial court discounted that testimony in the face of a trial transcript that evinced compelling evidence to the contrary. That finding is entitled to a presumption of correctness,

---

[29]     The analysis is similar with respect to the search warrant affidavit relating to the Willie James Smiley lead and the accompanying statement from Dolly Jackson. At trial, Ray's attorneys effectively elicited testimony from Detective Jon Martin of the Selma Police Department, setting forth virtually the entire contents of the Dolly Jackson statement that Ray now complains was wrongfully suppressed. (Vol. 4, R-13 at 408.) In particular, the testimony about Smiley that the jury heard from Detective Martin included the following: "His girlfriend had … advised that around the date that Tiffany Harville come up missing, he had come up home real late one morning complaining of somebody getting blood all in his car. … He was questioning her how to clean up blood, how do you get it out of the car, that kind of thing." (*Id.*) Notably, Detective Martin also testified that Forensic Science had examined Smiley's vehicle and found no evidence, leaving law enforcement officers with no basis for pursuing Smiley as a suspect. (*Id.*) Even if this information had not previously been disclosed to Ray, there can be no prejudice from that omission because his attorneys successfully presented to the jury testimony covering almost the entirety of that statement. How could there be a reasonable probability that the results of the proceeding would have been different had the State disclosed the search warrant affidavit, when defense counsel successfully got into the record at trial all information from that affidavit that was in any way exculpatory or helpful to Ray or to the defense theory that someone else had murdered Harville? Petitioner does not answer this question.

[30]     Judge Jones also observed signs of equivocation, such as an exchange during the evidentiary hearing in which the State asked Whatley whether it was "possible you just don't remember seeing those particular documents" that Ray's counsel had gone over with him during the hearing. Whatley's response was, "That is always possible." (Vol. 25, R-47 at 372.) Such uncertainty is to be expected; after all, the Rule 32 hearing took place in September 2006, more than seven years after Ray's July 1999 trial in the Harville case.

and petitioner has not come close to satisfying his burden of proof by clear and convincing evidence to overcome that presumption.  The trial court's factual determination that Ray's counsel had the information in the subject statements before trial is not clearly erroneous and will not be disturbed on federal habeas review under AEDPA.  That finding compels the legal conclusion that no *Brady* violation occurred with respect to these statements.  *See, e.g., Blanco*, 688 F.3d at 1244 ("because his attorneys were made fully aware of the information at issue and had access to it before the alleged violation occurred, Blanco's *Brady* claim is meritless"); *Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009) ("[T]here is no suppression if the defendant knew of the information or had equal access to obtaining it.").[31]  The state courts' disposition of Ray's *Brady* claim concerning purportedly undisclosed witness statements was neither contrary to, nor an unreasonable application of, clearly established federal law.

### 3.    *Purportedly Suppressed Letter to New York Police.*

As for petitioner's *Brady* claim relating to the DCSO letter to New York State Police dated August 23, 1995, even if the merits of that claim must be reached, the claim would still fail.[32]  Recall that a habeas petitioner bringing a *Brady* claim must establish prejudice by showing a reasonable probability that the result of his trial would have been different had the evidence been disclosed.  *See Allen*, 611 F.3d at 746.  The subject letter does not reach, much less surpass, that threshold.  To be sure, the letter reflects that in the early stages of their

---

[31]    Even if, by some remote possibility, defense counsel had not been furnished with all of the statements implicating Suttle, any omission in this regard would not give rise to a viable federal constitutional claim for Ray because any missing statements were merely cumulative of evidence that petitioner already had and used at trial.  *See, e.g., Hammond*, 586 F.3d at 1321 (finding *Brady* materiality threshold not satisfied as to witness about whom negative evidence was suppressed, where "[e]veryone knew Weldon was bad" and "[t]he additional details that would have been provided by the undisclosed evidence … would have been raindrops in the waterfall of evil surrounding Weldon"); *Pardo v. Secretary, Florida Dep't of Corrections*, 587 F.3d 1093, 1106 (11th Cir. 2009) ("The non-disclosure of cumulative or repetitious evidence is not sufficient to establish a *Brady* claim.").

[32]    The state courts did not address this claim on the merits.  Therefore, assuming adjudication on the merits is even appropriate for this claim (which the Court has already found not to be the case, given the procedural bar via adequate and independent state ground), AEDPA review would be *de novo*.  *See Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) ("When, however, a claim is properly presented to the state court, but the state court does not adjudicate it on the merits, we review *de novo*.") (citation omitted).

investigation, law enforcement agents hypothesized that Harville might have been abducted and killed somewhere else, with her body dumped near the cotton field later.  But the letter does not show that police investigators had any particular evidence or reason to support that theory, much less hard facts to give it credence.  Nor did petitioner develop any such facts in the Rule 32 hearing that lent even the faintest support to the hypothesis that Harville was murdered at a location other than that where her remains were found.  To suggest, as petitioner now does, that defense counsel could have challenged the reliability of the confessions of Owden and Ray by reference to an unadorned police conjecture at the inception of the investigation is far too slender a reed to demonstrate materiality or prejudice.[33]  In short, any suppression of this letter by the State does not undermine confidence in the verdict.[34]

### 4.     Purportedly Suppressed Evidence Concerning Mabins Murders.

The third and final category of evidence that Ray contends was suppressed in violation of *Brady* tenets is evidence that the Mabins brothers' mother had purchased life insurance policies on them two months before they were murdered; that the mother made a claim for benefits on those policies after they were murdered; and that homicide investigators at some point suspected

---

[33]     Detective Jon Martin testified at trial that, shortly after Harville's body was found, "[w]e had leads going in all different directions."  (Vol. 4, R-13 at 405.)  Lt. Freine testified at trial that the police investigation involved "various and sundry leads or pieces of evidence or information that came [their] way."  (*Id.* at 474.)  The jury heard about various of these leads and theories, and nonetheless convicted Ray of Harville's murder.  Petitioner's argument that the police speculation in August 1995 (evidently untethered to any known facts) that Harville's body might have been dumped at the location where it was found would somehow have persuaded the jury that Ray was not the killer is strained well past the breaking point of logic and reason.

[34]     The part of the letter stating that the DCSO's investigation "revealed that the victim may have got into a vehicle with a New York license plate the day she disappeared" was not *Brady* material because it was cumulative or repetitive of information defense counsel already had.  This conclusion is supported by defense counsel's cross-examination of Detective Martin at trial, wherein counsel asked him about evidence that Harville had been seen with four men from New York on the day she disappeared (Vol. 4, R-13 at 405-06) and whether evidence was taken from their vehicle by New York authorities (*id.* at 407).  Defense counsel also cross-examined Lt. Freine at trial about Harville's propensity to get in cars with men in the alley on the night in question.  (Vol. 5, R-13 at 591-92.)  This record demonstrates that defense counsel was aware of evidence from the investigation that Harville may have gotten into a car with strangers from out of town on the evening in question, such that suppression of that cumulative portion of the August 1995 letter would not have violated *Brady*, in any event.

the boys' father.  This evidence was exculpatory, Ray reasons, because he could have used it to mitigate the State's use of his murder convictions in the Mabins case as an aggravating circumstance.

If this aspect of the *Brady* claim were properly considered on the merits (which the Court has already found not to be the case because of the procedural bar and independent/adequate state law ground), habeas relief would remain unavailable to Ray.  Once again, petitioner has failed to satisfy the materiality requirement of *Brady*.  Petitioner has made no showing that this evidence concerning the Mabins murders would have been admissible in the penalty phase of his trial in the Harville case.  To be sure, Alabama law provides that an aggravating factor in a capital murder case is that "[t]he defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person."  Ala. Code § 13A-5-49(2).  The State invoked that aggravating circumstance during the penalty phase of the Harville trial by introducing evidence that Ray had, indeed, been previously convicted of capital offenses in the Mabins case.  There is no indication that, under Alabama law, Ray was entitled to transform the penalty phase of the Harville trial into a re-trial of the Mabins case.  Obviously, as a general proposition, it is improper for a defendant to collaterally attack one conviction in another case.  Petitioner has identified no authority supporting his position that this "exculpatory" evidence related to the Mabins convictions would have been admissible under Alabama law during the penalty phase of the Harville trial.[35]  Absent some showing – which petitioner has not made –

_____

[35]      What's more, Ray's trial counsel (who had represented him in the Mabins trial too) showed no inclination during the penalty phase of the Harville trial to challenge Ray's guilt or raise any defenses to the Mabins offenses.  There is thus no reason to believe that, as a matter of trial strategy, defense counsel would have used this evidence in the Harville penalty phase even if they had had it.  As a thought experiment, imagine what would have happened if defense counsel had tried to create doubt at the penalty phase that Ray had murdered the Mabins.  In all likelihood, that line of argument would have opened the door for the State to trot out the full weight of its evidence that Ray had, in fact, killed the Mabins.  The jury would have heard more confessions; seen more gruesome crime-scene photographs; and learned grisly details about the Mabins slaying and the evidence linking Ray to those murders.  In that scenario, the most likely impact of defense counsel introducing evidence about the insurance policies and the police's early suspicions about the Mabins' father would be to harm (not help) Ray's interests in the penalty phase of this trial, because it would have allowed the State to demonize him with extensive, highly damaging evidence and details of the Mabins' killings.  Indeed, such a trial strategy by defense counsel might have been deficient to the point of constitutional ineffectiveness.  Under the circumstances, defendant is probably fortunate that his lawyers did (Continued)

that he could properly have used this information in the manner he now says he would have used it, its alleged suppression does not satisfy the materiality test of *Brady* and does not erode confidence in the jury's verdict.[36]

## IV.   Ineffective Assistance Claims Relating to Mitigation.

The centerpiece of Ray's Amended § 2254 Petition is that he received ineffective assistance of counsel at the penalty phase of his trial.  Indeed, Ray devotes more than 50 pages of his habeas petition and nearly half of the accompanying merits brief to presenting and arguing this one claim.  (Doc. 32-1, at 39-92; doc. 31, at 2-31.)  The Court will examine this claim in detail, just as the Alabama courts did in Ray's state post-conviction proceedings.

### A.   Defense Counsel's Mitigation Investigation and Penalty-Phase Case.

In a penalty-phase ineffective assistance claim such as Ray's, the appropriate analytical starting point is to examine what defense counsel actually did to investigate and present a mitigation case.  *See Chandler v. United States*, 218 F.3d 1305, 1320 (11th Cir. 2000) ("Although Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact."); *see also Williams v. Allen*, 598 F.3d 778, 793 (11th Cir. 2010) ("We must first examine what counsel did in fact.").  This is because, fundamentally, a habeas court's role is not to decide whether defense counsel could have done something more; rather, the reviewing court's "proper inquiry is limited to whether the course of action followed by defense counsel might have been a reasonable one."  *Williams*, 598 F.3d at 793 (citations and internal brackets omitted); *see also Rhode v. Hall*, 582 F.3d 1273, 1284 (11th Cir. 2009) ("[I]t is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented.") (citation omitted).

---

not open the door to such an avalanche of damning evidence by challenging his guilt for the Mabins murders during the Harville penalty phase.

[36]      As discussed *supra*, the Supreme Court has held that *Brady* materiality must be considered on an item-by-item basis, as well as cumulatively.  After considering the cumulative impact of the evidence that Ray says was unlawfully suppressed, and weighing it against the inculpatory evidence presented at trial, the Court finds that its confidence in the guilty verdict and death sentence is not undermined.  Thus, the *Brady* materiality/prejudice requirement is not satisfied even under a cumulative impacts analysis.

As previously discussed, attorney William Whatley was appointed to represent Ray in October 1998, after a conflict / communication breakdown between Ray and his previously appointed defense team prompted those attorneys to seek and obtain leave to withdraw from the representation.  In March 1999, Judge Jones appointed attorney Juliana Taylor to serve as Whatley's co-counsel.  Whatley and Taylor had the unusual distinction of representing Ray in two capital murder trials, including the Mabins double-homicide trial in February 1999 and the Harville murder trial in July 1999.  Whatley (who was lead counsel) was an attorney with 15 years of experience at the time of these trials.  (Vol. 25, R-52 at 340.)  He had spent 11 years working in the Alabama Attorney General's Office, including substantial work on capital cases both at trial and at the post-conviction stage.  (Id.)[37]  During his representation of Ray, Whatley maintained a general practice with a concentration in criminal defense work.  (Id. at 342.)  He had been appointed to represent a "handful" of other capital defendants prior to his representation of Ray.  (Id. at 377.)  He had also attended annual death penalty seminars sponsored by the Alabama Criminal Defense Association, through which he obtained extensive materials and information that assisted him in defending capital cases.  (Id. at 379-80.)[38]

Because Whatley and Taylor did not commence their representation of Ray at the outset of the criminal proceedings, they were not painting on a blank canvas.  Ray's previous counsel had represented him in the Harville matter for more than a year, and they furnished new counsel with their investigative materials.[39]  Under the circumstances, Whatley did not request additional

---

[37]     In that capacity, Whatley testified, he spent two years handling state-court collateral attacks (then called "coram nobis reviews") in death penalty cases.  (Id. at 376-77.)  He also worked in the general trial section, where he prosecuted one capital murder case through trial.  (Id. at 378.)

[38]     Whatley's "extensive experience is important because our strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel."  Rhode, 582 F.3d at 1282 (citation and internal marks omitted); see also Chandler, 218 F.3d at 1316 & n.18 ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger" for the simple reason that "[e]xperience is due some respect").

[39]     To the extent that petitioner accuses his initial attorneys of withdrawing from the case for reasons such as their inability to strongarm him into pleading guilty, such accusations are misleading.  A clear-eyed reading of the record demonstrates that attorneys Keith and Jones moved to terminate their attorney-client relationship with Ray after they learned that he had been (Continued)

funds to retain an investigator because "the former counsel had gotten approval and had hired an investigator to help gather information.  And I had been informed by his former attorneys that this investigator had found all there was to find, and that this was it and that it was in the material that they had provided to me."  (Vol. 25, R-52 at 381.)  Nor did Whatley request funds for a mitigation expert because, at that time, "it was not the standard of practice in this section of the state to retain and utilize mitigation experts to assist counsel in capital murder cases."  (*Id.* at 394.)[40]

Whatley elected not to request an independent mental evaluation of Ray because "[t]here was no evidence that I was aware of at the time that that would be a fruitful avenue to pursue."  (*Id.* at 382.)  This determination was rooted in his review of the forensic report prepared by Kathy Ronan (Staff Psychologist at the Taylor Hardin Secure Medical Facility) and in his conversations with Ray and Ray's mother, all of which led to a determination "that there was nothing there that would be helpful for us to use either in the guilt phase or the penalty phase."  (*Id.* at 382.)[41]  Whatley's conclusion, based on this information, was that he "didn't have

---

lying to them for a year about crucial facts on which their defense and investigation strategies were predicated.  (Vol. 2, R-7 at 52-53 ("[W]e cannot continue to work with the Defendant in this case because quite frankly we don't believe what he is saying after telling us a certain version of the events for twelve months and then changing that less than three weeks before trial and insisting that is the truth and doesn't understand why we don't believe him and insists that we go to trial on that. … [B]ased on our client's statement to us that he has been lying to us for the last twelve months … he is in essence wanting us to assert a claim or a contention that we feel has no merit.").)

[40]     Whatley went even further, as he testified that during the time when he worked in capital cases for the Alabama Attorney General's Office, "I do not recall a trial counsel, someone in my position in Domineque's case that retained an expert in the field of mitigation to present this type of evidence."  (*Id.* at 398.)

[41]     Dr. Ronan's report documenting her competency evaluation of Ray in January 1998 found that "[t]here was no evidence of any type of major psychiatric disorder noted during the current evaluation, although Mr. Ray did appear to try to embellish some symptoms."  (Vol. 14, R-47 at 1346.)  She also opined that "[c]ognitively, there were no areas of significant deficit noted, although a few areas of below normal functioning were indicated.  … There was no indication of retardation."  (*Id.* at 1346-47.)  Dr. Ronan's diagnostic impression was that Ray "appears to be suffering from situational depression related to his legal case," with "some evidence of mild Malingering during the current evaluation."  (*Id.* at 1347.)  During his own conversations and interactions with Ray, Whatley observed the following:  "He was intelligent, (Continued)

anything that anyone showed [him], told [him] about or presented to [him] that led [him] to believe that [he] had a rational basis to come and ask the Court to allow [him] to retain an expert to present this information, the psychological information." (*Id.* at 383-84.)  Whatley testified that the prevailing practice in capital murder cases in Dallas County at the time was that use of a mental-health expert during the penalty phase "was not a common thing" where the defense lacked information to use as a basis for requesting funds for a mental health expert.  (*Id.* at 384.)  In Whatley's mind, there was no "rational basis" to request funding for a psychologist here, "relying heavily on what the family members had told us as well as the forensic report" prepared by Dr. Ronan.  (*Id.*)  As Whatley put it, "other than the situational depression that would come with these pending charges against him, I had no indication from him or from any other source that he was suicidal or had any overriding mental illness or anything that would rise to the level to be helpful to us."  (*Id.* at 411.)

    In investigating Ray's mitigation case, defense counsel were provided a list of names of potential witnesses from Ray and/or his mother.  (*Id.* at 385.)  Defense counsel attempted to contact all of these individuals; however, many of those efforts "were not successful."  (*Id.*)  Whatley recalled knocking on doors and having witnesses refuse to answer, or worse, being told by witnesses, "I'm not coming [to court].  And if I come, you don't want to hear what I have got to say" about Ray.  (*Id.*)  Overall, defense counsel reported that Ray and his mother were not particularly cooperative in the mitigation investigation.  In certain areas, they provided no information at all, even after Whatley and Taylor impressed upon them the importance of doing so.[42]  In other respects, Ray and his mother erected affirmative roadblocks to defense counsel's

---

coherent.  He was able to communicate fully with my conversations with him.  We had exchanges back and forth.  We talked about the case.  We talked about his life.  We talked about his family.  I had no indication from him or from his family that there was anything more … [to suggest mental illness or psychological issues] than what I feared to be malingering."  (*Id.* at 413.)

    [42]    As Whatley testified in the Rule 32 hearing, "We told them what we needed.  We told them it was important.  We told them we needed to have this information in order to help Domineque in mitigation as well as in his case.  That information was not forthcoming until it was too late."  (*Id.* at 440.)  Taylor echoed Whatley's testimony, indicating that they had stressed to Ray and his mother "how important this was" and "the consequences of what could happen," and explained their objective of "looking for anybody to help put a human face on Domineque, (Continued)

-32-

ability to investigate and prepare a mitigation case.  For example, Whatley knew that Ray had a brother, but understood that the brother "had not been available or been anywhere where we knew anything about his brother," and such information "was not forthcoming" from Ray or his mother.  (*Id.* at 383.)  Defense counsel was "told [Ray's brother] was not available and not around and not in the picture and had not been a part of Domineque's life for some time."  (*Id.* at 418, 450.)  With respect to Ray's brother, Ray and his mother told trial counsel that "they had had no contact for years and didn't know where he was."  (*Id.* at 451.)  Moreover, Ray "instructed" defense counsel in "unequivocal" terms not to communicate with the mother of his child, and defense counsel honored that directive.  (*Id.* at 409-10.)  Overall, in the realm of mitigation, "there was not a lot of information" that Ray's trial counsel received from Ray.  (*Id.* at 383.)[43]

Notwithstanding the general unhelpfulness of Ray and his mother, petitioner's trial counsel did conduct a mitigation investigation.  They reviewed all the information they had, whether provided by Ray and his mother, furnished by predecessor defense counsel, or disclosed by the State (such as the Dr. Ronan report).  They contacted or attempted to contact every witness identified by Ray or his mother.  (*Id.* at 447 ("If I was given their names, I attempted to

---

you know, not to see him as somebody that they could recommend the death penalty for."  (*Id.* at 447.)  Petitioner and his mother were not diligent in lending assistance to these investigative activities, despite the pleas of counsel for their help.

[43]      Whatley complained about the uncooperativeness of Ray and his mother in the mitigation investigation.  As he put it, Whatley and Taylor "both had conversations with Domineque and with Gladys [Ray's mother].  And that was what we relied on.  That was what we went forward with, and there came a point in time when all of a sudden there was more information than we had gotten, you know, six months before.  Unfortunately the jury had already said he was guilty and in fact recommended that he be sentenced to death.  If we had had that information six months ahead of time, it would have made a difference in what we did."  (*Id.* at 438.)  When petitioner's present counsel asked whether it was fair to state that Whatley and Taylor began and ended their investigation with information provided by Ray and his mother, Whatley disagreed, testifying, "I don't think that's a fair statement."  (*Id.* at 441.)  Defendant's trial counsel had and used information from various sources, and did not confine their investigation solely to what Ray and his mother told them.

contact them.").)[44]  Whenever they spoke with a witness, they asked that person for additional contacts.  (*Id.* at 446 ("Everybody that I talked to I asked them for additional people.  So if I talked to somebody, I would say, do you know of anyone else who can help us?").)  Unfortunately, defense counsel found that many of the contacts "were fairly negative.  A lot of people did not want to help.  A lot of people told me they did not have anything positive to say." (*Id.* at 448.)  Those witnesses who did have positive, helpful things to say about Ray that might humanize him were called to testify at the judicial sentencing hearing.  (*Id.*)  With respect to "air[ing] the family's dirty laundry in court," the defense team elected to call defendant's mother, Gladys Ray, for that purpose, both at the penalty phase and during the sentencing hearing.  (*Id.*)

During the penalty phase of the trial, defense counsel elicited testimony from Gladys Ray that Ray was 23 years old, that Ray's childhood had been difficult, that she had raised him as a divorced mother (with the divorce occurring when Ray was 8 or 9 years old because Ray's father was having an extramarital affair), that Ray's father had "disowned him," that Gladys Ray had "tried to do the best [she] can with him," that Ray was a "born again Christian" who "tried to be nice to people" and was "easy going" and "did believe in holding a job."  (Vol. 5, R-24 at 741.)  Gladys Ray also recounted to the jury the history of violence in the home when Ray was a boy, as Ray had witnessed his father beating his mother and had also witnessed domestic violence against his mother at the hands of other men.  (*Id.* at 742.)  And she admitted to the jury that she "wasn't a good mother" to Ray and that she had "turned [her] back on [Ray] when he tried to come to [her] for help and love," instead telling her son that she "didn't want to be bothered" because of her own problems.  (*Id.*)[45]  The jury heard from Gladys Ray that Ray's father had

---

[44]     During the Rule 32 hearing, petitioner's present counsel suggested that Whatley and Taylor were ill-equipped to speak with witnesses because they were "white attorneys from Montgomery who are coming into primarily black neighborhoods" to meet with witnesses, and further suggested that they should have had a trained investigator to assist them.  (*Id.* at 443.) Whatley emphatically disagreed, describing his years of supervising investigators, his detailed knowledge of the investigator's job function, and so on.  As to the absence of an investigator, Whatley testified, "I don't think that made a difference at all."  (*Id.*)

[45]     Gladys Ray's testimony on this point belies petitioner's characterization of the evidence as having "shockingly misled the jury" about Ray's formative years, such that "the jury and court judged a defendant they believed had turned to violent crime despite the love and guidance of a mother, who though single and poor, did her best to guide and control her son." (Continued)

-34-

stated "that he hated the day Dominique was born," and that Ray had heard him say so.  (*Id.* at 742-43.)  Gladys Ray explained that his father's rejection had been "hard for [Ray] to accept," and that Ray had "tried to show love" to his father, only to be pushed away.  (*Id.* at 743.)  At the end of her emotional testimony, Gladys Ray told the jury that Ray "really is a nice person," that he "would do for anybody," and that he "has a girl two years old who he loves."  (*Id.* at 744.)[46]

From this presentation during the penalty phase, Whatley argued to the jury to recommend that Ray's life be spared because he was only 19 years old at the time of the offense, there was a "violent and/or chaotic lifestyle in his home as he grew up," and notions of proportionality favored treating Ray and Owden the same (and Owden had been sentenced to life imprisonment for his role in the Harville slaying).  (Vol. 5, R-26 at 752-54.)

The jury returned a death recommendation by a vote of 11-1, after which Judge Jones set the matter for a sentencing hearing on September 27, 1999.  Sometime between the trial and the sentencing hearing, Ray and his mother supplied defense counsel with a list of names of potentially helpful witnesses, as defense counsel had requested months earlier.  Counsel's investigation of those names is reflected in the fact that the defense called eight witnesses at the sentencing hearing.  (Vol. 5, R-30 at 785-800.)  These witnesses, and a brief sketch of their testimony, were as follows: (i) Sister Norma Bourdon, who had interacted with Ray when he went to the St. Edmunds Learning Center to work on his GED, testified that a life sentence was appropriate because she did not believe in the death penalty, even though Ray's acts were "despicable in every sense of the word;" (ii) April Lewis, who had been a friend of Ray's for more than four years, testified that she had never seen Ray be violent, that she thought he was a

---

(Doc. 32-1, at 39.)  A fair reading of Gladys Ray's penalty-phase testimony exposes glaring inaccuracies in petitioner's argument.

[46]    Defense counsel did not elicit testimony or present evidence during the penalty phase that Ray was a victim of sexual abuse as a child because counsel "had no clue" that such was the case.  (Vol. 25, R-52 at 406.)  Likewise, defense counsel presented no evidence of steroid or other substance abuse.  In that regard, defense counsel "considered the possibility of it being relevant to the mental state at the time of the offense;" however, his discussions with Ray convinced Whatley that "[i]t was not an issue" and that he had no basis for pursuing a substance abuse or steroid theory in mitigation aside from a couple of stray lines in Dr. Ronan's report.  (*Id.* at 411.)  Thus, Whatley's determination was that steroids and controlled substance use "did not appear to be an issue" and "didn't appear to be an overriding concern."  (*Id.* at 416.)

"nice person," and that she thought life without parole was the appropriate sentence; (iii) Patricia Lewis, who used to be Ray's neighbor and "helped raise him," declined to offer any testimony as to appropriate sentence; (iv) Sharon Berry, who was Ray's cousin, testified that she felt Ray "shouldn't get the death penalty" because "he has a child" for whom "[h]e needs to be around;" (v) Monica Kelly, who was a neighbor and friend of Ray's for 18 years, testified that Ray was a "good person," that he never hurt anyone, that he was dependable, that he was not violent, and that his sentence should be life without parole; (vi) Veronica Kelly, who characterized Ray as "one of [her] best friends" for many years, testified that Ray was well-rounded, loyal, understanding, caring, and "always there," that he did not have a violent side, and that life without parole was an appropriate sentence; (vii) Karlinski Jones, who had been Ray's "best friend" for seven years, testified that Ray was loyal, truthful, and "always there," and that life without parole was the appropriate sentence because he was opposed to the death penalty; and (viii) Gladys Ray testified again that she had "turned [her] back" on Ray when he came to her for help, that she wished "the parents would blame [her] for not being a mother for him," and that she loves Ray.  (Id.)[47]

In total, this evidence was moderately supportive of the notion that Ray was a person of good character and that his family and friends did not want him to receive the death penalty for Harville's murder.  Judge Jones did not find this mitigation evidence persuasive, however.  At the close of the hearing, after affording Ray an opportunity to allocute (in which Ray denied having anything to do with Harville's demise), Judge Jones imposed the sentence of death, stating his reasons on the record.  (Vol. 5, R-31 at 805.)

**B.    *Facts that Petitioner Claims Should Have Been Investigated and Presented.***

In his Amended § 2254 Petition, Ray recites an array of mitigating circumstances that he claims trial counsel should have discovered, investigated and presented during the penalty phase. First, with regard to Ray's background, petitioner argues that counsel should have obtained records from the Alabama Department of Human Resources, from the Selma school system, and

---

[47]    Petitioner's ineffective assistance claim does not allege that trial counsel could or should have elicited any more, different or better testimony from these witnesses than they did. In other words, petitioner does not suggest that any of these witnesses (whose testimony was of marginal value, other than Gladys Ray) possessed helpful information that might have made a difference at sentencing, if only defense counsel had asked the right questions.

from the State of Illinois. According to petitioner, those records document Gladys Ray's tenuous personal, educational, intellectual, and financial position; the Illinois Department of Children and Family Services' determination in 1980 that Ray was a neglected minor; and Ray's school performance of low academic achievement but no disciplinary problems. (Doc. 32-1, at 49-50.) In the same vein, petitioner sharply criticizes counsel for not contacting Ray's brother, Europe Ray, to testify about the challenging and difficult environment in which the two brothers grew up, in which their mother was abused by men, their father beat them, the brothers moved to a number of different states, their mother's home was unsanitary, and their mother attempted suicide. (*Id.* at 52-55.) Petitioner contends that Europe Ray's observations about changes in Ray's personality at the ages of 15 or 16 (*i.e.*, becoming more aggressive, worrying about his physique, being distant, showing off his muscles) could have supported a steroid-abuse defense. (*Id.* at 56.) Petitioner also faults trial counsel for not speaking with other relatives (including Regina Marshall and Verna Mullins) who could have corroborated certain of these details. (*Id.* at 56-59.)

Second, petitioner ascribes constitutional deficiency to trial counsel's failure to retain a variety of experts to offer opinions as to Ray's background and mental health, in light of his successful post-conviction efforts to locate experts who diagnose him with various clinical conditions.[48] For starters, Ray faults counsel for not hiring a clinical social worker such as Janet Vogelsang, MSW, who concluded based on interviews and review of records that Ray "suffered

---

[48]     A counterweight to petitioner's mental health evidence offered at the Rule 32 hearing is the State's presentation of mental health evidence that was in many respects inconsistent with the defense's evidence. Specifically, Glen David King, Ph.D., a clinical and forensic psychologist and attorney, testified for the State during the Rule 32 hearing that Ray reads and spells at a high-school level, that Ray "does not meet [the] requirements for a diagnosis of mental retardation," that Ray's "adaptive functioning would place him probably in the average range of ability," and that Ray "was not suffering from any serious mental illness or mental defect at the time of the offense and does not now." (Vol. 25, R-52 at 459-80.) In sharp contrast to petitioner's current counsel's efforts to portray Ray as "guarded" or "defensive," Dr. King reported (much as Whatley did) that Ray was "pleasant, cooperative. I couldn't have asked for a better interviewee." (*Id.* at 491.) Also, Dr. King testified that he did not perform neuropsychological testing on Ray because he "had no history of any kind of head trauma, head injury, neurological disease process, never even been hospitalized … except for a left leg injury at age 14. … I saw no evidence whatsoever anywhere that he has ever had any seizures or even been treated for seizures." (*Id.* at 498.)

emotional neglect by rejection, isolation, terrorizing, ignoring and corruption," and that Ray's upbringing "put him at high risk for serious criminal behavior." (*Id.* at 59-61.) Similarly, petitioner identifies psychologist Catherine Boyer, Ph.D., who diagnosed Ray with "schizotypal personality disorder, a condition characterized by social isolation, odd thinking and behavior, and unconventional beliefs." (*Id.* at 62-65.) Dr. Boyer disputed Dr. Ronan's conclusions because Dr. Ronan did not perform psychological testing or interview persons other than Ray himself. Petitioner also maintains that counsel should have retained someone like Dr. Charles Golden, a professor and neuropsychologist, who testified about "evidence of anomalous brain development that causes Ray to suffer severe problems with interpersonal relationships and self control," particularly in stressful situations. (*Id.* at 66-68.) Dr. Golden also tested Ray's IQ at 83, which lies at the upper boundary of the borderline range. (*Id.* at 68-70.)[49]

Third, petitioner maintains that his attorneys at trial were constitutionally ineffective for not pursuing a steroid defense. (Doc. 32-1, at 90-93.) In petitioner's view, his lawyers should have hired someone like Harrison Pope, M.D., a Massachusetts psychiatrist who opined (based on his review of the documents and his interviews of Ray's brother and cousin, not Ray himself)

---

[49]    Embedded in the discussion of IQ evidence in Ray's Amended § 2254 Petition is a contention that Ray's IQ, age and schizotypal personality disorder combined to "place[] him within the category of persons recognized by *Roper* and *Atkins* who cannot be held fully accountable for their criminal acts, and for whom the imposition of the death penalty is cruel and unusual and a violation of the Eighth Amendment." (Doc. 32-1, at 70.) Petitioner has not brought a separate Eighth Amendment claim under *Roper* or *Atkins*. Nor did Ray ever present such a claim to the state appellate courts in the Rule 32 proceedings. To the extent, then, that Ray is endeavoring surreptitiously to litigate a *Roper / Atkins* type claim in these § 2254 proceedings, he is barred from doing so under the exhaustion doctrine, and has failed to show cause and prejudice or manifest injustice to excuse the default. Even if such a claim were not procedurally barred, it would fail on the merits for the reasons stated by the Rule 32 trial court. (Vol. 30, R-65 at 1196-99.) Certainly, no clearly established federal law as determined by the Supreme Court was in conflict with Judge Jones' resolution of this Eighth Amendment issue. *See generally Powell v. Allen*, 602 F.3d 1263, 1272 (11th Cir. 2010) ("In Alabama, to establish mental retardation a defendant must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, … the IQ and deficits in adaptive behavior [must] exist not only prior to the age of eighteen but also both at the time of the crime and currently.") (citations omitted). And a *Roper* issue would have been frivolous, had trial counsel raised it, given the undisputed evidence that Ray was 19 at the time of Tiffany Harville's murder. *See Roper v. Simmons*, 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed.").

that "it is very likely that if Domineque Ray committed the murder of Tiffany Harville, he was under the influence of anabolic steroids at the time." (Vol. 13, R-47 at 1033.)[50]  At the close of the Rule 32 hearing, Judge Jones refused to allow Dr. Pope to testify, based on the paucity of record evidence "that would justify his testimony" or "that Mr. Ray was addicted to steroids." (Vol. 26, R-52 at 549.)  Judge Jones reasoned that none of the lay witnesses had testified to knowledge of Ray's steroid use, and that petitioner was resting this defense on two stray lines in Dr. Ronan's report, which was not enough to satisfy the threshold for allowing Dr. Pope's testimony.  (*Id.* at 550-51.)[51]

### C.    Legal Standard for Ineffective Assistance of Counsel Claims.

Ray's ineffective assistance of counsel claims will be evaluated through the familiar standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  *See Connor v. Secretary, Florida Dep't of Corrections*, --- F.3d ----, 2013 WL 1222792, *14 (11th Cir. Mar. 27, 2013) ("The merits of [a habeas petitioner]'s penalty phase ineffective assistance of counsel claim are 'squarely governed' by the Supreme Court's holding in *Strickland* ….").  To establish an ineffective assistance claim under the Sixth Amendment, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."  *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *see also Darden v. United States*, 708 F.3d 1225, 1228 (11th Cir. 2013) ("To determine whether counsel's performance at trial fell below the level of effectiveness [guaranteed by] the Sixth Amendment usually requires courts to apply the familiar two-part test established in *Strickland v. Washington*.").  "Unless a defendant makes both showings, it cannot

---

[50]    The limitations of these interviews are readily apparent.  Ray's brother testified that he moved to Indiana in 1994 (vol. 23, R-52 at 101); therefore, he could have had no information as to whether Ray was or was not using steroids in Selma, Alabama in July 1995. Likewise, the events that Dr. Pope describes as having been related to him by Ray's cousin are devoid of a temporal element.  (Vol. 13, R-47 at 1034-35.)  No evidence that Dr. Pope identifies would link Ray's use of anabolic steroids to even the general timeframe of Harville's murder.

[51]    The Alabama Court of Criminal Appeals endorsed Judge Jones' treatment of this issue by observing that "little credible evidence suggests that Ray was using steroids at the time of the murder. … We fail to see the relevancy of an expert's opinion on the effects of steroid abuse when there was little credible evidence to suggest that Ray was abusing steroids."  *Ray II*, 80 So.3d at 996-97.

be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Haliburton v. Secretary for Dep't of Corrections*, 342 F.3d 1233, 1243 (11th Cir. 2003).

"First, the defendant must show that his lawyer's performance was deficient," by overcoming "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," which is accomplished by demonstrating "that it was objectively unreasonable." *Darden*, 708 F.3d at 1228 (citation and internal quotation marks omitted); *see also Williams*, 598 F.3d at 788 (under deficient performance prong, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness") (citation omitted). "This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Haliburton*, 342 F.3d at 1243. In conducting this inquiry, "*Strickland* specifically commands that a court must indulge [the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." *Morton v. Secretary, Florida Dep't of Corrections*, 684 F.3d 1157, 1168 (11th Cir. 2012) (citation omitted); *see also Evans*, 699 F.3d at 1270 ("Instead of trying to find errors, we begin with the premise that under the circumstances, the challenged actions might be considered sound trial strategy.") (citation and internal marks omitted). "The presumption runs against the defendant, the burden is on him, and speculation about the merits of counsel's trial strategy is not enough to carry that burden." *Evans*, 699 F.3d at 1270. In light of this "strong presumption" in favor of competence, a petitioner bears the heavy burden of showing "that no competent counsel would have taken the action that his counsel did take." *Williams*, 598 F.3d at 790 (citation and internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, --- U.S. ----, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (citation and internal quotation marks omitted). And such inquiry must include "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523 (citation and internal quotation marks omitted).

"Second, the defendant must show that the lawyer's deficiency caused prejudice to his defense – *i.e.*, there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Darden*, 708 F.3d at 1228 (citation and

internal quotation marks omitted); *see also Williams*, 598 F.3d at 789 (similar). "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Haliburton*, 342 F.3d at 1243. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S.Ct. at 792; *see also Evans*, 699 F.3d at 1270 (similar). Thus, where a petitioner alleges ineffective assistance in the penalty phase, he must show "a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Pooler v. Secretary, Florida Dep't of Corrections*, 702 F.3d 1252, 1270 (11th Cir. 2012) (citation omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010); *see also Harrington*, 131 S.Ct. at 788 (cautioning that "the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve"). However, a petitioner's task is even more daunting in the habeas context where the state courts have adjudicated the ineffective assistance claims on the merits in state collateral review, thereby triggering AEDPA's restrictions as set forth in § 2254(d). Thus, "where, as here, a claim implicates AEDPA and *Strickland*, our review is doubly deferential." *Boyd v. Commissioner, Alabama Dep't of Corrections*, 697 F.3d 1320, 1332 (11th Cir. 2012). "Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson*, 643 F.3d at 911; *see also Holsey*, 694 F.3d at 1258 (similar). A habeas court does not evaluate whether petitioner's trial counsel's actions were reasonable, but instead examines whether "there is any reasonable argument that [the attorney] satisfied *Strickland*'s deferential standard. … If any such reasonable argument exists, then [petitioner] cannot prevail." *Pooler*, 702 F.3d at 1270 (citations omitted). "[T]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Connor*, 2013 WL 1222792, at *14 (citation omitted); *see also Williams*, 598 F.3d at 789 (habeas petitioner "not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*") (citations and internal quotation marks omitted).

These burdens rest squarely on Ray's shoulders.  After all, "[t]o give trial counsel proper deference, this circuit presumes that trial counsel provided effective assistance. … And it is the petitioner's burden to persuade us otherwise."  *Harvey v. Warden, Union Correctional Institution*, 629 F.3d 1228, 1245 (11th Cir. 2011).

> ### D.    *Alabama State Courts' Rulings on Penalty-Phase Ineffectiveness Claim.*

Ray presented his penalty-phase ineffective assistance claim in his Rule 32 petition, and the Alabama courts considered and rejected it on the merits after detailed analysis.  *See Ray II*, 80 So.3d at 977-85.  In examining the deficient performance prong of *Strickland*, the Alabama appellate court observed that (i) trial counsel had successfully obtained a life sentence for Ray in the Mabins case using a substantially similar mitigation strategy to that employed in the Harville case, (ii) counsel had spoken numerous times with Ray and his mother in their mitigation investigation, (iii) counsel was well aware of the unfavorable results of Ray's pretrial mental health evaluation performed by Dr. Ronan (including her assessment that Ray was competent and that he was malingering), and (iv) counsel's own interactions with Ray provided no reason to believe that he suffered from mental illness, disorder or retardation.  *Id.* at 984-85.  As to deficient performance, the Alabama Court of Criminal Appeals succinctly concluded that "[t]his is not a situation where counsel conducted no investigation or where counsel, like counsel in *Wiggins*, was in possession of documents that alluded to the defendant's troubled and difficult childhood but counsel failed to conduct a more thorough investigation."  *Id.* at 985.

The Alabama Court of Criminal Appeals likewise found Ray's penalty-phase ineffective assistance claim unpersuasive when examined through the lens of *Strickland*'s prejudice prong. The mitigation evidence that Ray now insists his lawyer should have uncovered was, in the eyes of the Alabama courts, "far less compelling than the mitigation evidence omitted in *Wiggins*," was largely "cumulative to Ray's mother's testimony," and (as to mental health) "was disputed by the State's expert testimony."  *Id.*  The appellate court was also swayed by Judge Jones' determination in his Rule 32 written order "that if the evidence presented by Ray at his evidentiary hearing had been presented during the penalty phase of trial it would not have changed this Court's determination that the aggravating circumstances outweighed the mitigating circumstances."  *Id.* (citation omitted).  The Alabama appellate court's ultimate conclusion was as follows:  "We are confident … that the mitigating evidence presented at the postconviction

hearing – but omitted from the penalty phase of Ray's capital-murder trial – would have had no impact on the sentence in this case," *id.*, such that the *Strickland* prejudice prong is not satisfied.

Finally, with regard to whether trial counsel was ineffective for not pursuing a defense of steroid abuse, the Alabama Court of Criminal Appeals rejected that ground for postconviction relief on the merits.  In so doing, the court reasoned, "Absolutely no evidence was presented during the evidentiary hearing that Ray had been abusing steroids at the time of the murder, that the murder was a result of a steroid-induced episode, or that Ray's personality was altered at the time of the murder.  Clearly, counsel had no reason to believe that steroid use was an issue in this case.  Because there was no evidence of steroid abuse, expert testimony regarding this issue would not have been relevant."  *Ray II*, 80 So.3d at 997.

### E.     Merits of Ray's Penalty-Phase Ineffective Assistance Claim.

#### 1.     Background Investigation.

As noted, Ray's Amended § 2254 Petition asserts that his Sixth Amendment right to effective assistance of counsel was impaired when trial counsel failed to conduct a reasonable background investigation that would have facilitated the development of evidence of Ray's poor academic performance in school, his mother's personal shortcomings, his dysfunctional family circumstances, his chaotic upbringing, his physical and sexual abuse, and so on.[52]

With regard to this kind of background investigation concerning childhood abuse, the Eleventh Circuit has repeatedly emphasized that, in a *Strickland* reasonableness analysis, the petitioner's own statements and degree of cooperation and candor with trial counsel are of vital importance.  *See, e.g., Pooler*, 702 F.3d at 1269 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions, for attorneys – usually, and quite properly – base their actions on information supplied by the

---

[52]     To the extent that this claim relates to records, petitioner does not identify particularly helpful or insightful school or Job Corps records.  These documents are largely unremarkable in describing Ray as a below-average test taker who was nonetheless "a good student and very cooperative."  (Doc. 32-1, at 50.)  Many of the records that petitioner criticizes counsel for not obtaining are medical, legal, or other records relating to Ray's mother or brother, rather than records pertaining to Ray himself.  (*Id.* at 50-51.)  Petitioner thus apparently maintains that minimum constitutional standards required that his trial counsel work up a comprehensive background investigation of each of Ray's immediate family members, not just of Ray.  The Court is aware of no authority holding that the Sixth Amendment imposes such a duty on defense counsel in capital cases, as a matter of basic attorney competence.

defendant. … In particular, what investigation decisions are reasonable depends critically upon information the defendant furnishes to his counsel.") (citations and internal quotation marks omitted); *Newland*, 527 F.3d at 1202 ("In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant.").  Simply put, "[e]specially when it comes to childhood abuse, information supplied by a petitioner is extremely important in determining whether a lawyer's performance is constitutionally adequate. … This Court has already stated in no uncertain terms: 'An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.'"  *Callahan v. Campbell*, 427 F.3d 897, 934 (11th Cir. 2005) (citation omitted). Despite numerous interviews and discussions with trial counsel, neither Ray nor his mother ever mentioned to trial counsel the severity of the chaos, neglect, disruption and abuse to which Ray was exposed at a young age.[53]  That omission receives heavy weight in this Court's evaluation of the reasonableness of trial counsel's investigation into Ray's background.

What's more, the record affirmatively shows that Ray and his mother impeded counsel's ability to conduct a thorough, complete background investigation.  They were unresponsive or uncooperative when counsel emphasized the importance of locating witnesses who might be helpful in establishing a mitigation case.  Some of the witnesses' names they did provide were of people who either declined to participate or informed defense counsel that they had no helpful information to provide about Ray.  They discouraged trial counsel from contacting Ray's brother, Europe Ray, and did not provide counsel with any information as to Europe's whereabouts.[54]  *See Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000) ("When a

---

[53]       By way of example, Ray and his mother never informed counsel that petitioner had been subjected to sexual abuse as a boy.  (Ray's brother's testimony on this point was spotty, but that's a different issue.)  They never told counsel that Gladys Ray would abandon her sons for weeks or months at a time or that Gladys Ray and Ray's father were physically abusive toward Ray.

[54]       Petitioner suggests that it would have been a simple, easy matter for defense counsel to flip open an Indianapolis telephone directory and find Europe Ray's telephone number.  But there is no evidence that trial counsel had any idea where Europe Ray was.  Again, the Rule 32 hearing testimony was that Ray and his mother told Ray's lawyers that Ray's brother "was not available and not around and not in the picture," and that there had been "no contact for years" and they "didn't know where he was."  Such statements would discourage even the most (Continued)

defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.") (citation omitted).  And they forbade counsel from speaking to certain witnesses (*i.e.*, the mother of Ray's child).  These obstacles imposed by petitioner hampered trial counsel's mitigation investigation and are plainly relevant to the *Strickland* deficient performance analysis.[55]  Additionally, the Eleventh Circuit has rejected "a *per se* rule of ineffective assistance where counsel does not consult with family members," and has found mitigation investigation to be reasonable where counsel did not interview the defendant's father "because the defendant had not lived with him for very long."  *Holladay*, 209 F.3d at 1252 ("Counsel are not required to interview all family members, and it is reasonable that Mrs. Warren, after interviewing two helpful relatives, would limit her investigation in accordance with their advice.").

Notwithstanding the difficulties that trial counsel encountered in attempting to conduct a background investigation (*i.e.*, petitioner and his mother were not forthcoming, did not identify aspects of Ray's upbringing that might bolster a mitigation case, failed to provide witnesses when counsel requested names, identified witnesses who were hostile and/or unhelpful, minimized the role of Europe Ray in Ray's life and withheld information as to his whereabouts, and directed counsel not to contact at least one potentially important witness), trial counsel nonetheless did uncover evidence of Ray's traumatic and chaotic childhood, and presented such evidence to the jury in the penalty phase.  In particular, defense counsel put on testimony that Ray's childhood had been difficult, that his parents had divorced when he was a boy, that Ray had been exposed to domestic violence (via both his father and a boyfriend physically abusing his mother), that his father had disowned him and told Ray he "hated the day [Ray] was born,"

---

zealous advocate from trying to track down Europe Ray, even if they had any inkling of where to look in the first place.

[55]     *See, e.g., Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008) ("We have also emphasized the importance of a mentally competent client's instructions in our analysis of defense counsel's investigative performance under the Sixth Amendment."); *Morton*, 684 F.3d at 1172-73 ("When a defendant prevents his trial counsel from preventing mitigating evidence, he cannot argue on collateral review that he was prejudiced by the failure to present that evidence.").

and that his mother had not been a good mother but had turned her back on Ray when he needed her most because she was self-absorbed in her own problems.

Considering all of the facts and circumstances of this case, the Court finds that petitioner has not satisfied his burden under *Strickland* of showing that no competent counsel would have failed to investigate deeper into Ray's background in preparing a mitigation case. Trial counsel faced a situation in which, despite receiving little information or cooperation from defendant or his mother, they had nonetheless developed evidence that Ray's childhood had been traumatic and abusive. That trial counsel did not develop this evidence further (in spite of the obstacles to their investigation as documented above) was not a failing outside the wide range of reasonable professional assistance, as needed to establish deficient performance under *Strickland*.[56]

Before leaving the deficient performance prong of the analysis, the Court pauses to address petitioner's allegations concerning Ray's brother, Europe Ray. The Amended § 2254 Petition is particularly strident in its criticism of trial counsel for not contacting Europe Ray and calling him as a witness in the penalty phase to corroborate and elaborate on the turbulent, disruptive, unsanitary and physically abusive conditions of Ray's childhood. Leaving aside the logistical problem of trial counsel not knowing Europe Ray's whereabouts, much less how to contact him, it was not constitutionally deficient performance for trial counsel not to offer Europe Ray's testimony during the penalty phase. The reason is this: Europe Ray's life is a success story. In the Rule 32 hearing, Europe Ray testified that he lives in Indiana with his wife and two children, and is gainfully employed for Briarwood Health Care as an activity director certified by the State of Indiana. (Vol. 23, R-52 at 60.) Having held that certification since 1998, Europe Ray's work entails providing quality of life programs for older adults residing in the nursing home. (*Id.* at 61.) Europe Ray testified that his profession is "something that I enjoy

---

[56]     To the extent that petitioner also argues it was deficient performance for trial counsel not to retain a social worker such as Janet Vogelsang to compile, present, interpret and filter the results of the background investigation, the Court finds that this omission was within the wide range of reasonable professional assistance. It would have been entirely reasonable and appropriate for counsel to conclude based on the facts and evidence before them that (i) a licensed social worker was unnecessary to explain and interpret the implications of the straightforward evidence concerning Ray's difficult childhood, and (ii) the likelihood of receiving approval for funding for such an expert was so low that pursuing this avenue would not be a prudent use of scarce defense resources.

-46-

and love to do." (*Id.*)  He also testified that he moved to Indiana in 1994 (at age 19) because he was "tired of a lot of things that were going on in Selma" and "wanted a new start." (*Id.* at 101.)  The point is that Europe Ray's testimony reveals that he was able to overcome his traumatic upbringing and become a happy, well-adjusted, law-abiding citizen making positive contributions to his community on a daily basis.  Such testimony would likely have harmed Ray's mitigation case at least as much as it helped it, effectively sabotaging a neglect-and-abuse theory of mitigation by juxtaposing Europe Ray's positive life choices beginning at age 19 with petitioner's life choice of murdering Harville at age 19, after both were exposed to the same difficult and abusive childhood.[57]  Another damaging detail that this testimony would have exposed is that when Europe Ray reached out to petitioner for love and support, petitioner "rejected" him.  (*Id.* at 92.)[58]  Under the circumstances, the Court cannot say that any competent counsel would have called Europe Ray as a witness during the penalty phase of Ray's trial (even assuming that counsel could have found him).[59]

---

[57]     The Eleventh Circuit has repeatedly cautioned about the potential for testimony such as Europe Ray's to backfire during the penalty phase.  *See Kormondy v. Secretary, Florida Dep't of Corrections*, 688 F.3d 1244, 1283 (11th Cir. 2012) ("The evidence of [petitioner]'s impoverished upbringing, lack of parenting, and a father who abandoned him is also problematic.  [Petitioner]'s half-siblings … were brought up in the same environment of physical abuse, neglect and poverty, their fathers left their mother to fend for herself and her children, yet they emerged as law abiding citizens.  The mitigating evidence now pressed by Kormondy has its obvious limitations."); *Sochor*, 685 F.3d at 1032-33 (observing that "[w]hen additional mitigating evidence emphasizing physical abuse, neglect, and poverty has the potential to highlight that a petitioner's sibling grew up in the same environment and still emerged as a successfully employed, law-abiding citizen, that evidence can pose as much harm as good") (citation and internal quotation marks omitted).

[58]     Such testimony could have been highlighted by the State to undermine petitioner's theory that Ray was alone and isolated with no one to support him, and to show that petitioner cut off his older brother when the latter tried to be a positive force in his life.

[59]     Whether this rationale tracks defense counsel's actual thought process is of no consequence.  "[I]t matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight.  The relevant question is not what actually motivated counsel, but what reasonably could have motivated counsel."  *Allen v. Secretary, Florida Dep't of Corrections*, 611 F.3d 740, 759 n.10 (11th Cir. 2010) (citations omitted); *see also Chandler*, 218 F.3d at 1315 ("The reasonableness of counsel's performance is an objective inquiry," such that analysis turns on whether there are reasons "why counsel reasonably *could* have" taken the challenged action) (citation omitted).

Even if petitioner had made a sufficient showing to satisfy the *Strickland* deficient performance prong with respect to trial counsel's investigation into Ray's background, this ineffective assistance claim would nonetheless fail for want of proof of prejudice.  The Alabama Court of Criminal Appeals concluded that the *Strickland* prejudice prong was not satisfied.  That determination was not an unreasonable application of *Strickland*.  After all, much (albeit not all) of the childhood abuse/trauma evidence that Ray contends counsel should have presented was cumulative of the themes trial counsel actually did develop in the penalty phase.  *See, e.g., Connor*, 2013 WL 1222792, at *15 ("This Court has said that *Strickland* does not require penalty-phase counsel to present cumulative evidence in mitigation in order to render effective assistance."); *Rose v. McNeil*, 634 F.3d 1224, 1243 (11ᵗʰ Cir. 2011) ("Obviously, a petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial.").[60]  It was not unreasonable for the state courts to conclude that petitioner has not shown a reasonable probability that, had counsel investigated and presented the mitigation evidence concerning Ray's childhood that petitioner says should

---

[60]     Of course, "counsel is not required to present cumulative evidence or evidence incompatible with the defense strategy."  *Rhode*, 582 F.3d at 1287.  The Eleventh Circuit affirms "findings of no prejudice where, as here, (1) the new mitigation evidence did not establish any statutory mitigating factors, (2) the new mitigation did not reduce the weight of the statutory aggravating factors, and (3) the jury had heard some non-statutory mitigation of the same character the new mitigation presented, just in less detailed form."  *Boyd*, 697 F.3d at 1341.  To the extent petitioner argues that the background evidence he says counsel should have presented was not cumulative of the mitigation evidence the jury did hear, he is not correct.  The Eleventh Circuit recognizes that "evidence presented in postconviction proceedings is cumulative or largely cumulative to or duplicative of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury."  *Holsey*, 694 F.3d at 1260-61.  Witnesses like Europe Ray would, at most, have simply told a more detailed version of the same story that Gladys Ray told the jury, amplifying the existing themes.  Thus, the *Holsey* court found not unreasonable the state court's determination that evidence presented in state postconviction proceedings of petitioner's troubled and abusive childhood was largely cumulative of evidence presented during penalty phase, where "the basic story of his troubled abusive childhood was nonetheless known to the … jury when it sentenced him to death."  *Id.* at 1265-66 (citation and internal quotation marks omitted); *see also Cullen v. Pinholster*, --- U.S. ----, 131 S.Ct. 1388, 1409-10, 179 L.Ed.2d 557 (2011) (no *Strickland* violation where the "new" evidence "largely duplicated the mitigation evidence at trial," such as records that "basically substantiate the testimony of Pinholster's mother and brother," and sibling testimony that simply "support[s] his mother's testimony that his stepfather was abusive").  The same is true here.

have been presented, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant a death sentence.[61]

### 2. Failure to Develop Expert Evidence of Mental Illness, Defect or IQ.

Similar principles and reasoning defeat Ray's contention that trial counsel rendered ineffective assistance in failing to develop expert testimony that Ray had a personality disorder, that he might suffer from anomalous brain development, that his IQ was at the upper end of the "borderline" range, and so on.

Much of petitioner's argument on this claim (as set forth in both the Amended § 2254 Petition and the merits brief) invokes a sort of mechanistic approach to *Strickland*. Petitioner appears to be working from a "checklist" that he contends trial counsel was required to complete in performing a mitigation investigation. Thus, the apparent premise of petitioner's argument is that hiring a psychologist and neuropsychologist to evaluate Ray should have been an automatic, kneejerk reaction by trial counsel during the mitigation investigation. Black-letter law is otherwise. *See, e.g., Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (decrying such an analysis because "[a]bsolute rules would interfere with counsel's independence – which is also constitutionally protected – and would restrict the wide latitude counsel have in making tactical decisions") (citation omitted); *Chandler*, 218 F.3d at 1317 (opining that "[n]o absolute rules dictate what is reasonable performance for lawyers" and that "no absolute duty exists to investigate particular facts or a certain line of defense"). Now, many years after his conviction, Ray has developed evidence of mental health issues, and he lambastes his trial counsel for not having ferreted out that evidence back in 1999. But petitioner presents his arguments using the wrong analytical framework. What matters in the first instance is not whether these *post hoc*

---

[61] This is particularly true where Judge Jones, the same judge who initially imposed Ray's death sentence in the Harville case, opined in the Rule 32 proceedings that none of the evidence presented by petitioner at the postconviction hearing would have tilted the balance of aggravating and mitigating circumstances in favor of a life sentence. In this context, petitioner "must show more than that the evidence would have been helpful. He must show that the evidence would have been so helpful that every reasonable jurist, without exception, would have concluded that there is a reasonable probability that the sentence would have been different if the jury had heard all of the aggravating circumstances evidence and all of the mitigating circumstances evidence. He must show not only that the [Alabama Court of Criminal Appeals'] contrary conclusion is wrong but that it is so wrong that no fairminded jurist could reach that conclusion." *Holsey*, 694 F.3d at 1273. Ray has not made such a showing here.

mental health evaluations have ultimately borne fruit, through the benefit of hindsight and with the luxury of virtually unlimited postconviction resources; rather, what matters is whether it was reasonable for trial counsel not to investigate those lines of inquiry further, based on counsel's knowledge at the time. *See, e.g., Williams*, 598 F.3d at 793 (in assessing reasonableness of investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further") (citation omitted). "Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." *Chandler*, 218 F.3d at 1316 n.20 (citation omitted).

So the obvious question is this: What information did trial counsel have about Ray's mental health and mental condition during their mitigation investigation? Counsel knew that Ray had previously been evaluated by the State, and that Dr. Ronan had submitted a detailed written report setting forth her findings that Ray did not show signs of any major psychiatric disorder, that he displayed no cognitive areas of significant deficit, that there was no indication of mental retardation, and that Ray did appear to be malingering by attempting to embellish his symptoms. Counsel also knew that they had engaged in numerous interactions with Ray, and that they found him to be intelligent, coherent, able to communicate fully, and not to show any signs of mental illness or mental retardation. And counsel had the benefit of conversations with Ray's mother and other witnesses, plus the investigative materials gathered by the investigator hired by Ray's previous defense team, none of which suggested that mental health issues might be a viable avenue of defense in mitigation.

Faced with this knowledge and these circumstances, trial counsel was not obligated under *Strickland* to seek an independent evaluation of Ray or to request funds to hire mental health experts. As a general proposition, "[i]nvestigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." *Chandler*, 218 F.3d at 1318. Again, the *Strickland* deficient performance analysis is not governed by a mechanistic checklist of steps that must be taken in all cases by all counsel. *See, e.g., Holladay v. Haley*, 209 F.3d 1243, 1250 (11th Cir. 2000) ("Counsel is not necessarily required to seek independent medical evaluations in order to render effective assistance. … [T]he choice not to seek out such an evaluation is a tactical decision, which must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgment.") (citation and internal quotation marks omitted).  More specifically, the Eleventh Circuit has held on numerous occasions that "[c]ounsel is not required to seek an independent evaluation when the defendant does not display strong evidence of mental problems." *Callahan*, 427 F.3d at 934 (citation omitted).[62]

The bottom line is that, where defense counsel is not confronted with "red flags" that would prompt a reasonable attorney to investigate mental health issues further, the Sixth Amendment does not require counsel to expend valuable time and scarce resources attempting to develop a mitigation case built around mental illness or mental retardation. *Compare Michael*, 430 F.3d at 1322 (no deficient performance in attorney's failure to pursue PTSD defense, where review of the record reveals "no 'red flags' that would have prompted a reasonable attorney to investigate further for PTSD materials") (citations omitted) *with Ferrell v. Hall*, 640 F.3d 1199, 1233 (11th Cir. 2011) (counsel unreasonably failed to investigate petitioner's mental health despite "many red flags" such as visible facial movements, strange demeanor, obsessive religious beliefs, and seizure in counsel's presence).  Petitioner struggles mightily to cobble together the requisite set of "red flags" from offhand remarks in Dr. Ronan's report, from general knowledge that anabolic steroid abuse might be linked to violent criminal behavior, or from "Ray's contradictory pretrial statements to police."  (Doc. 32-1, at 73-74.)  The Alabama Court of Criminal Appeals rejected petitioner's efforts in this regard, concluding that "we cannot say that any reasonable attorney would have pursued a mental-health defense" and that petitioner had

---

[62]    *See also Pooler*, 702 F.3d at 1273 (finding that it was neither unreasonable nor contrary to Supreme Court precedent for state court to conclude that a reasonable attorney could have decided not to hire mental health experts where neither existing reports from competency proceedings nor information derived in existing mitigation search "suggested a need for mental health experts to look further"); *Newland*, 527 F.3d at 1213 ("We have addressed similar situations before, in which neither psychiatric evaluations nor counsel's observations indicated that a petitioner suffered from mental illness.  Under these circumstances, we have concluded that counsel performed reasonably in deciding not to seek further evaluation of a petitioner's mental health."); *Holladay*, 209 F.3d at 1252 (observing that counsel's duty to investigate is "confined to reasonable investigation" and that counsel fulfills this duty even if he does not investigate client's psychological problems, where "the client never told him of any problems," "the competency evaluation did not suggest any problems existed," and the client "acted competently while assisting counsel in preparing his case"); *Housel v. Head*, 238 F.3d 1289, 1296 (11th Cir. 2001) (counsel not ineffective for failing to pursue mental health investigation where counsel observed nothing unusual about petitioner's behavior).

failed the *Strickland* deficient performance test.  *Ray II*, 80 So.3d at 990.  This was not an objectively unreasonable application of *Strickland* to the facts of this case; therefore, under the doubly deferential standard applicable to ineffective-assistance habeas claims decided on the merits by state courts, Ray is not entitled to federal habeas relief on this claim.[63]

### 3.    *Failure to Investigate Steroid Defense.*

Finally, petitioner contends that it amounted to constitutionally ineffective assistance for his trial lawyers not to investigate, develop and present a steroid-abuse defense during the penalty phase.  The inescapable fact is that, as the Alabama courts found during the Rule 32 proceedings, there is no evidence that Ray was abusing steroids at the time he murdered Harville.  Ray himself did not testify at the Rule 32 hearing, and apparently has never told anyone at any time that he was on steroids in July 1995.  None of his family members or acquaintances who did testify at the Rule 32 hearing said anything about Ray using steroids in or about July 1995.  And Whatley testified that, based on his discussions with Ray, he understood that steroid or other substance abuse was simply not an issue in the case.

At best, Dr. Ronan's report specified that Ray had told her that "he had used steroids for several years and was addicted to these at about 16."  (Vol. 14, R-47 at 1345.)  But the Harville murder occurred when Ray was 19, not 16.  Certainly, Ray did not inform Dr. Ronan that he had

---

[63]    Recall that attorney Whatley testified in the Rule 32 hearing that he did not feel he had a "rational basis" to ask Judge Jones for funding for a mental health expert.  That concern looms large, and was entirely warranted on this record.  Had Whatley sought such funding with the evidence he had, it almost certainly would have been rejected.  *See Newland*, 527 F.3d at 1213 ("Counsel did not tell the habeas court what [trial counsel] could have shown the trial court as the basis for providing the necessary funds; counsel evidently assumed, without citation of authority, that the funds would have been available to [trial counsel] simply for the asking.  The assumption is unsupportable ….").  *Strickland* does not obligate defense counsel to engage in futile acts or to file motions for expert funding on a wing and a prayer.  Although petitioner is correct that *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), recognizes that indigent defendants have a constitutional right to funds to retain a psychiatrist in certain circumstances, petitioner glosses over the preliminary showing of need that must be made to trigger an *Ake* obligation.  *See Ake*, 470 U.S. at 74 (defendant has a right to funds for a psychiatrist where he "has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial"); *Conklin v. Schofield*, 366 F.3d 1191, 1208 (11th Cir. 2004) (explaining pivotal importance of "the sufficiency of the petitioner's explanation as to why he needed an expert") (citation omitted).  Trial counsel did not have the luxury of ignoring the "preliminary showing" requirement, and did not have sufficient facts to satisfy that threshold.

been using steroids at or around the time of that offense. In fact, the only record evidence about when and for how long Ray actually used steroids is what Ray told Dr. King during a forensic interview in August 2006. At that time, Ray informed Dr. King "that he obtained some steroids from, on the street at age sixteen and did that because he was interested in body building and wanted to get bigger. … [H]e used for approximately two months. He wanted to gain about ten pounds, which he did and discontinued usage at that time." (Vol. 25, R-52 at 480-81.) Thus, Ray himself has denied having used steroids at all for a period of several years before the Harville murder.

The sum total of the record evidence concerning anabolic steroids is that Ray used them for two months in or about 1992, several years before the Harville offense. On this record, the Alabama courts' finding of fact that defense counsel "had no reason to believe that steroid use was an issue in this case" is not clearly erroneous. More importantly, the Alabama Court of Criminal Appeals' determination that trial counsel did not render deficient performance under *Strickland* in failing to pursue such a line of defense was not objectively unreasonable, and therefore is not a viable basis for federal habeas relief.[64] Accepting as true petitioner's position that experts like Dr. Pope could have pieced together a colorable steroid-abuse defense from the fragmentary, indirect clues in the record, there were plainly no "red flags" that would necessarily have placed any reasonable counsel on notice of the need to investigate such a theory.

Even if petitioner could somehow make the requisite showing under the *Strickland* deficient performance prong, he could not establish prejudice under *Strickland*. It is far from

---

[64]     The Court is aware, of course, that petitioner retained Dr. Pope to derive from the record an inference that Ray was under the influence of anabolic steroids when he stabbed Tiffany Harville to death. The Court is also aware that Judge Jones refused to allow Dr. Pope to testify at the Rule 32 hearing for lack of sufficient evidentiary foundation. Under the circumstances, this exclusion of Dr. Pope's testimony was appropriate, as Dr. Pope's opinions were speculative and lacked sufficient factual grounding to be reliable, where neither Ray nor anyone else has ever said that Ray was abusing anabolic steroids in the summer of 1995, much less at the time of Tiffany Harville's disappearance and murder. This claim might have been different if Ray had said he was using steroids in July 1995, or if someone like Karlinski Jones (who testified at the sentencing hearing that he had been Ray's "best friend" for seven years) or Veronica Kelly (who had a similarly close, long-term friendship with Ray) had indicated that Ray was using steroids in July 1995. But they didn't. No evidence of steroid use at the time of Harville's murder has ever been offered by petitioner, other than the inferential, extrapolation-based opinion of Dr. Pope.

clear to the undersigned that arguing to the jury that Ray was hopped up on anabolic steroids when he killed Harville would have been a helpful line of defense. Even with Dr. Pope, the evidence that this killing was steroids-induced would have been extraordinarily weak. Moreover, "such testimony could potentially alienate the jury as an attempt to excuse truly horrendous conduct." *Newland*, 527 F.3d at 1217 n.85 (citation and internal quotation marks omitted). The Eleventh Circuit has long recognized "that evidence of substance abuse can do as much or more harm than good in the eyes of the jury." *Evans*, 703 F.3d at 1329 (citations and internal quotation marks omitted); *Sochor*, 685 F.3d at 1031 ("[w]e have recognized that a jury can react hostilely to an assertion that a person should in some way be excused from the consequences of his acts because he had voluntarily taken drugs") (citation and internal quotation marks omitted). Given the double-edged sword nature of evidence of voluntary abuse of illicit substances, defense counsel's failure to present a threadbare, steroids-abuse theory of mitigation did not prejudice Ray because there is not a reasonable probability that, but for that omission, the result of the proceedings would have been different.

### 4.    Petitioner's Authority is Distinguishable.

In reaching the above conclusions, the Court has carefully considered and finds unpersuasive petitioner's arguments that Supreme Court and Eleventh Circuit precedent demand a contrary outcome.

For example, the Amended § 2254 Petition goes on at length that the Supreme Court's ruling in *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), means that, in the context of a *Strickland* analysis, "[a] defendant's lack of cooperation or even active obstruction does not matter." (Doc. 32-1, at 77.) This is not correct. Even after *Rompilla*, "the reasonableness of an attorney's investigative decisions 'depends critically' upon information the defendant furnishes to his counsel." *Pooler*, 702 F.3d at 1272 (citation omitted). The "limited holding of *Rompilla*" is that when a defendant suggests that no mitigating evidence exists, "his lawyer is bound to make reasonable efforts to obtain and review *material that counsel knows the prosecution will probably rely on as evidence of aggravation* at the sentencing phase of trial." *Id.* at 1272 n.11 (citation omitted). No such circumstances are present here. *Rompilla* did not invalidate, overrule or negate the substantial Eleventh Circuit precedent discussed *supra* to the effect that defense counsel does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that the defendant never mentions. The *Pooler* panel

criticized an argument much like that employed by Ray's counsel here as "misconstru[ing] (and go[ing] well beyond) the limited holding of *Rompilla*." *Id.* In light of *Pooler* and other Eleventh Circuit authorities construing *Rompilla*, it was not an unreasonable application of clearly established federal law as determined by the Supreme Court for the Alabama Court of Criminal Appeals to find no *Strickland* error with respect to defense counsel's background investigation. *Id.* at 1272 ("this is a case, like *Strickland* itself, in which defense counsel's decision not to seek more mitigating evidence from the defendant's background than was already in hand fell well within the range of professionally reasonable judgments") (citation and internal quotation marks omitted).

Petitioner also likens this case to *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), going so far as to argue that "[i]ndividually and collectively the elements of Ray's challenged and turbulent life are as compelling as those in *Wiggins*." (Doc. 32-1, at 89.) But this case differs from *Wiggins* in critical respects. In *Wiggins*, "counsel's investigation of petitioner's background was limited to the PSI and the DSS records." 539 U.S. at 533. Ray's trial counsel went much further, including (i) numerous interviews of Ray and his mother; (ii) review of documents provided by the State, including Dr. Ronan's report; (ii) review of the results of the investigation performed by the investigator retained by Ray's prior counsel; and (iv) attempts to contact every person identified by Ray or his mother as a potential witness. Furthermore, with respect to background/upbringing issues, unlike in *Wiggins*, "here the new mitigation is simply an extension of what the jury had heard, which is critically different from [*Wiggins*], in which the new mitigation was not only powerful, but of a type that counsel did not present in the penalty phase at all." *Rose v. McNeil*, 634 F.3d 1224, 1246 (11th Cir. 2011).

In his merits brief, Ray also urges this Court to follow *Evans v. Secretary, Dep't of Corrections*, 681 F.3d 1241 (11th Cir. 2012), in which a panel of the Eleventh Circuit vacated the denial of the petitioner's habeas petition with respect to penalty-phase ineffective assistance. (Doc. 31, at 8-16.) Following the submission of Ray's merits brief, however, the panel opinion was vacated. *See Evans v. Secretary, Dep't of Corrections*, 686 F.3d 1321 (11th Cir. 2012). Earlier this year, the Eleventh Circuit issued an *en banc* opinion affirming the Florida Supreme Court's determination that the petitioner was not prejudiced by his trial counsel's deficient performance because the new background evidence in question would likely have been more harmful than helpful, and would have opened the door to damaging evidence. *See Evans v.*

*Secretary, Dep't of Corrections*, 703 F.3d 1316 (11th Cir. 2013).  By all appearances, the *en banc* opinion in *Evans* does not advance Ray's cause, and he has presented no argument otherwise.

Petitioner also likens his penalty-phase ineffective assistance claim to that in *Cooper v. Secretary, Dep't of Corrections*, 646 F.3d 1328 (11th Cir. 2011).  In *Cooper*, the Eleventh Circuit found deficient performance where the defendant's mitigation evidence at trial consisted of his mother's testimony that the defendant's father abused the mother, without referencing the extreme physical beatings to which defendant's father subjected all of his children, including defendant.  This evidence was that the defendant's father beat his children every day, that he would "start wailing on you with the belt and just lose control," that he would "bounce their heads off the walls or throw them against a door," that he "beat them with boards, switches, belts, and horse whips, leaving welts up and down their bodies and bruises from being grabbed and hit so hard," and that he often threatened to shoot them.  *Id.* at 1342-43.  The *Cooper* jury heard none of this evidence.  Defense counsel knew about this abuse (because their psychologist alluded to it at the sentencing hearing), but did not develop or put on evidence in the penalty phase to present it to the jury.  As the Eleventh Circuit observed, "Notably absent from the attorneys' testimony was any explanation as to why they did not contact Cooper's siblings, whether they attempted to contact them at all, or if they were contacted, what the results were." *Id.* at 1352.  *Cooper* is distinguishable from Ray's case in numerous material respects, including the following: (i) Ray's lawyers did not limit their investigation to talking to Ray and his mother, but attempted to contact every witness they identified (only to find that many of these witnesses had nothing helpful to say); (ii) Ray's lawyers offered a reasonable explanation for why they did not seek out Europe Ray, on the strength of information that he was "not available," had not been "in the picture" for years, and was of unknown whereabouts; (iii) Ray's lawyers did not know, and did not have any reason to believe, that there was anything more to the abusive childhood angle than what they already knew and were able to present to the jury through Gladys Ray; and (iv) the abuse at issue in Ray's case frankly pales in comparison to that chronicled in *Cooper*.[65]

---

[65]     This is not to minimize the accounts of Ray's childhood.  The Rule 32 evidentiary record includes testimony that Ray's mother disciplined Ray and his brother on one occasion by hitting them with a broomstick, that their father beat them during the short period of time they lived with him, that their father's stepchildren would take their food, that their father would lock them in a dark room for an hour or two, that their stepmother dressed Ray up like a girl on one (Continued)

Also, *Cooper* is distinguishable from Ray's case because "[i]n contrast to the additional evidence presented in the state collateral hearing in *Cooper*, [Ray]'s additional evidence told largely the same story as his sentencing phase evidence, although it did add details and bolster that evidence."  *Holsey*, 694 F.3d at 1267.

Finally, petitioner relies on *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011), where the Eleventh Circuit found deficient performance in defense counsel's failure to follow up on "obvious indicators that Ferrell had substantial mental health issues" (including an instance during the trial in which the defendant suddenly fell to the floor, shook and spoke gibberish).  *Id.* at 1228.  The *Ferrell* Court also found *Strickland* error in defense counsel's failure to ask mitigation witnesses any questions about the defendant's childhood.  *Id.* at 1230 (counsel "could have elicited significant, and powerful, additional mitigating evidence from the witnesses who were willing to testify, and did testify on Ferrell's behalf, if counsel had only asked these witnesses about the defendant's background and childhood").  Here, by contrast, Ray's trial counsel observed no "obvious indicators" or "red flags" concerning petitioner's mental health, and obtained all evidence about Ray's background and childhood that they could from the witnesses they had.  Unlike *Ferrell*, petitioner has not identified any helpful evidence that defense counsel could have procured from the testifying witnesses at the penalty phase and sentencing hearing, if only they had asked the right questions.  And unlike *Ferrell*, Ray's case is simply not one in which defense counsel ignored the background/upbringing aspect of mitigation altogether in their investigation and interrogation of witnesses.

For all of the foregoing reasons, it is the undersigned's opinion that Ray's penalty-phase ineffective assistance claims are not strengthened, and the analysis is not changed, by his efforts to analogize his circumstances with those in *Rompilla*, *Wiggins*, *Evans*, *Cooper* and *Ferrell* via checklist/chart in his merits brief.  Ray's trial counsel conducted a reasonable investigation and pursued a reasonable mitigation strategy.  Not only was their mitigation strategy at the Harville

---

occasion, that their stepmother's nieces took Ray to a shed on two occasions and "pretended to have sex with him," that their mother was "not there" for long periods of time while they lived with her, and that they saw their mother being beaten by her boyfriends at different times.  (Vol., 23, R-52, at 66, 74-79, 81, 93-95.)  It is to say, however, that the level of violence at issue in *Cooper* was several orders of magnitude greater and more horrific than that described here.

trial reasonable, but it had been battle-tested because they had used it successfully during the penalty phase in their defense of Ray in the Mabins trial, just a few months earlier.  Surely it was not constitutionally infirm for defense counsel to reprise their successful mitigation strategy from the Mabins trial by deploying it in the Harville trial.  With regard to Ray's background and childhood, they asked the right questions of the right witnesses, and put on testimony in the penalty phase that, at least in broad strokes, told the story of Ray's challenging upbringing.  They did not have any reason to contact Ray's brother, Europe Ray, because Ray and his mother told counsel that he was not available and had been out of the picture for years.  And they did not have "red flags" calling Ray's mental health into question that might have obligated them to seek appointment of a psychologist or other mental health expert to evaluate him.  In sum, the state courts' determination of no deficient performance cannot and will not be disturbed on federal habeas review under the doubly deferential standard of review required by AEDPA and *Strickland*.  The Court cannot say that it was objectively unreasonable for the state courts to conclude that Ray has failed to show "that no competent counsel would have taken the action that his counsel did take."  *Chandler*, 218 F.3d at 1315.

## V.     Ineffective Assistance Claims Relating to Guilt Phase and Direct Appeal.

Petitioner's third ground for habeas relief is that his attorneys rendered ineffective assistance at the guilt/innocence phase of trial and on direct appeal.  This claim is governed by the same *Strickland v. Washington* standard set forth in § IV, *supra*.  Although it is framed as a single ground for relief, Claim III actually encompasses 19 enumerated sub-issues spanning almost 40 pages of Ray's Amended § 2254 Petition.  The Court will consider each of these purported aspects of constitutionally deficient, prejudicial representation at the guilt/innocence phase and direct appeal in turn.[66]

---

[66]     In his § 2254 Petition, Ray makes much of the need to examine the totality of the circumstances to resolve his *Strickland* claims.  (Doc. 32-1, at 94.)  Certainly, it is a correct statement of law that ineffective assistance claims are evaluated by reference to the totality of the circumstances.  *See, e.g., McCoy v. Newsome*, 953 F.2d 1252, 1262 (11th Cir. 1992) ("An ineffective assistance of counsel claim is examined under the totality of the circumstances.") (citation and internal quotation marks omitted).  It is also true, however, "[w]hile the prejudice inquiry should be a cumulative one as to the effect of all of the failures of counsel that meet the performance deficiency requirement, only the effect of counsel's actions or inactions that do meet the deficiency requirement are considered in determining prejudice." *Evans*, 699 F.3d at 1269.  So the cumulative error doctrine can aid Ray's *Strickland* claims relating to trial and (Continued)

## A.    Petitioner's Counsel Were Inexperienced and Spent Insufficient Time on his Defense.

This assignment of error actually consists of two issues (*i.e.*, inexperience, insufficient investment of time) combined into one ground for relief.  The first question is whether Ray was denied effective assistance of counsel by virtue of the fact that one of his trial attorneys, Juliana Taylor, had been practicing law for less than three years and had worked on only one capital murder trial before the Harville murder trial.  Although the Amended § 2254 Petition appears to assert that it was a *per se* violation of *Strickland* for Ray to be represented by a lawyer with fewer than five years' experience (doc. 32-1, at 94-95), Ray's merits brief expressly disclaims any such argument.  As presently formulated, the record is clear that Ray is not arguing "that because Juliana Taylor had less than the ABA-recommended five years' experience his constitutional guarantee to counsel was categorically denied."  (Doc. 31, at 50.)  The Court therefore need not and will not scrutinize the issue of Taylor's experience as a separate *Strickland* claim (as the state postconviction review court did), but instead views Taylor's experience as a background fact in the larger question of whether defense counsel were *per se* ineffective for devoting insufficient time (as reflected by hours billed in their fee petitions) to Ray's defense.

In Rule 32 proceedings, the state courts did not specifically address any claim that defense counsel had failed to provide adequate representation because Ray's lawyers did not spend sufficient time preparing for trial.  Contrary to the State's position, however, that claim was fairly presented in the Rule 32 proceedings.  In the ineffective assistance section of his Rule 32 brief to the Alabama Court of Criminal Appeals, petitioner specifically referenced "[t]he minimal investment of time by both defense lawyers in preparing Ray's defense," cited fee petitions showing that Whatley and Taylor had billed 215.5 hours in trial preparations, and argued that "[w]ithout far greater effort, it would have been impossible for any attorney" to have

---

direct appeal only insofar as his specific delineated grounds of ineffective assistance actually amount to constitutionally deficient performance.  This question will be examined further in subsection V.S., *infra*.

provided meaningful, effective assistance to Ray.  (Vol. 27, R-54 at 102-03.)[67]  Thus, this claim is properly exhausted, notwithstanding the state courts' failure to write to it.  *See generally Lucas v. Secretary, Dep't of Corrections*, 682 F.3d 1342, 1352 (11th Cir. 2012) ("Here, the Florida Supreme Court did not specifically address Lucas's first claim in federal constitutional terms …, but this does not mean the claim was not presented to it.") (citations and internal quotation marks omitted).[68]

        The trouble with this claim is that petitioner does not identify any precedent for the proposition that counsel's expenditure of less than some predetermined, arbitrary minimum number of hours in preparing for trial is constitutionally deficient representation, as a matter of law.  To the contrary, federal courts have routinely given short shrift to mechanistic arguments tarring trial counsel as ineffective based purely on the amount of time spent.  *See Williams v. Washington*, 59 F.3d 673, 680 (7th Cir. 1995) ("[C]ounsel is not required to spend any specific number of hours preparing for trial, whether those preparations relate to investigation, witness interviews or other preparatory matters.").[69]  Clearly established federal law does not set a

_____

[67]    To be sure, it does not appear that this claim was raised in Ray's Amended Rule 32 Petition.  While that omission might have given rise to an adequate and independent state procedural ground for the Alabama Court of Criminal Appeals to deny this claim, the fact remains that the appellate court chose not to address the claim at all, even though it was plainly raised on appeal in state postconviction proceedings.

[68]    That said, petitioner bears some responsibility for the state courts' omission. Given the confusing manner in which he fused what appeared to be distinct *Strickland* claims (*i.e.*, Taylor's inexperience, insufficient investment of time) into a single ground for collateral relief, the Alabama Court of Criminal Appeals can hardly be faulted for seizing on the experience issue without recognizing the expenditure-of-time argument hitchhiking on that same claim.

[69]    *See also United States v. Taylor*, 802 F.2d 1108, 1119 (9th Cir. 1986) (summarily rejecting claim that trial counsel violated *Strickland* by failing "to expend the time and energy necessary to adequately prepare his defense," and reasoning that petitioner must establish ineffective assistance claim by reference to specific errors or omissions, rather than vague and conclusory assertions); *Ulrey v. Zavaras*, 2012 WL 2045769, *13 (10th Cir. June 7, 2012) (noting that while insufficient preparation time may violate *Strickland*, "[w]hat amount of time is sufficient, however, will vary widely"); *Caldwell v. Lewis*, 2006 WL 572021, *7 (E.D. Tenn. Mar. 8, 2006) ("Defendant basically contends that we should view his lawyers' trial preparation as inadequate based simply on the number of hours they spent.  We decline to adopt, however, such a formulaic approach to determining the effectiveness of legal representation.") (citation omitted); *see generally Jones v. Wainwright*, 604 F.2d 414, 416 (5th Cir. 1979) ("Our standard (Continued)

minimum floor of hours that trial counsel must invest as a threshold to satisfy the Sixth Amendment; rather, *Strickland* demands a much more flexible, totality-of-the-circumstances approach.[70]  As such, this Court will not disturb the Alabama courts' decision on Rule 32 proceedings not to afford Ray relief on his claim that his trial lawyers rendered ineffective assistance by not devoting enough hours to the case and (with respect to second-chair counsel, Juliana Taylor) being insufficiently experienced in the practice of law.[71]  The constitutional adequacy or inadequacy of a defense lawyer's performance must be assessed not by reference to the overall number of hours billed by trial counsel, but by counsel's particular acts and omissions during the course of that representation.  The Court therefore declines to impute any defect to trial counsel's performance in preparing for trial, simply because Ray thinks his lawyers should have billed more hours and because his second-chair attorney did not have five years of experience.[72]

---

requires not perfect but reasonably effective assistance, … which may be provided even if counsel spends only a short time with his client.").

[70]    Petitioner's notion that there is a specific, identifiable target number of hours that trial counsel must devote to a capital murder case in order to provide constitutionally adequate representation is as impractical as it is unwieldy.  Different attorneys work at dramatically different speeds and levels of efficiency.  Different cases call for dramatically different levels of attorney effort and involvement.  And the range of reasonableness in the *Strickland* inquiry is extremely broad.  Considering all of those variables and factors in the aggregate, the Court cannot begin to fathom (and petitioner does not begin to explain) how a habeas court could set a fixed number of hours below which trial counsel's representation was *per se* inadequate, irrespective of the amount and quality of work accomplished (and the nature and quality of the defense delivered) during those hours.  Such a formulaic, checklist approach is fundamentally incompatible with the flexible, case-specific principles on which a *Strickland* analysis is predicated.

[71]    Recall that the applicable standard of review is that the habeas court "must determine what arguments or theories supported or, [if none were stated], ***could have supported*** [ ] the state court's decision; and then it must ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  *Evans*, 703 F.3d at 1326 (emphasis added and citations omitted).  The Court answers this question in the affirmative.

[72]    One other point bears mention.  Any analysis of time spent on the case that looks only at Whatley's and Taylor's billings in the Harville matter (as Ray does) is fundamentally flawed.  Recall that Ray was represented by two other lawyers (Alson Keith and George Jones) (Continued)

**B.      Failure to Challenge Admissibility and Credibility of Ray's Custodial Statements.**

Ray's second ineffective assistance claim concerning the performance of his counsel at trial is that they failed to challenge the admissibility and credibility of Ray's statements to law enforcement.  (Doc. 32-1, at 97-100.)  In support of this claim, petitioner maintains that his lawyers "never investigated the possibility that Ray's statement was coerced," and theorizes that Lt. Freine failed to Mirandize Ray and "cajole[d], lull[ed], trick[ed], coerce[d], or otherwise induce[d]" him to make the inculpatory statement that Lt. Freine wanted him to make, yet counsel "raised no objection."  (*Id.* at 98-99.)[73]  Petitioner suggests that investigation would have led him to someone like Dr. Stanley Brodsky, who could have "provided testimony about the scientific possibility that Ray had falsely confessed."  (*Id.* at 100.)

To the extent that this claim is alleging that defense counsel took no steps to seek exclusion of Ray's statements to law enforcement officers, it is counterfactual.  The record plainly establishes that defense counsel filed a Motion to Suppress in March 1998 seeking to

_____

for a year before Whatley took over.  Whatley and Taylor received the benefit of the substantial investigation, motions practice, and trial preparation in which their predecessors had engaged.  Also, Whatley and Taylor had previously represented Ray in the Mabins capital murder case, and there was substantial spillover between the two cases (at least insofar as mitigation is concerned).  Under the circumstances, petitioner's focus on the number of hours Whatley and Taylor billed in the Harville matter paints a highly misleading and distorted picture.

     73     As alleged in the § 2254 petition, the sequence of events was that Lt. Freine "deliberately interrogated Ray with no tape recording … in the middle of the night, from approximately 2:25 a.m. until 4:00 a.m.  Freine then re-interrogated Ray with the tape recorder … after the confession has been fully rehearsed, to create a recorded statement calculated to sound and seem voluntary."  (Doc. 32-1, at 97-98.)  Petitioner's rhetoric takes unwarranted and inappropriate liberties with the record.  The <u>only</u> record evidence about what happened during this time is Lt. Freine's testimony that all conversation and questioning of Ray during the period of 2:25 a.m. until 4:35 a.m. on August 19, 1997 concerned the Mabins killings, not the Harville case.  (Vol. 22, R-47 at 2856-61.)  Lt. Freine's uncontroverted testimony is that there was no discussion of the Harville case until 11:00 a.m. the next morning.  (*Id.*)  Absent any evidence (which petitioner has never presented) that the overnight questioning concerned the Harville case rather than the Mabins case, it is inconsequential whether there were problems or defects in the manner in which police extracted the Mabins confession from Ray.  Trial counsel's performance cannot be deemed outside the wide range of attorney competence because they did not challenge the Harville confession based on purported deficiencies in the manner in which the police obtained the Mabins confession.

exclude any and all statements by Ray on the grounds that they "were the result of coercion and were involuntarily made," were given even though law enforcement had not "properly advised the defendant of his rights and the nature of the investigation," and "were made as a result of subterfuge and misrepresentations." (Vol. 1, R-2 at 38-39.) At trial, voir dire of Lt. Freine was conducted outside the presence of the jury, with defense counsel cross-examining him vigorously as to the voluntariness of Ray's statements. (Vol. 4, R-13 at 476-505.) The trial court admitted those statements over defense counsel's objection. (*Id.* at 528.) The Alabama trial and appellate courts expressly found that those statements were admissible, notwithstanding counsel's objections. *See Ray I*, 809 So.2d at 806-09; *Ray II*, 80 So.3d at 992-93. Insofar, then, as petitioner is arguing that trial counsel rendered ineffective assistance by not seeking to exclude his statements to law enforcement, the claim is baseless on its face because counsel did seek to suppress the statements and those statements were properly admissible in any event.[74]

Upon closer inspection of the Amended § 2254 Petition, it appears that Ray's focal point of this ground of relief is that trial counsel should have "investigated" the confession's reliability by hiring Dr. Brodsky or someone like him to testify "about the scientific possibility that Ray had falsely confessed." (Doc. 32-1, at 100.) During Rule 32 proceedings, however, the Alabama Court of Criminal Appeals opined that "[t]his issue does not appear to have been raised in Ray's amended [Rule 32] petition; therefore, it is not properly before this Court." *Ray II*, 80 So.3d at 991. Thus, the state appellate court rejected this claim based on an adequate and independent state rule of decision (*i.e.*, that postconviction claims for relief must be presented in the Rule 32 petition itself to be properly before state appellate courts on appeal). As a matter of well-settled

---

[74]    To be sure, the § 2254 Petition includes allegations that (i) Lt. Freine failed to Mirandize Ray; (ii) Lt. Freine cajoled or tricked Ray into confessing off the record, then created a recorded statement after the fact; and (iii) trial counsel never objected to any of this. (Doc. 32-1, at 98-99.) The obvious problem that defense counsel confronted at trial was that there was no evidence of either (i) or (ii). Lt. Freine testified that he did read Ray his rights, and there was no evidence of trickery or coercion, aside from pure speculation as to what was happening before the tape recorder started running. Under the circumstances, any failure by trial counsel to object as forcefully to the admission of Ray's statements as petitioner now believes they should have objected is not a viable basis for habeas relief because the *Strickland* standard does not find constitutionally deficient performance where a lawyer fails to pursue baseless arguments. *See generally Shere v. Secretary, Florida Dep't of Corrections*, 537 F.3d 1304, 1311 (11th Cir. 2008) ("Shere's appellate counsel did not have a meritorious issue to raise on appeal, so his failure to address that issue did not constitute deficient performance.").

law, "[f]ederal courts are barred from reaching the merits of a state prisoner's federal habeas claim where the petitioner has failed to comply with an independent and adequate state procedural rule." *Kuenzel v. Commissioner, Alabama Dep't of Corrections*, 690 F.3d 1311, 1314 (11th Cir. 2012); *see also Boyd v. Commissioner, Alabama Dep't of Corrections*, 697 F.3d 1320, 1336 (11th Cir. 2012) ("As a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are 'independent and adequate' to support the judgment.") (citation omitted).  Such a procedural default can be overcome only by a showing of cause and prejudice, or alternatively, a fundamental miscarriage of justice.  *Id.*  Petitioner has shown neither; therefore, his ineffective assistance claim predicated on trial counsel's failure to hire an expert witness to explore whether Ray's confessions were false is procedurally defaulted and this Court cannot reach the merits of same in federal habeas review.[75]

> ### C.    Failure to Seek to Exclude Owden's Testimony on Robbery and Rape.

Petitioner contends that he received ineffective assistance of counsel when his defense team failed to seek exclusion of Marcus Owden's testimony that Tiffany Harville was raped and robbed.  In support of this claim, petitioner posits that "[t]here is no physical evidence that Harville was raped or that she was robbed," that "[t]he rape and robbery charges against Ray relied entirely on Owden's testimony," that defense counsel never challenged Owden's "grip on reality" using the State's forensic evaluation of him, and that Owden's testimony lacked "any credible corroboration."  (Doc. 32-1, at 100-01).

---

[75]    Even if the merits of this claim were to be considered, the Alabama Court of Criminal Appeals observed that the use of expert testimony concerning "false confessions" is so exceedingly rare that "we could not hold that the failure to introduce such testimony falls below prevailing professional norms" for *Strickland* purposes.  *Ray II*, 80 So.3d at 992 (citation omitted).  This alternative finding by the state court is not an objectively unreasonable application of the *Strickland* standard, and easily withstands doubly deferential habeas review.  Besides, any attempt by trial counsel to develop a defense rooted in scientific testimony about "false confessions" would have encountered severe (and perhaps insuperable) difficulty because Ray's statements to Lt. Freine included details that had not been released to the public.  (Vol. 26, R-52 at 544-46.)  Defense counsel would have had an inordinately difficult time convincing the jury that Ray simply fabricated his confession out of thin air when that confession included non-public investigative details.  Counsel could not have rendered constitutionally deficient performance by electing not to pursue an avenue of defense that was fraught with such glaring weaknesses.

The Alabama Court of Criminal Appeals rejected this claim on collateral review for two reasons.  First, the state court deemed the claim relating to the lack of physical evidence to be procedurally defaulted because "[t]his specific claim was not raised in Ray's amended postconviction petition; therefore, it is not properly before this Court." *Ray II*, 80 So.3d at 987.  Second, the Alabama appellate court reasoned that it had already concluded on direct appeal that Owden's testimony was sufficiently corroborated to be admissible, such that trial counsel could not have provided ineffective assistance by failing to challenge its admission.  *Id.*

The threshold question is whether this Court can consider this claim at all.  Federal habeas courts do not review questions "decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("[u]nder the doctrine of procedural default, a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment").  Here, the independent and adequate state procedural ground is that, under well-settled Alabama law, "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition."  *Kelley v. State*, 985 So.2d 972, 976 (Ala.Crim.App. 2007); *see also Dunaway v. State*, --- So.3d ----, 2009 WL 4980320, *16 (Ala.Crim.App. Dec. 18, 2009) (same); *Arrington v. State*, 716 So.2d 237, 239 (Ala.Crim.App. 1997).[76]

Petitioner does not contend that the Alabama Court of Criminal Appeals' ruling was not an adequate and independent procedural ground (*i.e.*, he does not argue that this was actually on "on the merits" decision).  Instead, Ray's only argument against procedural default is that he disagrees with the Alabama Court of Criminal Appeals' assessment that "[t]his specific claim

---

[76]     Circuit precedent teaches that an adequate and independent state ground bars federal habeas review when the following criteria are satisfied: (i) the last court's ruling must fulfill the "plain statement rule" and "clearly and expressly state that it is relying on waiver as a ground for rejecting the petitioner's claim;" (ii) "the procedural rule relied on by the state court must serve as an independent state law ground for denying relief, and may not be intertwined with an interpretation of federal law;" and (iii) "the state's application of the procedural bar … must not be applied in an arbitrary or unprecedented fashion."  *Borden v. Allen*, 646 F.3d 785, 813 n.37 (11th Cir. 2011).  Each of these elements is satisfied here.

was not raised in Ray's amended postconviction petition." (Doc. 31, at 53.) In that regard, Ray insists that the state courts "misapprehended" his Rule 32 petition. This argument fails. A federal habeas court does not look behind a state court's procedural default decision by second-guessing the state court's application of its own procedural rule. *See Ferguson v. Secretary for Dep't of Corrections*, 580 F.3d 1183, 1193 (11th Cir. 2009) ("We defer to the state court's findings regarding procedural default."); *Zeigler v. Crosby*, 345 F.3d 1300, 1304 (11th Cir. 2003) (similar). Yet that is effectively what Ray is asking this Court to do. The argument fails, and the state court's finding that this claim is procedurally defaulted pursuant to an adequate and independent state procedural rule precludes this Court from examining whether trial counsel was ineffective in failing to seek exclusion of Owden's testimony on rape and robbery for lack of physical evidence to support the crimes.[77]

As an alternative basis for its decision, the state appellate court on collateral review addressed the merits of Ray's contention that trial court was constitutionally deficient in failing to move to exclude Owden's testimony concerning robbery and rape as uncorroborated. In particular, the Alabama Court of Criminal Appeals correctly observed that (i) petitioner's trial counsel did in fact object to Owden's testimony on the grounds that it was uncorroborated and therefore inadequate to convict Ray as to the issues of rape and robbery (Vol. 5, R-13 at 635); and (ii) petitioner's counsel unsuccessfully raised the same issue on direct appeal. *See Ray II*, 80 So.3d at 987. The lack-of-corroboration argument was meritless, the Alabama Court of Criminal Appeals explained; therefore, any deficiency in the manner in which petitioner's trial counsel raised that issue could not have been constitutionally ineffective performance, as a matter of law. *Id.* Federal law fully supports this determination. *See, e.g., Cave v. Secretary for Dep't of Corrections*, 638 F.3d 739, 755 (11th Cir. 2011) ("[c]ounsel cannot be labeled ineffective for failing to raise issues which have no merit") (citation omitted).

In sum, the state court's rejection of this claim rests on an adequate and independent state procedural ground, and is therefore not reviewable in these § 2254 proceedings. To the extent

---

[77] To overcome a finding of procedural default by state court pursuant to an adequate and independent state procedural rule, the petitioner must "show cause for the default and resulting prejudice, or a fundamental miscarriage of justice." *Ferguson*, 580 F.3d at 1193 (citation omitted). Ray has done neither.

that this claim is not procedurally defaulted, petitioner is not entitled to relief because the state court did not apply *Strickland* in an objectively unreasonable manner.[78]

### D.      Failure to Sever Rape and Robbery Charges from Murder Charge.

Ray also contends that trial counsel fell short of Sixth Amendment guarantees by "fail[ing] to sever the charges of rape and robbery from the murder charge." (Doc. 32-1, at 102.) According to the Amended § 2254 Petition, "[t]rial counsel should have asked the jury to separately consider the rape and robbery charges." (*Id.*)

There are two fundamental infirmities with this habeas claim.  First, the Alabama Court of Criminal Appeals rejected it on an adequate, independent state procedural ground. Specifically, the appellate court reasoned that "[t]his issue was not presented in Ray's amended Rule 32 petition; therefore, it is not properly before this Court." *Ray II*, 80 So.3d at 995.  Under the Alabama line of authorities including *Kelley*, *Dunaway* and *Arrington*, this was a legitimate state procedural ground for denying the claim.  Petitioner now insists that his Rule 32 petition actually did raise "several issues with counsel's failure to address the rape and robbery." (Doc. 31, at 55.)  Once again, however, where a state court rejects a claim pursuant to an adequate and independent state procedural rule, the federal habeas court does not look behind that ruling or embark on its own *de novo* application of how it thinks the state courts should have applied their

---

[78]      In a tangentially-related argument tacked onto his claim that "Ray's counsel failed to move to exclude Owden's testimony on robbery and rape," petitioner states in his Amended § 2254 Petition that no information regarding Owden's forensic evaluation was "brought to the jury's attention" even though such evidence "bears directly on Owden's grip on reality." (Doc. 32-1, at 100-01.)  The Amended § 2254 Petition does not allege that trial counsel provided ineffective assistance in failing to use this evidence to attack Owden's credibility, and it is unclear why Owden's forensic evaluation is discussed in the petition at all (given petitioner's failure to connect it logically or legally to any ineffective assistance claim).  To the extent that petitioner intends to assert a separate ineffective assistance of counsel claim concerning the non-use of Owden's forensic evaluation, the Court finds such a claim to be meritless because (i) it was not included in Ray's Rule 32 petition or fairly presented to the state courts and therefore is unexhausted, and petitioner has shown neither cause and prejudice for the default nor a fundamental miscarriage of justice; and (ii) trial counsel's failure to tell the jury about Owden's evaluation was not deficient performance under *Strickland* because trial counsel likely could not have presented the information in Owden's forensic evaluation to the jury (given the evidentiary limitations on use of extrinsic materials to impeach a witness's credibility, and the evident futility of cross-examining Owden himself about an evaluation that he had not prepared and probably had never even seen).

own procedural rule in this case.  *See, e.g., Ferguson*, 580 F.3d at 1193; *Zeigler*, 345 F.3d at 1304.  Instead, the federal habeas court declines to review the claim, absent a showing of cause and prejudice or fundamental miscarriage of justice, neither of which has been made here.  As this ground for relief is procedurally defaulted, it is not reviewable.

Second, as the Rule 32 appellate court observed, it would have made little sense for Ray's trial counsel to file a motion to sever "given that the underlying felonies were an element of the capital-murder charges and were necessary to prove the capital-murder charges.  A motion to sever would most likely have been denied."  *Ray II*, 80 So.3d at 995.  Contrary to petitioner's apparent understanding, Ray was not charged separately with murder, robbery and rape.  The indictment charged him with two – and only two – offenses.  Count One charged Ray with "intentionally caus[ing] the death of TIFFANY HARVILLE by stabbing her with a knife and … caus[ing] said death during the time that [Ray] … was engaging, or attempting to engage, in sexual intercourse with [Harville] … by forcible compulsion, in violation of Section 13A-5-40(3)."  (Vol. 1, R-2 at 85.)  Count Two charged Ray with "intentionnaly [*sic*] caus[ing] the death of [Harville] by stabbing her with a knife, and … caus[ing] said death during the time that [Ray] was in the course of committing the theft of lawful money of the United States, … the property of [Harville] … in violation of Section 13A-5-40(a)(2)."  (*Id.*)  The point is simple:  There was nothing to sever.  The robbery and rape charges could not logically be severed from the murder charges because they were part and parcel of those murder charges.  Such a motion would have been futile to the point of amounting to wishful thinking; therefore, it was not ineffective assistance for Ray's trial counsel not to engage in the hollow, empty gesture of moving to sever that which could not (legally or logically) be severed.[79]

### E.    Failure to Use Available Helpful Evidence.

---

[79]    Additionally, in asserting that trial counsel should have tried to sever the rape and robbery charges from the murder charges, petitioner now argues that "[g]iven the lack of any physical evidence that any robbery or rape actually took place, the State's case as to these felonies was particularly weak."  (Doc. 32-1, at 102.)  This characterization of the evidence is inaccurate.  The evidence that Harville had been raped and robbed at the time that Ray and Owden murdered her was strong; indeed, such evidence came from the mouths of both Ray and Owden themselves in their confessions.  Given petitioner's own words, plus Owden's testimony, the State's proof of rape and robbery cannot fairly be described as "particularly weak."

-68-

Petitioner's fifth assignment of ineffective assistance by his trial counsel is that they "ignored" what he characterizes as "[h]elpful, readily available evidence that Harville was abducted and murdered by someone other than Ray." (Vol. 32-1, at 102-03.) In particular, Ray cites evidence that three witnesses last saw Harville getting into a brown car, while Owden's car was gray, green or blue.

As with several of petitioner's other allegations of ineffective assistance, this one is procedurally defaulted. Indeed, when petitioner raised this same argument to the Alabama Court of Criminal Appeals during Rule 32 proceedings, that court wrote, "This issue was not specifically raised in Ray's Rule 32 petition; therefore, it is not properly before this Court." *Ray II*, 80 So.3d at 990. Once again, this is an adequate, independent state procedural ground for denial of this claim. Once again, petitioner now expresses disagreement with the state courts' application of the adequate, independent state procedural ground to this assignment of error; however, this Court on habeas review does not second-guess how a state court applied a state procedural rule to dispose of a federal constitutional claim. Absent equivocation or ambiguity in the state court's ruling, or application of the state rule in arbitrary or unprecedented fashion, whether the Alabama Court of Criminal Appeals "got it wrong" in finding a well-settled state-law procedural bar applicable to this claim is immaterial under the limited habeas review authorized by 28 U.S.C. § 2254. Petitioner having shown no cause, no prejudice, and no fundamental miscarriage of justice, this procedural default precludes federal habeas review of this claim.

Alternatively, the Alabama Court of Criminal Appeals did address the merits of this claim and found that trial counsel's performance was not constitutionally deficient because "[c]ounsel did present 'helpful evidence'" on the topic of whether someone else had abducted and murdered Harville. *Ray II*, 80 So.3d at 990. As the Alabama appellate court explained, the evidence presented by trial counsel included (i) "testimony that two witnesses saw Rod Suttle stab Tiffany Harville;" (ii) testimony that Suttle "had been indicted for capital murder;" (iii) testimony from Latonya Simmons that on the day of Harville's disappearance, numerous individuals (including Suttle, but not including Ray) were congregated in an alley near the house Harville was visiting; and (iv) testimony from Erica Powell that when Harville left to go home that day, "there were a lot of people in the alley and Ray was not one of the individuals." *Id.* This evidence clearly shows that, far from ignoring evidence that Ray was not the perpetrator of

Harville's murder, trial counsel presented substantial evidence to the jury tending to show just that. Collectively, this evidence was far more "helpful" than the evidence showing confusion about the color of a car.

Defense counsel's strategic decision to introduce certain evidence advancing the "other killer" theory, but not to introduce other such evidence, did not fall below an objective standard of reasonableness, so as to constitute deficient performance under *Strickland*. *See, e.g., Evans*, 699 F.3d at 1268 ("[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess") (citations omitted). "[I]t is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented. … Counsel is not required to present cumulative evidence …." *Hall v. Thomas*, 611 F.3d 1259, 1293 (11th Cir. 2010) (citations omitted). Having presented substantial evidence tending to show that someone other than Ray killed Tiffany Harville, defense counsel cannot be deemed to have fallen below Sixth Amendment minimum standards of representation by electing not to present other, cumulative, weak evidence tending to support the same point.[80]

---

[80]    Scrutiny of the three witness statements that Ray faults his trial counsel for not presenting confirms that none of them can reasonably be viewed as game-changers or even particularly helpful. Daisy Wade's statement (given on August 26, 1995, nearly a month after Harville's disappearance) indicated only that she "saw a large car possible Thunderbird or a cougar median brown in color" parked across the street, without indicating that she saw Harville get into the car. (Vol. 20, R-47 at 2420.) Eric Wilson's statement (given on August 25, 1995) merely related that "my friend Paul Allen told me that Willie James Smiley, Charlie Fails and Kelvin Wilson was in a lt. brown or crème colored ltd. and had this girl inside the car." (*Id.* at 2421.) Eric Wilson's statement was hearsay and, besides, unhelpful since he did not know what color the car was or who "this girl" was. And Isaiah Johnson's statement (given on August 18, 1995) indicated that he saw Harville talking to "four or five black males in a brown Fifth Ave Crysler," then later saw that both Harville and the brown car were gone. (*Id.* at 2422.) All of these observations were made on July 29, 1995, at approximately 7:45 p.m. (*i.e.*, at or around nightfall) in an alley. How reliable could that "vehicle color" testimony have been? It was a reasonable strategic decision for defense counsel to answer that question, "Not very." This was hardly "smoking gun" evidence implicating someone else in Harville's murder and, indeed, was not nearly as strong as the evidence defense counsel actually presented to the jury on this point. It was thus a permissible, reasonable strategy decision, and not ineffective assistance, for counsel to elect not to present the car-color testimony. *See, e.g., Boyd*, 697 F.3d at 1339-40 (no guilt-phase ineffectiveness where evidence that petitioner contended trial counsel should have found and presented at trial was "contradictory, cumulative, and weak when compared to the evidence (Continued)

### F.   *Failure to Raise Pretrial Objections to Use of Mabins Convictions.*

As his next claim for ineffective assistance, Ray faults trial counsel for failing to "litigate[] the admissibility of the Mabins capital murder convictions in advance of Ray's trial in the Harville case."  (Doc. 32-1, at 103.)  Petitioner reasons that if his lawyers had moved to exclude the Mabins convictions before the Harville trial, they would have known that those convictions would be admissible and could have modified their penalty-phase strategy accordingly.  In that regard, petitioner hypothesizes that if they had known ahead of time that the Mabins convictions would be deemed admissible in the penalty phase, "they would or certainly should have prepared differently for the penalty phase."  (*Id.* at 104.)  On collateral review in state court, the Alabama Court of Criminal Appeals affirmed the trial court's determination that "[t]his claim of ineffective assistance is completely without merit" because counsel did not perform deficiently.  *Ray II*, 80 So.3d at 988 (citation omitted).

This is an unconventional assignment of error, one which essentially amounts to Monday-morning quarterbacking of an adverse circumstance that developed in an unexpected, last-minute fashion.  At the Rule 32 evidentiary hearing, defense counsel testified that he had no inkling that the prosecution might attempt to use the Mabins convictions as an aggravating circumstance against Ray.  (Vol. 25, R-52 at 394-95, 404.)  He simply "didn't think it was an issue."  (*Id.* at 426.)  At trial, when the State announced its intent to pursue that strategy, this revelation was "out of the blue."  (*Id.* at 436.)  Until that moment, "Nobody mentioned it. Nobody brought it up.  It was not a consideration.  It was completely off the radar."  (*Id.*)  Indeed, just a week before trial, the State (specifically, lead prosecutor Ed Greene) provided assurances to defense counsel and the trial court that it did not intend to use the Mabins convictions unless Ray testified (which he did not, either at the guilt/innocence phase or at the penalty phase).[81]  Then, at the outset of the penalty phase in the Harville trial, the State flipped

---

presented at trial," such that "there is no reasonable probability of a different outcome" and *Strickland* prejudice cannot be shown).

[81]     During the July 19, 1999 pretrial hearing, the following exchange took place:

"THE COURT:     Let's go back to his previous conviction.
"MR. WHATLEY:   In the capital case?  Well, Judge, our position is that it doesn't
                come up until and unless it's there for impeachment.

(Continued)

positions and declared its intent to offer the Mabins convictions in support of a third aggravating circumstance favoring imposition of the death penalty against Ray.  (Vol. 5, R-19 at 724.) Defense counsel promptly objected "to the use of the prior capital conviction as an aggravating circumstance and letting this jury have knowledge of the prior capital conviction.  And we would preserve that objection throughout this phase of the case."  (*Id.* at 725.)  When Judge Jones ruled that the jury could hear about the Mabins convictions as an aggravating circumstance, defense counsel reiterated, "For purposes of the record we would object and ask that it be noted in the record so that we preserve the issue for later review."  (Vol. 5, R-20 at 726.)

In his Amended § 2254 Petition, Ray argues that his trial counsel provided constitutionally inadequate assistance by failing to move to exclude the Mabins convictions before trial began.  This is not a fair or reasonable critique of trial counsel's performance.  The critical fact (overlooked in Ray's habeas petition) is that, before trial began, the State had unequivocally (and on the record) expressed its intention <u>not</u> to use the Mabins convictions.  The Court cannot say that no competent counsel would have take prosecutor Greene at his word, much less that any reasonably competent attorney would have filed a formal pretrial motion as a preemptive strike to litigate what both sides and the trial judge then believed was a non-issue. Nor is it persuasive for petitioner to argue that defense counsel would have altered their approach to Ray's mitigation case based on the presence or absence of a third aggravating circumstance. Certainly, attorney Whatley did not so testify during the Rule 32 hearing.  Ray was charged with a gruesome and horrific crime bearing a significant risk of the death penalty based on the two aggravating circumstances (*i.e.*, murder during the course of a rape, murder during the course of a robbery) that had been identified at the outset of the case.  After she was repeatedly sexually assaulted and robbed, the young victim was stabbed in the head a dozen times (several stabs piercing the skull and entering the brain), and her blood-soaked, partially clothed corpse had been left to rot near a cotton field.  Ray had confessed to this crime in all particulars.  The risk of a death sentence was <u>always</u> high in this case, even without admission of the Mabins

---

      "MR. GREENE:     I concur with that.
      "MR. WHATLEY:   And if Mr. Ray chooses to testify.
      "MR. GREENE:     Then we intend to use it."
(Vol. 2, R-8 at 67.)

convictions.  There is no evidence and no reason to believe that any competent counsel would have approached mitigation differently with the knowledge of a third aggravating circumstance than counsel would have done with just the first two aggravators.[82]  Either way, Ray's risk of exposure to the death penalty was substantial, and the need for the defense to take that threat seriously and prepare a strong mitigating case was obvious and self-evident.

For all of the foregoing reasons, and given the doubly deferential standard of review, the Court finds that the Alabama Court of Criminal Appeals did not err in concluding that defense counsel satisfied the *Strickland* performance threshold by objecting contemporaneously when the State reversed course and announced its intent to introduce evidence of the Mabins convictions during the penalty phase.  No pretrial motion on the subject was necessary for defense counsel to comport with minimum constitutional guarantees of acceptable, competent representation.

### G.    Failure to Move for Change of Venue.

Ray also ascribes ineffective assistance to his trial counsel's failure to file a motion for change of venue.  The factual basis for this claim is that Ray had been convicted of capital murder in the Circuit Court of Dallas County, Alabama, on February 25, 1999 for the slaying of two children, Earnest and Reinhard Mabins, inside their home.  Ray's trial for the Harville murder took place in Dallas County beginning on July 26, 1999, just five months after the Mabins trial.  Petitioner ascribes constitutionally deficient performance to trial counsel's purported failure to move for change of venue.  The Alabama Court of Criminal Appeals denied this claim on the merits, finding no constitutionally deficient performance.  *See Ray II*, 80 So.3d at 986-87.

---

[82]    During the Rule 32 hearing, petitioner's counsel repeatedly asked attorney Whatley questions that appeared designed to elicit a response that he did not view Ray as facing a serious risk of being sentenced to death until prosecutor Greene dropped the bombshell about the Mabins convictions, that he would have designed his mitigation case differently had he known the Mabins convictions were coming in, and so on.  Whatley did not take the bait.  Each time such a question was asked, Whatley's responses gave scant (if any) support to that line of reasoning.  (Vol. 25, R-52 at 395 & 440.)  Thus, the idea that the introduction of the Mabins convictions somehow caught defense counsel flatfooted because they had previously seen no reason to invest thought and effort into preparing an effective mitigation case appears to be counterfactual.  There is no evidence that the defense team would have investigated and prepared their mitigation case in a materially different manner had they known in advance that they would have to contend with a third aggravating circumstance.

As an initial matter, petitioner is incorrect in stating that his counsel "did not seek a change of venue after Ray was convicted of" the Mabins murders.  (Doc. 32-1, at 105.)  As the Rule 32 appellate court recognized, Ray's previous trial counsel did indeed file a motion for change of venue on the ground of excessive pretrial publicity in March 1998.  (Vol. 1, R-2 at 34-36.)[83]  More importantly, petitioner overlooks the fact that attorney Whatley affirmatively sought relief on that motion in oral argument before the trial judge on July 19, 1999, one week before the Harville murder trial commenced.[84]  At that time, Ray's trial counsel specifically argued that this case was "completely unique" because "you have a capital defendant who was convicted less than six months [earlier] in the same county and then come back with your venire to select another capital murder case unrelated."  (Vol. 2, R-8 at 68.)  Trial counsel also indicated to the trial judge that, with respect to the Mabins trial, "the case has been reported extensively in the local paper.  There has been coverage in the Montgomery paper.  There has been coverage in WAKA since my involvement in the case, and I think everybody is well aware of that."  (*Id.* at

---

[83]     Defense counsel advocated in favor of that motion at a hearing held on August 31, 1998, arguing that the cumulative effect of local newspaper articles was "to set community feeling against our client and prejudice and poison the minds of prospective jurors."  (Vol. 2, R-6 at 46.)  Judge Jones reserved ruling on the motion until jury selection.  (*Id.* at 47.)

[84]     Petitioner's statement in his Amended § 2254 Petition that trial counsel "did not renew the change of venue motion or press for a ruling even after Ray was convicted of the Mabins murders" (doc. 32-1, at 106) is thus materially inaccurate.  Remarkably, petitioner describes trial counsel's oral argument in favor of the motion to change venue as a circumstance in which they "withdrew the motion."  (*Id.*)  The transcript reflects nothing of the sort.  Counsel argued the motion, and the trial judge announced that he would carry it to trial to see if the panel members had actually been prejudiced by the pretrial publicity.  Similarly unhelpful is petitioner's out-of-context suggestion that Whatley agreed during the Rule 32 evidentiary hearing that "he may have made a wrong call" on the venue issue.  (*Id.*)  That is not a fair portrayal of Whatley's testimony.  In fact, what Whatley said is that "there wasn't" significant publicity about the Mabins case, that he was "shocked" by the dearth of publicity the Mabins trial generated, that after the Mabins verdict he "expected a great deal more attention in the media than what we got," and that he "knew [he] would never win" if he pushed hard for a change of venue because his "impression was we were never going to get a change of venue in this case, and it didn't matter that the Mabins case was before."  (Vol. 25, R-52 at 424-25, 434.)  Taken in context, Whatley's testimony leaves no doubt that he viewed a motion for change of venue as being a futile endeavor in this case.  Contrary to petitioner's characterization in the Amended § 2254 Petition, there was no meaningful indication in Whatley's Rule 32 hearing testimony that he regretted or second-guessed that assessment or believed he had gotten it wrong.

-74-

69.)  The trial judge declined to grant the motion for change of venue on July 19, 1999, instead opting for a wait-and-see approach of conducting the voir dire process and see what evidence of media saturation or actual prejudice might exist.  (*Id.* at 69-71.)[85]  Trial counsel could not have been ineffective in failing to seek a change of venue, because the record unambiguously shows that trial counsel argued for just that at a motions hearing conducted just one week before the Harville murder trial began.

More broadly, applicable precedents leave no doubt that a motion for change of venue for adverse pretrial publicity places an onerous burden on the movant.  *See generally Gaskin v. Secretary, Dep't of Corrections*, 494 F.3d 997, 1005 (11th Cir. 2007) (no habeas error in denial of petitioner's motion or change of venue, even though local newspaper articles "may have been somewhat prejudicial or inflammatory" and "92% of potential jurors and 11 of the 12 jurors at trial had read newspaper accounts of the crime"); *United States v. Campa*, 459 F.3d 1121, 1144 (11th Cir. 2006) (explaining that there is no presumed prejudice absent a trial atmosphere "utterly corrupted by press coverage"); *Baldwin v. Johnson*, 152 F.3d 1304, 1314 (11th Cir. 1998) ("The fact that a case generates widespread publicity does not, in and of itself, warrant a change of venue.").  With respect to actual prejudice from pretrial publicity, the Rule 32 trial court made a factual finding (later affirmed by the appellate court) that Ray "offered no evidence at his evidentiary hearing affirmatively proving that any member of venire had read news reports about his case or that any juror knew he had been convicted for the capital murder of the Mabins brothers."  *Ray II*, 80 So.3d at 986 (citation omitted).  Petitioner makes no showing to overcome the presumption of correctness to which that finding is entitled on habeas review.[86]

---

[85]     The trial court's announced approach to defense counsel's urging of the change of venue motion on July 19, 1999 echoed the court's reaction when Ray's original defense counsel first argued in support of its change of venue motion at a hearing held on August 31, 1998.  At that time, the trial judge took the motion under advisement pending voir dire, so as to gauge the level of media saturation in the case.  (Vol. 2, R-6 at 47.)  When attorney Whatley re-argued the motion for change of venue at the hearing held on July 19, 1999, Judge Jones' reaction was unchanged.

[86]     Given the careful, extensive voir dire on pretrial publicity, any attempt by defense counsel to renew or re-argue the motion for change of venue at the close of jury selection would have been futile.  As such, counsel's decision not to make such an attempt cannot be constitutionally deficient performance, as a matter of law.  *See Stephens v. Secretary, Florida Dep't of Corrections*, 678 F.3d 1219, 1226 (11th Cir. 2012) (state court's rejection of claim that (Continued)

Considering all of these circumstances, the Court finds that it was neither contrary to, nor an unreasonable application of, clearly established federal law for the state courts to determine that Ray's trial counsel did not provide constitutionally deficient performance under *Strickland* with regard to seeking a change of venue. To the extent that trial counsel did not pursue such a motion as vigorously as petitioner now thinks they should have done, that decision was a reasonable strategic decision well within the wide parameters of reasonable attorney competence, particularly given the likely futility of any such motion in light of the surprisingly moderate level of media coverage involved.

> ### H.     *Failure to Preserve Evidentiary Objections.*

The eighth respect in which Ray contends trial counsel was ineffective is an alleged "fail[ure] to make timely objections to preserve evidentiary issues for appellate review." (Doc. 32-1, at 107.) Specifically, petitioner criticizes trial counsel for not timely objecting to the following matters: (i) the State's use of a conviction post-dating the Harville offense as an aggravator; (ii) admission of prejudicial evidence of Ray's convictions in the Mabins murders; (iii) the State's failure to arraign Ray on a new indictment; and (iv) admission of prejudicial photographs of Tiffany Harville's skeletal remains.

Alabama courts carefully reviewed each of these sub-issues during the Rule 32 proceedings and found no deficient performance under *Strickland*. Concerning counsel's failure to object at trial that the Mabins convictions were not permissible aggravators on the ground that they post-dated the Harville slaying, the Alabama Court of Criminal Appeals reasoned that it did not matter because "Ray's prior capital-murder conviction was admissible at Ray's sentencing" under Alabama law, regardless of what objections counsel did or did not raise. *Ray II*, 80 So.3d at 993-94. Concerning the allegation that counsel failed to object to admission of the Mabins convictions as unduly prejudicial, the state court deemed that assignment of error to be counterfactual because the record confirms that trial counsel did in fact raise that objection at trial. *Id.* at 993. As for trial counsel's failure to object to the lack of an arraignment on the new

---

trial counsel was ineffective in failing to move for change of venue was not contrary to or an unreasonable application of clearly established federal law, where "the record demonstrates that the trial court went to great lengths to voir dire the jury with regard to the pretrial publicity of this case, and to insulate the jury from the taint of []partiality").

indictment, the Alabama Court of Criminal Appeals opined that trial counsel could not have performed deficiently in this regard as long as Ray was on notice of the charges against him, which he obviously was. *Id.* at 994-95. And the Alabama Court of Criminal Appeals waved off Ray's protestations that trial counsel should have objected to the photographs of Harville's remains, concluding that those images were relevant and admissible to show the jury the victim's injuries and the location of the crime, and they also corroborated facts from Ray's own confession as well as the testimony of certain other witnesses. Because any objection on this point would have been meritless, the Alabama courts in the Rule 32 proceedings found that counsel was not ineffective for failing to make one. *Id.* at 995.[87]

Petitioner has not met his burden under the doubly deferential standard of *Strickland* and § 2254(d) to persuade this Court that the state courts applied *Strickland* to the facts of these claims in an objectively unreasonable manner. Certainly, there is a reasonable argument that counsel satisfied minimum performance standards by vigorously objecting to the admissibility of the Mabins convictions, not objecting to the State's failure to arraign him on a new indictment as to which Ray obviously had notice, and not objecting earlier to crime-scene photographs that were plainly admissible in any event. Given the state courts' clear-eyed, well-reasoned and eminently sensible application of *Strickland* to all four sub-assignments of error contained in this claim, habeas relief is inappropriate and unavailable.

### I. *Deficient Presentation of Evidence and Cross-Examination of Witnesses.*

Petitioner also criticizes trial counsel on the stated ground that their "presentation of evidence and cross-examination of witnesses at the guilt phase of the trial fell below an objective standard of reasonableness." (Doc. 32-1, at 108.) This claim is short on specifics; indeed, the Amended § 2254 Petition offers only nebulous supporting statements such as "Counsel … failed to put forth a defense," counsel made unspecified "contradictory assertions throughout the course

---

[87]      With regard to the photographs, Ray's assertion that his attorney failed to make timely objection suffers from the additional defect that it is inaccurate. The record shows that trial counsel filed a five-page written "Motion in Limine to Preclude the State from Moving to Admit into Evidence Photographs Prejudicial to Mr. Ray" (Vol. 1, R-2 at 222-26) approximately one week before trial. This is plainly a "timely objection." Defense counsel followed up by arguing in support of that motion at the hearing held on July 19, 1999. (Vol. 2, R-8 at 74-75.) Under the circumstances, petitioner's contention that trial counsel was ineffective for failing to seek exclusion of the photographs approaches frivolity.

of the trial," and counsel should have addressed the theory that Owden and Ray had robbed, raped and murdered Harville to gain respect for their "gang." (*Id.*)

The threshold defect in this claim is that petitioner never presented it to the Alabama appellate courts. To be sure, Ray raised this very claim in the very same terms in his Rule 32 petition. (Vol. 9, R-45 at 371.) The trial court rejected this claim as being too general and pleading insufficient facts to comport with the requirements of Rule 32.6(b), Ala.R.Crim.P. (Vol. 30, R-65 at 1147-48.) In his Rule 32 appeal, however, Ray omitted this issue (*see* vol. 27, R-54 at 101-20); indeed, he does not contend otherwise in these habeas proceedings. Of course, where a trial court enters a Rule 32 denial of a claim, a habeas petitioner must appeal that ruling to the Alabama appellate courts in order for it to be exhausted. *See Hunt v. Commissioner, Alabama Dep't of Corrections*, 666 F.3d 708, 740 (11th Cir. 2012) ("the prisoner must appeal the Rule 32 court's denial of his claim to the court of criminal appeals in order to satisfy the exhaustion requirement"); *Mancill v. Hall*, 545 F.3d 935, 939 (11th Cir. 2008) (habeas exhaustion requirement "is not satisfied if the petitioner fails to present his claims to the state's highest court"). This claim is not exhausted, and petitioner has shown neither cause and prejudice, nor a fundamental miscarriage of justice, that might excuse same. Accordingly, this Court is precluded from examining this claim on the merits.[88]

---

[88]     If the merits of this claim were to be considered, the results would be unchanged. The broad, conclusory allegation that "Counsel … failed to put forth a defense" on Ray's behalf cannot be reconciled with the facts. Trial counsel raised numerous defenses for Ray by presenting arguments to the jury that Ray was not guilty of the Harville murder because he was cloaked with the presumption of innocence, the State's identification of the skeletal remains as Harville was deficient, there was eyewitness testimony that Rod Suttle had stabbed Harville and Suttle had previously been indicted for this crime, the State had not met its burden of proof, and the evidence of rape was weak. (Vol. 5, R-16 at 686-94.) Trial counsel unquestionably put forward legal and factual defenses on Ray's behalf. That those defenses were not successful – or that Ray's habeas counsel thinks more or different defenses should have been emphasized instead – does not remove the performance of Ray's trial counsel from the broad range of competence expected of criminal defense attorneys. As for defense counsel's failure to address the "gang" issue, petitioner is incorrect in saying that the enhancement of the gang's respect as a motive for the crime is "ungrounded speculation." (Doc. 32-1, at 108.) The jurors heard Marcus Owden testify that he and Ray were forming a gang and that their crimes against Harville were conceived as part of that enterprise. (Vol. 5, R-13 at 598-99.) Certainly, it was a reasonable strategic decision for trial counsel to stay as far away from the "gang" issue as possible to avoid heightening it in jurors' consciences.

### J.      *Failure to Present Exculpatory Evidence.*

Petitioner next contends that he was deprived of his Sixth Amendment right to counsel at trial because defense counsel "made no effort to inform the jury that Ray had publicly retracted both of his confessions," "made no effort to attack the credibility of Ray's custodial statements," and failed to "present evidence that Ray's confessions were the result of Owden's influence and coercion." (Doc. 32-1, at 109.)[89]

During Rule 32 proceedings, the Alabama Court of Criminal Appeals found no deficient performance under *Strickland* because (i) petitioner developed no evidence at the Rule 32 hearing that might overcome the presumption that trial counsel's acts and omissions in this regard were a reasonable exercise of professional judgment; (ii) Ray's "retraction" was inadmissible hearsay under Alabama law, so defense counsel could not have put it before the jury in any event; and (iii) Ray came forward with no evidence in the Rule 32 hearing tending to show that Owden dominated or coerced him into confessing guilt to murders that he did not commit. *See Ray II*, 80 So.3d at 990-91.[90]

The Alabama courts' findings of fact on this issue are not clearly erroneous, and therefore must be accepted for purposes of habeas review. Furthermore, the legal reasoning of the Alabama Court of Criminal Appeals on this point is virtually unassailable. It's one thing for petitioner to blast his trial counsel for not "inform[ing] the jury" that Ray now says his confessions are not truthful. It's quite another for petitioner to offer any colorable evidentiary

---

[89]      In support of this ground for relief, petitioner cites only a Memo to File prepared by trial counsel on December 9, 1998, reflecting that Ray had informed his lawyers "that his confessions were not truthful … and that he did not commit the offenses" in either the Mabins or the Harville cases. (Vol. 20, R-47 at 2590.) Petitioner also argues that because of counsel's omissions, "a guilty verdict was a foregone conclusion." (Doc. 32-1, at 109.) The Amended § 2254 Petition mischaracterizes the record and overlooks the substantial defenses that trial counsel pursued on Ray's behalf. No reasonable observer could review the trial transcript and conclude that "a guilty verdict was a foregone conclusion" because defense counsel failed to introduce evidence that either they did not have or would not have been admissible under the Alabama Rules of Evidence.

[90]      According to the Rule 32 trial court, "Ray did not present any evidence at his evidentiary hearing … that Owden forced him to participate, and subsequently cover-up, the rape, robbery, and brutal murder of Tiffany Harville." *Ray II*, 80 So.3d at 991 (citation omitted). There was, in short, a complete failure of proof by petitioner on his theory that Owden had dominated or coerced him in some way.

pathway that trial counsel might have had to convey such information to the jury.  Through what witness does petitioner think trial counsel should have introduced the retraction?  Ray exercised his Fifth Amendment privilege not to testify at trial.  If not through Ray, what witness could possibly have testified to Ray's stance that he was not telling the truth when he confessed to murdering Harville?  Counsel is not constitutionally ineffective under *Strickland* for failing to accomplish (or attempt) mission impossible by seeking to introduce evidence that is plainly inadmissible under applicable rules of evidence.  And petitioner presented the Rule 32 court with no evidence tending to show coercion or domination by Owden that caused him to confess.  Trial counsel was not ineffective for failing to present evidence to the jury that, to this day, has never been shown to exist.

At a minimum, there is a reasonable argument that Ray's trial counsel satisfied *Strickland*'s deferential standard for objectively reasonable performance.  As such, this Court cannot and will not disturb the state courts' reasonable determination that the assistance provided by Ray's trial counsel in this regard falls within the wide range of competence permitted under the Sixth Amendment.

### K.      Failure to Present Helpful Character Evidence.

Petitioner's guilt-phase ineffectiveness subclaim #11 is that his Sixth Amendment right to counsel was compromised when trial counsel failed to present "readily available character evidence" during the guilt/innocence phase.  (Vol. 32-1, at 110.)  According to the § 2254 Petition, this evidence would have included testimony that "Ray was always willing to help others, was shy, friendly and quiet, and easily influenced and impressed," and that the witnesses "never knew Ray to instigate violence against women … or to carry a knife."  (*Id.*)

During Rule 32 proceedings, Ray raised this claim; however, the trial court denied it on the merits.  In so doing, the Rule 32 court reasoned that, had defense counsel presented evidence in the guilt/innocence phase concerning Ray's reputation for peacefulness, helpfulness, and non-violence, the State would have been able to present cross-examination or rebuttal evidence showing that Ray had been convicted of shooting the two Mabins brothers to death in their home.  Under the circumstances, the trial court reasoned, "Ray's trial counsel were very wise to stay away from doing anything that might have allowed the State to offer[] evidence about the Mabins case during the guilt phase of Ray's trial."  (Vol. 30, R-65 at 1152.)  Petitioner did not

present this claim to the Alabama Court of Criminal Appeals; however, he renews the claim here in his Amended § 2254 Petition.

As a preliminary matter, this issue is procedurally barred from federal habeas review because Ray did not present it to the state's highest court in his state post-conviction proceedings. Because of that omission, this claim is not exhausted, and petitioner has shown neither cause and prejudice, nor a fundamental miscarriage of justice, that might enable him to overcome the procedural default as to this claim.

If the claim were considered on the merits, the outcome would be unchanged for the reasons stated in the Rule 32 trial court's written opinion. To say that defense counsel would have been playing with fire had they elected to introduce this character evidence would be an understatement. By offering evidence in the guilt/innocence phase that Ray had a reputation for non-violence, defense counsel would have opened the door for the State to present evidence that Ray had been convicted of brutally gunning down two young boys in cold blood. At the very least, it was an acceptable strategic decision, well within the range of objectively reasonable and competent representation, for defense counsel to stay as far away from this subject as they could during the guilt/innocence phase, particularly in light of the minimal benefit such character evidence would have likely conferred. *See generally Chandler v. United States*, 218 F.3d 1305, 1321 (11th Cir. 2000) ("A lawyer reasonably could have determined that character evidence would not be compelling in this case. And a lawyer reasonably could also fear that character evidence might, in fact, be counterproductive: it might provoke harmful cross-examination and rebuttal witnesses."); *see also Evans*, 699 F.3d at 1268 ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.") (citations omitted).[91]

---

[91] This assignment of error calls to mind the Eleventh Circuit's recent observation that, regardless of the strategy that capital defense lawyers choose, "they are often 'damned if they do, and damned if they don't' when their clients later assert claims of ineffective assistance of counsel during collateral review." *Morton v. Secretary, Florida Dep't of Corrections*, 684 F.3d 1157, 1160 (11th Cir. 2012). The same habeas counsel who now malign Ray's trial counsel for not getting into reputation evidence during the guilt/innocence phase would no doubt have brought an equally vehement *Strickland* challenge against Ray's lawyers had they presented such (weak) character evidence, thereby enabling the State to present extremely damaging evidence of Ray's previous murder convictions during the guilt phase to rebut such character evidence. Such (Continued)

### L.    *Passivity / Lackadaisical Approach to Defense.*

Yet another subclaim of ineffective assistance that Ray advances in his § 2254 Petition is a sweeping catch-all claim that trial counsel were "passive and ineffective," "perfunctory," and "lackadaisical" throughout the guilt phase of trial.  (Doc. 32-1, at 110-11.)  This claim is confusingly pleaded; indeed, its contours are difficult to define, because it embraces a grab-bag of allegations and events, many of which are already encompassed in other claims.  (*Id.* at 110-17.)[92]  Among other things, Ray argues in this claim that counsel was ineffective by (i) failing to hire experts to challenge the State's experts identifying the skeletal remains as those of Tiffany Harville; (ii) presenting only three witnesses in the guilt/innocence phase, which witnesses did not testify as long or as helpfully as petitioner thinks they should have; (iii) failing to cross-examine witnesses Coleman, Freine, Owden and Edwards effectively; (iv) failing to anticipate a hearsay objection with respect to one item of cross-examination; (v) failing to challenge the State's "irrelevant and inflammatory" evidence that Ray had visited Harville's mother the day after Harville went missing; (vi) failing to object to references in Owden's testimony that Owden had been convicted of the Mabins murders, for fear that jurors' memories might be jogged that Ray was also a defendant in that case; and (vii) failing to object at trial to the admission of crime scene photographs.

Ray's Rule 32 petition included a similar "passive and ineffective" claim of ineffective assistance.  (Vol. 9, R-45 at 373-74.)  That claim raised items (i), (ii) and (iii) above.  In a separate claim in the Rule 32 petition, Ray alleged that his lawyers at trial were ineffective as to the cross-examination items listed at (iv) above.  (*Id.* at 374-76.)  In yet a third Rule 32 claim,

---

results-driven opportunistic second-guessing is not the proper function or use of *Strickland* review in federal habeas corpus proceedings.

[92]    The Court is well aware, of course, of the convention in habeas petitions of bringing an ineffective assistance claim touting cumulative error.  But that's not what this ground #12 is.  Rather, ineffective assistance claim #19 (discussed *infra* in subsection S) is a cumulative error claim.  By all appearances, this ground #12 is redundant and unfocused.  The Court will not accept any invitation from petitioner to re-tread ground that has already been covered in this Order, or to craft a focus for this claim that petitioner has not.  *See generally Chavez v. Secretary Florida Dep't of Corrections*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him.").

Ray raised items (v), (vi) and (vii) above. (*Id.* at 376-78.)[93]  The Rule 32 trial court rejected the claim concerning expert DNA evidence and preparation of defense witnesses as being unsupported by evidence from the evidentiary hearing, such that petitioner had not met his burden under *Strickland* of showing deficient performance.  (Vol. 30, R-65 at 1152-54.)  The state trial court likewise denied the claim concerning cross-examination of State's witnesses and the hearsay objection because Ray developed no evidence of deficient performance as to the Coleman cross-examination, no evidence of deficient performance as to whether Freine could have collected DNA evidence from Owden's car or the victim's clothing, and no evidence of deficient cross-examination of Owden and Edwards.  (*Id.* at 1154-58.)  The Rule 32 trial court denied Ray's ineffective assistance claim as to the evidence that Ray had visited Harville's mother the day after Harville vanished on the ground that such evidence was highly probative and not objectionable.  (*Id.* at 1159-60.)  Similarly, the state court pointed out the dearth of evidence that any juror was affected in any way by Owden's limited testimony concerning Owden's involvement in the Mabins murders.  (*Id.* at 1160-62.)  Finally, the trial court opined that the crime scene photographs were plainly relevant and admissible, such that Ray's trial counsel would have had no viable basis for objecting to them.  (*Id.* at 1162-63.)

In his appeal of the Rule 32 proceedings, however, Ray raised none of these issues.  (Vol. 27, R-54 at 101-20.)  As such, these grounds of purported ineffective assistance have not been exhausted and are procedurally barred because Ray has not shown cause and prejudice or a fundamental miscarriage of justice that might excuse the lack of exhaustion.  As discussed in claim after claim discussed herein, a habeas petitioner does not properly exhaust a claim by submitting it to the state trial court on collateral review, but then failing to appeal the claim to the state's appellate courts.  Once again, this fundamental principal of exhaustion precludes examination of the merits of Ray's claim.[94]

---

[93]     Petitioner does not explain why he presented these issues as three separate subclaims of ineffective assistance of counsel in his Rule 32 petition, while combining them into a single subclaim in his Amended § 2254 Petition.  Be that is it may, those same claims were presented in both the Rule 32 petition and the federal petition for habeas corpus.

[94]     Even if these claims were to be addressed on the merits, the Court would deny relief because the Rule 32 court's treatment of these issues was not an objectively unreasonable application of *Strickland*.  To elaborate, there is no indication that defense counsel's challenge at trial to the State's identification expert would have been strengthened if trial counsel had (Continued)

### M.      Failure to Challenge Fifth, Sixth, and Fourteenth Amendment Violations.

Petitioner's next ground for alleging ineffective assistance is that trial counsel did not "adequately challenge" the admission of Ray's custodial statements into evidence.  (Doc. 32-1, at 117.)  The § 2254 Petition alleges that Ray's statements "were neither knowing, intelligent, nor voluntary," and that defense counsel did not do enough to prevent those statements from being admitted.  (*Id.* at 117-18.)[95]

---

requested and received permission to hire expert witnesses on DNA testing and the like.  The record is devoid of any evidence that trial counsel could have done anything to bolster their arguments at trial that the human remains found near a cotton field and identified via dental records were not actually those of Tiffany Harville.  Petitioner's theory that counsel failed "to adequately prepare their own witnesses" (doc. 32-1, at 111-12) is undermined by the record.  By all appearances, defense counsel obtained the testimony it wanted from witnesses Latonya Simmons and Erica Powell (*i.e.*, that many people (not Ray) were in the alley on the night Harville disappeared).  To be sure, defense counsel's examination of Patricia Simmons was not as successful, but a witness (and friend of the decedent) who exhibits uncooperativeness during questioning by defense counsel can hardly be said to prove inadequate performance by counsel under *Strickland*.  Likewise, if this Court were to declare every criminal defense lawyer who has been tripped up by a hearsay objection (even one that could have been anticipated in advance) to be constitutionally deficient, then nary a single lawyer in the State of Alabama would pass muster under *Strickland*.  Petitioner's objections to lines of inquiry not pursued in cross-examining Coleman, Lt. Freine, Owden and Edwards are all classic examples of strategic decisions that petitioner could (and should) have explored with trial counsel during the Rule 32 hearing, but failed to do so and therefore failed to present evidence sufficient to overcome the heavy *Strickland* presumption of reasonableness.  *See generally Johnson v. Alabama*, 256 F.3d 1156, 1186 (11th Cir. 2001) ("Absent a showing that real impeachment evidence was available and could have been, but was not, pursued at trial, [the petitioner] cannot establish that the cross conducted by his attorneys fell outside the range of professionally competent assistance."). While petitioner ascribes error to trial counsel's failure to object to evidence that Ray visited Harville's mother the day after Harville disappeared, such evidence was plainly admissible, such that any objection would have been certain to fail.  The references to the Mabins murder in Owden's testimony were not so inflammatory that any competent attorney necessarily would have objected to them.  And the Alabama courts were as clear as they could be that the crime scene photographs were relevant and admissible, so any objection by defense counsel on this point would have been for naught.  In short, even if this hodgepodge, grab-bag, multi-faceted claim of ineffective assistance of counsel were not barred for want of exhaustion (which it is), such claim would nonetheless fail on the merits because petitioner has failed to show that there is no reasonable argument that counsel satisfied *Strickland*'s deferential performance standards.

[95]      In certain respects, this subclaim is redundant of the issue previously addressed in Section V.B., *supra*.  The Court will not reiterate the same analysis and reasoning here, but incorporates it by reference to the extent that there is overlap between the two claims.

A multitude of inconvenient record facts undermine this claim for relief.  As previously discussed, defense counsel <u>did</u> challenge the admissibility of these statements via a motion to suppress filed before trial and cross-examination of Lt. Freine out of the jury's earshot to develop an involuntariness argument.  That these efforts were not successful does not equate to a Sixth Amendment violation.  More importantly, the available objections were meritless.  Alabama courts have ruled four different times that Ray's statements to Lt. Freine were voluntary and admissible.  At trial, Judge Jones heard the State's proffer of Lt. Freine's testimony and ruled (over defense objection) that the statements were admissible.  (Vol. 4, R-13 at 528.)  On direct appeal, the Alabama Court of Criminal Appeals ruled as to Ray's statements of April 18, 1997, April 24, 1997, and August 19, 1997 that "Investigator Freine's uncontested testimony is sufficient to establish that the appellant's last three statements were voluntary and that the proper *Miranda* predicate was laid.  Therefore, the trial court did not err in admitting these three statements into evidence."  *Ray I*, 809 So.2d at 887.  In Rule 32 proceedings, the trial court concluded that "Ray presented not [*sic*] evidence at his evidentiary hearing that would conflict with the Criminal Court of Appeals' ruling.  Ray failed to prove that any relationship he may have had with Freine or his alleged consumption of alcohol rendered his statements involuntary.  Ray also failed to present any evidence proving he was not informed of his *Miranda* rights before being questioned by Freine."  (Vol. 30, R-65 at 1164-65.)  And on appeal in the Rule 32 proceedings, the Alabama Court of Criminal Appeals affirmed Judge Jones' determinations and declared that "Ray's claim is not supported by the record."  *Ray II*, 80 So.3d at 993.  Ray's trial counsel did not violate *Strickland* by failing to achieve the exclusion of Ray's custodial statements, which (on this record) would have been nothing short of miraculous.

In his federal habeas petition, petitioner attempts to reinvigorate this claim by citing facts that have never been presented to or found by any court at any time.  He criticizes trial counsel for not presenting evidence "that Ray's relationship with Detective Roy Freine prevented Ray from intelligently waving [*sic*] his constitutional rights."  (Doc. 32-1, at 117.)  No evidence of such a "relationship" (or trial counsel's awareness of same) has been identified in the record, even though petitioner had a full and fair opportunity to develop that evidence at the Rule 32 hearing.  Likewise, petitioner now claims that "Ray … was intoxicated when the police arrested him," such that he "felt nauseated and disoriented" when he was questioned and "told police he wanted to sleep," yet the police "ordered" him "to remain awake for more questioning."  (*Id.* at

117-18.)  Again, petitioner offered no such evidence at the Rule 32 hearing.  And petitioner says that "Ray was given no *Miranda* warnings at the time of his interrogation." (*Id.* at 118.)  The only record evidence on these points is exactly to the contrary.[96]  If Ray had evidence to support these claims, it was incumbent on him to present it to the state courts long before now.  He did not and has not.  Habeas counsel having failed to generate or present such evidence in state or federal collateral proceedings, this Court cannot and will not deem Ray's trial counsel to have provided incompetent representation under prevailing professional norms on the strength of innuendo, wishful thinking, and nonexistent facts.

In short, the Alabama Court of Criminal Appeals' determination that petitioner's trial counsel did not provide constitutionally deficient performance in their attempts to challenge the admissibility of his confession was not an objectively unreasonable application of *Strickland*.  Habeas relief is unavailable on this claim.

### N.    *Failure to Object to Prosecutorial Misconduct.*

---

[96]     Lt. Freine testified at trial that he had read Ray his rights before beginning questioning him about the Mabins case in the early morning hours of August 19, 1997.  (Vol. 4, R-13 at 502-03.)  He further testified that Ray "didn't appear to be intoxicated or under the influence of any kind of narcotics." (*Id.* at 503.)  And Lt. Freine testified that when he questioned Ray in the early morning hours of August 19, 1997 without a tape recorder on, he was asking him about the Mabins killings.  (*Id.* at 489.)  After discussing the Mabins case that morning, Lt. Freine testified, he brought up the Harville case, and Ray said "he was tired and that he preferred I would see him in the morning and let him get some sleep," to which Lt. Freine acquiesced.  (*Id.* at 490.)  The next morning, at 11:00 a.m., Lt. Freine testified, he read Ray his *Miranda* rights, after which Ray signed a written waiver and Lt. Freine began questioning him about Harville.  (*Id.* at 490-93.)  Likewise, in his Rule 32 deposition, Lt. Freine testified that he began questioning Ray about the Harville case at around 11:00 a.m. on August 19, 1997, and the waiver of rights card shows that he was Mirandized at 10:55 a.m.  (Vol. 22, R-47 at 2861-62; vol. 2, R-2 at 337.)  This uncontested testimony stands in stark contrast to (and is irreconcilable with) petitioner's unsupported portrayal in the § 2254 petition that Ray was drunk, that Lt. Freine did not Mirandize him but grilled him about the Harville case for two hours in the middle of the night without a tape recorder running, and that Lt. Freine then came back a few hours later to force Ray to repeat the previously coerced Harville statement on a tape recording.  Where is the evidence of any of this?  Petitioner in these habeas proceedings may feel free to bandy about unsupported and speculative factual allegations and theories of coercion, intoxication and *Miranda* violations.  But Ray's trial counsel had no such luxury.  By all appearances, the only facts with which Ray's trial counsel had to work were those contained in Lt. Freine's testimony, which were uniformly unhelpful to any effort to attack the admissibility of Ray's statements under the Fifth, Sixth and Fourteenth Amendments.

As his 14th subclaim of ineffective assistance of counsel during trial, Ray asserts that trial counsel failed to reach the minimum level of competence required under the Sixth Amendment when they failed to object to two improper arguments by the State.  First, petitioner maintains that trial counsel should have objected to the State's closing argument that Owden was "the slower one, easier led one of the two" because there was no evidence to support it.  (Doc. 32-1, at 119.)  Second, petitioner argues that trial counsel likewise should have objected to the State's remark in closing argument that Ray and Owden had "stuck that knife inside her head and got her brain and her bone and popped it out on the ground," again for lack of supporting evidence.  (*Id.*)

The Rule 32 trial court found that this claim lacked merit for the simple reason that the prosecutor's comments were not improper, and therefore not objectionable.  With regard to the "slower one" remark, Judge Jones opined that it was a legitimate inference from the evidence that the State was permitted to argue.  (Vol. 30, R-65 at 1165-66.)  As for the "popped it out on the ground" comment, Judge Jones recited trial testimony in which Dr. Lauridson testified that "a fragment of bone popped out of the skull" of Harville because of the force used by her assailant(s) in stabbing her.  (*Id.* at 1167.)  Clearly, the Rule 32 trial court reasoned, it was not improper argument for the prosecutor to highlight that testimony for the jury during closing argument.  The Rule 32 trial court concluded that defense counsel's failure to object to these arguments by the prosecution was not ineffective assistance under *Strickland* because any such objections would have been baseless.

As with so many of Ray's other ineffective assistance claims, petitioner failed to present this claim to Alabama appellate courts during Rule 32 proceedings.  Accordingly, this claim of ineffective assistance has not been exhausted.  Also, petitioner has failed to show cause and prejudice or fundamental miscarriage of justice that might excuse the default.  In light of these circumstances, the Court is precluded from considering this claim on the merits because it is procedurally barred.  Even if the claim had been properly exhausted, it would nonetheless fail on the merits for the reasons specified in the Rule 32 trial court's opinion.[97]  Thus, both an

---

[97]     Two modest supplemental points are appropriate.  First, with regard to the "slower one" comment, the context in which this comment was made reveals just how innocuous it was and how pointless any objection would have been.  At this juncture of his closing argument, the prosecutor was addressing proof that each of Ray and Owden were trying to affix (Continued)

exhaustion analysis and a merits analysis lead to the same conclusion that this claim fails as a matter of law.

### O.      Failure to Reference Lesser-Included Offense in Closing Argument.

Ray also contends that his trial counsel violated minimum performance guarantees of the Sixth Amendment when, during closing arguments, counsel "failed to emphasize to the jury … the lesser included charge" of murder (as opposed to murder during the commission of a rape or robbery). (Doc. 32-1, at 120.)  During Rule 32 proceedings, the trial court considered and rejected this claim.  In so doing, Judge Jones observed that trial counsel had adopted a reasonable strategy of focusing on reasonable doubt (*i.e.*, attempting to convince the jury that Ray was not the killer at all), rather than arguing for a lesser-included offense, and that such performance did not fall outside the wide range of professional competence so as to be actionable under *Strickland*.  (Vol. 30, R-65 at 11-68-69.)  Petitioner did not present this claim to the Alabama appellate courts, and has shown neither cause and prejudice for the omission nor a fundamental miscarriage of justice.  As such, this claim is unexhausted and procedurally barred from consideration in federal habeas proceedings.

--------

primary blame on the other one, even though their statements revealed that both were active participants in the Harville slaying. So the prosecutor said, "Marcus would have you believe it was Dominique's idea.  He is the slower, easier led one of the two." (Vol. 5, R-15 at 680.)  The prosecutor then went on tell the jury that it was "[n]ot really" for them to decide which of Ray or Owden was the "main perpetrator" and that as long as they both participated, "they're equally guilty." (*Id.*)  To underscore the point, the State expressly told the jury that it does not matter whose plan it was and that "[y]ou don't have to figure that out." (*Id.*)  Viewed in this context then, the State was not making an improper argument that Owden was slower or more easily led than Ray, but was instead arguing that (i) Owden had tried to portray himself in that manner, but (ii) it did not matter anyway because the jury was not being asked to decide which of the two of them was the ringleader, the catalyst or the idea man.  Considered in this light, any objection that defense counsel might have articulated to this line of argument would have been certain to fail. Second, with regard to the "popped out" comment, petitioner says, "No where did the evidence support such a wild assertion."  (Doc 32-1, at 119.)  Petitioner is wrong.  The State's expert on cause and manner of death, Dr. Lauridson, testified as follows:  "And one of these wounds, the weapon went in and then was twisted or wedged so that ***a fragment of bone popped out of the skull at that point***.  And I found that fragment lying near the skull at the scene." (Vol. 4, R-13 at 433 (emphasis added).)  Not only was the prosecution's comment not a "wild assertion" divorced from the evidence, but it tracked Dr. Lauridson's testimony almost verbatim.  Any objection that defense counsel might have raised to this comment would have been futile.

Were it proper to consider this claim on the merits (which it is not), this Court would nonetheless deny relief to Ray on this aspect of his § 2254 petition. Counsel's decision to orient their closing argument in favor of outright acquittal rather than conviction on a lesser-included charge was a classic example of a reasonable strategy decision that passes muster under *Strickland*.[98] Where counsel adopts a strategy of "focusing on acquittal at trial," the Eleventh Circuit has opined that "[e]specially when … the evidence of guilt was not overwhelming, we expect that petitioners can rarely (if ever) prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client." *Chandler*, 218 F.3d at 1320 (footnote omitted); *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000) ("[C]onstitutionally sufficient assistance of counsel does not require presenting an alternative – not to mention unavailing or inconsistent – theory of the case."). The Court disagrees with petitioner's stance that no competent counsel would have made the same choice that Ray's trial counsel did make, as necessary to establish a viable claim for *Strickland* relief.

## P.    Failure to Investigate Alibi Evidence and the State's Case.

As his 16th claim of ineffective assistance of trial counsel, petitioner claims that trial counsel performed "inadequate investigation of alibi evidence and the state's case." (Doc. 32-1,

---

[98]    In fact, there is a compelling argument that the all-or-nothing strategy at the guilt phase in this case was more prudent than a strategy emphasizing the lesser-included offense. Recall that the key evidence against Ray consisted of the testimony of Owden, and Ray's own statements to law enforcement. That evidence was not only that Ray and Owden had murdered Harville, but that they had done so in the course of a rape and/or robbery. To ask the jury to discard portions of the Owden and Ray testimony even if they accepted other portions of it would have been a tough sell. Furthermore, all indications in the record are that Ray was vehemently opposed to a strategy that conceded guilt, but instead wanted full exoneration because he insisted he was not guilty and indeed that "he was not there at all" when Tiffany Harville was murdered. (Vol. 2, R-7 at 57-62; vol. 20, R-47 at 2590.) Such absolute denial of accountability persisted even to the sentencing hearing, where Ray allocuted as follows: "Also to the parents of Tiffany, I am sorry about your daughter. But like I told you before, I'm innocent on that." (Vol. 5, R-30 at 804.) On this record, the Court strongly suspects that had Ray's trial counsel emphasized to the jury the availability of the lesser-included offense of murder (as petitioner now argues they should have), we would be reviewing a habeas claim of *Strickland* error that counsel contravened Ray's wishes by urging the jury to convict on the lesser-included offense rather than murder in the course of a rape or robbery. The point is that, under the circumstances presented here, trial counsel's decision to push for outright acquittal in closing argument rather than conviction of the lesser-included offense was obviously reasonable and eminently defensible under *Strickland*.

at 120.)  Upon scrutiny, this claim is actually a collection of at least five sub-claims, to-wit: (i) "Defense counsel failed to investigate the possibility that Ray had no involvement at all in the Harville murder" (*id.*); (ii) failure "to adequately investigate the State's evidence on the possible involvement of other suspects" (*id.* at 121); (iii) "perfunctory" investigation of State's forensic evidence identifying the remains as being Harville's, including failure to retain a DNA expert and failure to test clothes found at the scene (*id.* at 122-23); (iv) failure "to gather and assimilate critical evidence regarding Ray's mental health" (*id.* at 123); and (v) failure to explore and investigate Owden's dominance and influence over Ray, particularly as it relates to Ray's statements to law enforcement (*id.* at 123-24).  This claim suffers from the same scattershot, grab-bag, and redundancy qualities that plague several other of Ray's assignments of error as pleaded in the Amended § 2254 Petition, thereby impeding efficient analysis of the claim.  In other words, by stuffing five claims into one, grouping claims differently than he did at the Rule 32 proceedings, and reiterating variants of allegations and arguments presented elsewhere in his habeas petition, Ray unhelpfully clutters and needlessly complicates the judicial review process.  That said, these five sub-issues presented under the heading of "inadequate investigation of alibi evidence and the state's case" will be examined in turn.

First, petitioner faults his trial lawyers for "fail[ing] to investigate the possibility that Ray had no involvement at all in the Harville murder."  (Doc. 32-1, at 120.)  The Rule 32 trial court denied this claim on the merits because petitioner "offered no evidence at his evidentiary hearing that his trial counsel could have presented at his trial proving that he was not in Selma when Harville was murdered."  (Vol. 30, R-65 at 1114.)  Petitioner did not appeal this ruling to the Alabama Court of Criminal Appeals; therefore, this subclaim is not exhausted.  Absent a showing of cause and prejudice, or a fundamental miscarriage of justice (neither of which Ray has made), this claim is procedurally barred from federal habeas review.  Alternatively, on the merits, there is at least a reasonable argument that counsel satisfied *Strickland*'s deferential standard by not investigating an apparently unfounded alibi defense (after all, petitioner has never presented any evidence to any court in any proceeding that might support such a defense).  Petitioner does not even indicate that he ever told his lawyers that he had an alibi, so as to trigger any reason to investigate that line of defense.  In short, there was no deficient performance in trial counsel's failure to investigate whether Ray had an alibi.

Second, petitioner says his Sixth Amendment right to effective representation was trammeled when trial counsel failed "to adequately investigate the State's evidence on the possible involvement of other suspects." (Doc. 32-1, at 121.) We've gone down this road already. To recap, in Rule 32 proceedings, the trial court deemed this claim to be meritless because Ray's lawyers had, in fact, cross-examined Lt. Freine aggressively and effectively about the possible involvement of other suspects in the Harville murder, and petitioner identified no other evidence that trial counsel could or should have obtained in that regard. (Vol. 30, R-65 at 1115.) Once again, petitioner failed to exhaust this claim because he did not raise it in his Rule 32 appeal, and he has made no showing to excuse the omission. Therefore, this claim is procedurally barred and is not properly raised in Ray's § 2254 petition. Even if the claim were properly presented, petitioner has made no showing that trial counsel failed to conduct an adequate investigation on this point and identifies no infirmities in counsel's investigation; to the contrary, the trial record shows that counsel presented substantial evidence to the jury tending to show the involvement of other suspects, which showing bespeaks reasonable investigation by defense counsel. Therefore, the state court's determination that counsel did not perform deficiently was plainly not an objectively unreasonable application of *Strickland* to the facts.

Third, Ray criticizes defense counsel's "perfunctory" investigation of the State's forensic evidence, and argues that counsel should have procured a DNA expert and taken other steps to contest the Dr. Lauridson's identification of the skeletal remains as Harville's. (Doc. 32-1, at 122-23.) This claim has already been covered in Section V.L., *supra*, and that analysis will not be repeated here merely because petitioner has chosen to repackage and resubmit the same claim in another portion of his § 2254 petition.[99]

---

[99] By way of summary, this Court has already found that Ray's claim of ineffective assistance related to trial counsel's failure to obtain DNA or other experts to challenge the identification of Harville's remains is procedurally barred because it was not exhausted in the state courts. Moreover, the Rule 32 trial court's determination that petitioner had failed to show deficient performance under *Strickland* was not objectively unreasonable, particularly given the dearth of evidence presented in collateral review proceedings that this line of investigation would have been even moderately fruitful, or that any helpful evidence could have been collected. Notably, Judge Jones wrote in his Rule 32 order that petitioner's current counsel admitted that "their retained expert also could not extract any usable DNA from the bone exemplars" or certain cloth samples. (Vol. 30, R-65 at 1116.) Petitioner's Sixth Amendment rights were not compromised by trial counsel's failure to investigate what was by all accounts a dead end.

Fourth, petitioner alleges ineffective assistance by his trial counsel in failing "to gather and assimilate critical evidence regarding Ray's mental health" that "would have shown that Ray was not competent to assist with his defense." (Doc. 32-1, at 123.)  The Rule 32 trial court denied this claim on the merits, based on findings that petitioner "presented no evidence at his evidentiary hearing concerning his mental health that would have been material or relevant to any issue in the guilt phase of his trial," and likewise "presented nothing proving that he was incompetent to stand trial or that he was otherwise incapable of assisting his trial counsel if he had chosen to do so." (Vol. 30, R-65 at 1117-18.)  As with many of Ray's other ineffective assistance claims, petitioner failed to exhaust this claim because he did not present it to the Alabama Court of Criminal Appeals, and has not attempted to make a showing that might overcome the procedural bar.  As such, this claim is not properly raised in his § 2254 petition and cannot be considered on the merits.  Even if it could, the Rule 32 trial court's determination that trial counsel's representation did not amount to incompetence under prevailing professional norms was not objectively unreasonable and will not be disturbed on federal habeas review.[100]

---

[100]     Aside from the reasons articulated by the Rule 32 court, the Court observes that record facts belie petitioner's position that any competent counsel would have performed such an investigation in this case.  For example, defense counsel had reviewed the forensic report of Dr. Kathy Ronan from February 1998, in which she concluded, *inter alia*, that (i) Ray "is not suffering from a mental illness which would interfere with his ability to assume the role of defendant at the present time;" (ii) Ray "demonstrated a good understanding of his current charges, as well as the range and nature of possible penalties;" (iii) Ray "would be capable of realistically challenging prosecution witnesses and testifying relevantly on his own behalf;" (iv) Ray "could relate adequately with his attorney if he chooses to do so;" and (v) there was "no information to indicate that Mr. Ray has ever suffered from any type of major psychiatric disorder which would interfere with his contact with reality or render him to be unable to understand right from wrong." (Vol. 14, R-47 at 1347-48.)  Defense counsel also had the benefit of their own dealings and interactions with Ray, which were fully consistent with Dr. Ronan's findings.  Indeed, attorney Whatley testified in the Rule 32 hearing that Ray "was intelligent, coherent.  He was able to communicate fully with my conversations with him.  We had exchanges back and forth.  We talked about the case.  We talked about life.  We talked about his family." (Vol. 25, R-47 at 413.)  Considering Dr. Ronan's report and Ray's own interactions with defense counsel, it was not objectively unreasonable of the Rule 32 court to find no deficient performance under *Strickland* in trial counsel's failure "to gather and assimilate critical evidence" that "would have shown that Ray was not competent to assist with his defense." (Doc. 32-1, at 123.)  Both what Whatley read in Dr. Ronan's report and what he experienced in speaking with Ray were to the contrary, and it was not objectively unreasonable for the state court to conclude that Whatley's failure to investigate further did not amount to incompetence (Continued)

Fifth, petitioner asserts that trial counsel did not provide effective representation because they failed to identify witnesses and present testimony establishing that "Owden exercised a great deal of influence over Ray," and that Ray provided law enforcement with a series of false statements at Owden's direction.  (Doc. 32-1, at 124.)  This claim has already been considered and rejected in section V.J., *supra*.  It fails for the same reasons here.  During state collateral review proceedings, the trial court made a factual finding that petitioner's evidence did not establish "that Ray's conduct either before, during, or after Harville's murder was influenced by Marcus Owden."  (Vol. 30, R-65 at 1118.)  The trial court also made a finding of fact that in the Rule 32 hearing, "Ray failed to affirmatively prove that Marcus Owden caused or otherwise influenced his confessions to Roy Freine."  (*Id.*)  Further, the trial court found that "Ray presented no evidence that Owden forced him to participate, and subsequently cover-up," the Harville murder.  (*Id.* at 1132.)  When petitioner appealed this ruling, the Alabama Court of Criminal Appeals agreed with Judge Jones that "Ray failed to meet his burden of proof in regard to this claim – Ray failed to show by a 'preponderance of the evidence' that he was entitled to relief."  *Ray II*, 80 So.3d at 991.  In his § 2254 petition, Ray renews this claim; however, he does not rebut the state courts' findings of fact by clear and convincing evidence or otherwise overcome the presumption of correctness.  *See Consalvo v. Secretary for Dep't of Corrections*, 664 F.3d 842, 845 (11th Cir. 2011) ("And the AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.").  Given that no adequate quantum of evidence of dominance or undue influence by Owden over Ray has ever been shown to exist, trial counsel's failure to seek out and present such evidence was not constitutionally deficient performance.  The state courts' conclusion that *Strickland* was not violated in this

---

under prevailing professional norms.  The Amended § 2254 Petition's misleading, out-of-context citation to a single sentence uttered by Ray's former counsel in July 1998 does not favor a contrary result.  Nor does the § 2254 petition's statement that Ray made a "repeated assertion in court that he did not understand the proceedings" (doc. 32-1, at 124), which occurred in a single hearing and was confined to the issue of the State's plea offer (which Ray rejected, against the advice of counsel).  Nothing in the record of pretrial and trial proceedings would suggest (much less necessarily yield) a conclusion that Ray did not understand the criminal action against him and was unable to provide assistance to counsel in preparing a defense, had he been willing and inclined to do so.

respect was not objectively unreasonable, and therefore will not be overturned on federal habeas review.

As to all of these subgrounds, of course, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Digsby v. McNeil*, 627 F.3d 823, 831 (11th Cir. 2010) (citation omitted). The Court finds with respect to each of them that the state court's treatment of these issues was not unreasonable, and that many of these issues are unexhausted and therefore unavailable to Ray in his § 2254 proceedings in any event.

### Q.      *Inadequate Voir Dire and Jury Selection.*

Ray's claim #17 of ineffective assistance relates to the voir dire and jury selection phase of trial. In support of this claim, petitioner alleges that trial counsel should have hired a jury selection expert. He also alleges that trial counsel deprived him of a fair and impartial jury because they "failed to ask consistent questions and rehabilitate potential jurors" who expressed hesitation about the death penalty; "failed to consistently ask questions" drawing a distinction between personal views on the death penalty and ability to follow the law and judicial instructions; "failed to ask questions designed to reveal potential juror bias," such as questions eliciting feelings about gangs or familiarity with other venire members; and "fail[ed] to remove jurors who demonstrated bias," or squandered peremptory challenges on biased jurors who could have been challenged for cause. (Doc. 32-1, at 125-27.)

This claim was presented in Ray's Amended Rule 32 Petition, and was denied on the merits. The written order denying state postconviction relief to Ray rejected the different facets of this claim under the following reasoning: (i) it was not deficient performance for trial counsel not to request funds for a jury selection expert; (ii) Ray made no showing of deficient performance with regard to questioning of jurors concerning their views on the death penalty; (iii) Ray made no showing at the Rule 32 hearing that any potential jurors had any particular feelings about gangs or that any jurors knew each other; and (iv) Ray made no showing that biased jurors sat on the jury. (Vol. 30, R-65 at 1132-39.)

The only one of these sub-issues that petitioner pursued on appeal in the Rule 32 proceedings was the failure to hire a jury consultant. (Vol. 27, R-54 at 106.) As to this claim, the Alabama Court of Criminal Appeals rejected it on the merits based on facts showing that at the time of Ray's trial, defense counsel was unaware of any capital-murder case in Dallas

County, Alabama, in which funds had ever been authorized for a jury consultant.  The appellate court wrote, "Certainly, under these circumstances, a reasonably prudent attorney would not be ineffective for failing to move for funds for a jury consultant." *Ray II*, 80 So.3d at 987.  That determination is an eminently reasonable application of *Strickland*.  As abundant authorities make clear, an indigent defendant has no automatic right to the "luxury" of a jury consultant.[101]  Ray's Amended § 2254 Petition proceeds from the assumption that public funds for him to hire a jury selection expert were readily available, if only his lawyers had asked.  As both the Alabama circuit court and appellate courts correctly found, that assumption is invalid.  *See Newland v. Hall*, 527 F.3d 1162, 1213 (11th Cir. 2008) ("Counsel did not tell the habeas court what [trial counsel] could have shown the trial court as the basis for providing the necessary funds; counsel evidently assumed, without citation of authority, that the funds would have been available to [trial counsel] simply for the asking.  The assumption is unsupportable ….").  Petitioner is plainly not entitled to habeas relief on the theory that counsel was constitutionally deficient in not seeking appointment of a jury consultant.

All other sub-issues presented in this ineffective assistance claim (*i.e.*, failure to ask consistent questions and rehabilitate jurors, failure to distinguish between personal views on the death penalty and ability to follow judicial instructions, failure to explore bias, failure to remove biased jurors) are unexhausted because Ray did not present them to the Alabama Court of Criminal Appeals.  These sub-issues are procedurally barred, and petitioner has not made the

---

[101]    *See, e.g., Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000) ("While the wealthiest of defendants might elect to spend their defense funds on jury consultants, indigent defendants are not privileged to force the state to expend its funds on this exercise in bolstering an attorney's fundamental skills …."); *Prousalis v. United States*, 2007 WL 2438422, *10 (S.D.N.Y. Aug. 24, 2007) ("[I]t is a rare defendant that is able to … hire a jury consultant.  It does not constitute ineffective assistance of counsel to proceed to trial without having undertaken such efforts."); *United States v. Rivera*, 292 F. Supp.2d 823, 825 (E.D. Va. 2003) (indigent defendants are not entitled to jury consultants at public expense because a jury consultant "is neither necessary for adequate representation of the defendants … nor one of the basic tools or raw materials integral to the building of an effective defense") (citations and internal quotation marks omitted); *United States v. Shakur*, 560 F. Supp. 337, 347 (S.D.N.Y. 1983) ("A jury selection expert is no more necessary than a tout at the race track.").

necessary showing of cause and prejudice, or fundamental miscarriage of justice, to overcome the bar. As such, these claims are not subject to federal habeas review on the merits.[102]

### R.   *Ineffectiveness on Direct Appeal.*

As a separate basis for his ineffective assistance claim, Ray alleges that he received ineffective assistance from counsel on direct appeal in three enumerated respects.[103]

---

[102]   Even if they were, these claims suffer from a host of deficiencies. For starters, as the Rule 32 trial court recognized, these sub-claims are maddeningly vague and devoid of cited evidentiary support. Petitioner's position is apparently that the collateral review courts should take it upon themselves to wade through 275 pages of transcripts of jury selection voir dire to search for excerpts that might lend support to this claim. The burden of showing entitlement to habeas relief rests with petitioner. *See, e.g., Hill v. Humphrey*, 662 F.3d 1335, 1346 (11th Cir. 2011) (explaining that § 2254(d)(1) provides a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt and that the petitioner carries the burden of proof") (citation and internal quotation marks omitted); *Chandler*, 218 F.3d at 1314 ("Given the strong presumption in favor of competence, the petitioner's burden of persuasion … is a heavy one."). A habeas petitioner cannot shift his burden to the federal district court by pointing to multiple volumes of the record and saying, "Look here, Judge. There's evidence to support my claim in there somewhere." In essence, that's what petitioner did in both the Rule 32 proceedings and these federal habeas proceedings as to this claim. The state courts rebuffed that approach, as will this Court. Furthermore, the Eleventh Circuit has emphasized that trial counsel's judgment and strategy calls during the voir dire / jury selection process are subject to particular deference on habeas review. *See, e.g., Harvey v. Warden, Union Correctional Institution*, 629 F.3d 1228, 1447 (11th Cir. 2011) (cautioning against "distorting effects of hindsight" in *Strickland* deferential review of trial counsel's decisions of whether or not to leave particular venire members on the jury); *Bell v. United States*, 2009 WL 3488457, *3 (11th Cir. Oct. 30, 2009) ("Assessing jurors during voir dire also requires an evaluation of demeanor and credibility. Review of counsel's performance is highly deferential in any case, but the case for deference is even greater when counsel is evaluating credibility."). It was not an unreasonable application of clearly established federal law for the state court to find no *Strickland* deficient performance in the manner in which trial counsel conducted voir dire and jury selection. Nor, at any rate, has Ray made any showing of *Strickland* prejudice arising from counsel's performance during jury selection. *See, e.g., Davis v. Woodward*, 384 F.3d 628, 643 (9th Cir. 2004) ("Establishing *Strickland* prejudice in the context of juror selection requires a showing that … the jury panel contained at least one juror who was biased."); *DeLozier v. Sirmons*, 531 F.3d 1306, 1323 (10th Cir. 2008) ("an attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness") (citation omitted). Even considered on the merits, then, this claim would fail under the deferential *Strickland* standard.

[103]   Of course, the Sixth Amendment right to effective assistance of counsel extends to direct appeal, and is analyzed under the same *Strickland* standard that applies to trial counsel. (Continued)

-96-

Specifically, petitioner faults appellate counsel for failing to litigate the following issues on direct appeal: (i) whether the trial court erred in allowing the State to use and reference Ray's custodial statement before proof of *corpus delicti*; (ii) whether it was "constitutionally impermissible" for Ray's prior capital conviction in the Mabins case to be used as an aggravating circumstance;[104] and (iii) whether the Sentencing Order contained "improprieties." (Doc. 32-1, at 127-28.)

In state collateral proceedings, the trial court denied this claim on the merits. As to the *corpus delicti* issue, Judge Jones opined that the prosecutor's use of the statement was proper, so there was no appealable error. (Vol. 30, R-65 at 1176.)[105] Similarly, as to the use of the prior conviction as an aggravating circumstance, the trial court found no constitutional error that might have presented an appealable issue. (*Id.* at 1177.)[106] And with regard to the Sentencing Order,

---

*See, e.g., Clark v. Crosby*, 335 F.3d 1303, 1310 (11th Cir. 2003) ("An ineffective assistance of appellate counsel claim is governed by the familiar two-part performance-and-prejudice standard set forth in *Strickland*"). That said, it is black-letter law that "[i]n order to render effective assistance, counsel need not raise every possible nonfrivolous issue on appeal. … Instead, it is the job of counsel to weed out the weaker arguments." *Holladay v. Haley*, 209 F.3d 1243, 1256 (11th Cir. 2000). The record establishes that this is precisely what Ray's appellate counsel did.

[104]    To be clear, Ray's counsel on direct appeal <u>did</u> raise a claim that "the trial court erred in allowing the state to offer evidence of another capital conviction against appellant Ray at the punishment phase before the jury." (Vol. 6, R-32 at 10.) Petitioner's point here is apparently that appellate counsel breached their duties under *Strickland* by failing to raise the constitutional dimension of this argument.

[105]    Alabama law substantially supports the conclusion that the *corpus delicti* argument would not have been successful on appeal. *See, e.g., Sheffield v. State*, 87 So.3d 607, 627 (Ala.Crim.App. 2010) (recognizing that a confession "can be used along with other evidence to satisfy the jury of the existence of the *corpus delicti*" and that "even if the *corpus delicti* is not proven before the admission or evidence of the confession, then such proof after its admission will cure the error") (citations omitted).

[106]    This conclusion is supported by the Alabama Court of Criminal Appeals' recognition on direct appeal that "there is no evidence in the record of any constitutional defect" with respect to the use of Ray's prior conviction as a statutory aggravating circumstance pursuant to Alabama Code § 13A-5-49(2). *Ray I*, 809 So.2d at 880 n.2. Nor does petitioner come forward with any evidence or argument suggesting that even a colorable argument of a constitutional violation exists, much less one so compelling that any minimally competent appellate counsel would have raised it on direct appeal.

Judge Jones found no ineffective assistance by appellate counsel because "Ray did not identify any improprieties in the Court's sentencing order in his amended Rule 32 petition or at the Rule 32 evidentiary hearing." (*Id.* at 1178.)[107]  On appeal to the Alabama Court of Criminal Appeals in the Rule 32 proceedings, Ray raised none of these sub-issues.  (Vol. 27, R-54.)  As such, petitioner's claim for ineffective assistance of appellate counsel is unexhausted and is procedurally barred from consideration in these habeas proceedings.  Ray has shown neither cause and prejudice, nor fundamental miscarriage of justice to overcome the procedural bar. Hence, this Court cannot reach the merits of this claim.[108]

### S.    Cumulative Error.

As his 19th and final claim of ineffective assistance by trial and appellate counsel, petitioner invokes the doctrine of cumulative error under *Strickland*.  Indeed, Ray's § 2254 petition attacks both Judge Jones' Rule 32 order and the Alabama Court of Criminal Appeals' affirmance on the ground that they "attempt to separately justify each aspect of deficient representation raised by Ray as it if existed in a vacuum and was the only error alleged.  The decisions take no note of how the elements of Ray's ineffective assistance claim interact.  The cumulative 'totality of the circumstances' reflects ineffective assistance of counsel and resulting prejudice that cannot be defeated by piecemeal rejection of each component of Ray's ineffective

---

[107]    That defect is carried through to federal habeas proceedings, inasmuch as Ray's Amended § 2254 Petition offers no insight into the nature of the "improprieties" that he says appellate counsel should have pursued on his behalf, much less why improprieties in the Sentencing Order would have any practical effect (or work any prejudice) on Ray.

[108]    Even if the merits were properly considered (which they are not), the Court would find no Sixth Amendment violation with regard to Ray's direct appeal.  Appellate counsel does not perform below minimal constitutional guarantees by failing to raise meritless issues.  *See Shere v. Secretary, Florida Dep't of Corrections*, 537 F.3d 1304, 1311 (11th Cir. 2008) ("Shere's appellate counsel did not have a meritorious issue to raise on appeal, so his failure to address the issue did not constitute deficient performance."); *Ladd v. Jones*, 864 F.2d 108, 110 (11th Cir. 1989) ("[S]ince these claims were meritless, it was clearly not ineffective for counsel not to pursue them.").  As none of these issues reasonably would have been successful on direct appeal, counsel could not have been ineffective in failing to present them.  More generally, as noted *supra*, it is black-letter law that appellate counsel is not constitutionally ineffective for failing to raise every nonfrivolous issue on appeal.  Appellate counsel's decision not to pursue these weak arguments, but instead to focus on other claims, is a reasonable strategic decision that rests comfortably within the heartland of constitutionally adequate performance.

assistance of counsel claim.  Under *Strickland*, the sum of these individual errors demonstrates prejudicial ineffective assistance of counsel that requires post-conviction relief."  (Doc. 32-1, at 130-31.)

Unfortunately, the federal habeas petition marks the first time that Ray has ever articulated such an argument of cumulative error under *Strickland*.  The Rule 32 petition identifies no such claim.  (Vol. 9, R-45.)  Ray's appellate brief in the Rule 32 proceedings contains a similar section of argument referencing an "extraordinary confluence of circumstances," just as his § 2254 petition does, but the Rule 32 appellate brief section omits the text alleging *Strickland* cumulative error.  In other words, petitioner has come to this federal habeas court and has asserted a brand new (but previously available) claim of *Strickland* cumulative error.  He faults the state courts for not addressing it, but of course there was no reason for them to analyze a *Strickland* cumulative-error claim that Ray never presented to them. This claim is procedurally defaulted, and petitioner has not overcome the default via a showing of cause and prejudice, or manifest injustice.  In post-conviction proceedings, "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review."  *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted).  Where he does not, and the "claim is procedurally defaulted, we reject it without addressing its merits."  *Hunt v. Commissioner, Alabama Dep't of Corrections*, 666 F.3d 708, 731 (11th Cir. 2012).  Such is the result here.[109]

---

[109]     On the merits, the result would be the same.  "Even if [this Court] were to determine that clearly established federal law mandates a cumulative-effect analysis of ineffective-assistance claims, [Ray] would not be entitled to relief: he has not shown that in this case the cumulative effect of counsel's alleged errors amounted to ineffective assistance."  *Hunt*, 666 F.3d at 731-32.  The overwhelming majority of the errors that petitioner ascribes to his trial counsel during the guilt phase and on direct appeal consist of after-the-fact quibbles with judgment calls and reasonable strategy decisions, all viewed through the clear-eyed lens of 20/20 hindsight.  That is not how *Strickland* review works, and little (if anything) in the sprawling section of Ray's § 2254 petition addressing ineffective assistance during guilt phase and direct appeal supports a finding of any constitutional infirmity in counsel's performance.  The Eleventh Circuit has indicated that "the prejudice inquiry should be a cumulative one as to the effect of all of the failures of counsel that meet the performance deficiency requirement."  *Evans v. Secretary, Florida Dep't of Corrections*, 699 F.3d 1249, 1269 (11th Cir. 2012).  Here, however, Ray "has failed to show any deficiency in counsel's performance …," so "there is no deficiency to accumulate in order to establish prejudice."  *Id.*

**VI.**   ***Ring v. Arizona* Claim and Lack of Juror Unanimity at Penalty Phase.**

As Claim IV in his Amended § 2254 Petition, Ray maintains that his death sentence violates *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because that sentence was "based on factual determinations by the judge and not the jury." (Doc. 32-1, at 131.) Ray takes this claim further by asserting that "because Alabama's sentencing scheme permits less than a unanimous jury recommendation in favor of death, it violates the Sixth and Eighth Amendments." (*Id.* at 132.) According to Ray, "[a]llowing less than a unanimous jury recommendation … to impose the death penalty is the judicial equivalent of a coin flip." (*Id.* at 133.) So Claim IV alleges that Ray's death sentence is unconstitutional because (i) the underlying factual determinations were made by a judge, not a jury, in violation of *Ring*; and (ii) the jury's recommendation for the death penalty in this case was not unanimous, but was instead made by a margin of 11-1, in violation of the Eighth Amendment's prohibition on arbitrary, capricious imposition of the death penalty.

Petitioner did not present this claim at trial or on direct appeal; rather, he raised a variant of his *Ring* claim for the first time in his Rule 32 petition.[110]  The Rule 32 trial court found that claim to be both procedurally barred and unfounded on the merits.  As to the former determination, Judge Jones opined that any claim that the death sentence must be imposed by the jury, rather than the court, "is procedurally barred from postconviction review because it could have been but was not raised at trial and because it could have been but was not raised on direct appeal." (Vol. 30, R-65 at 103, ¶ 217.)  On the merits, Judge Jones likewise found that Ray was not entitled to relief because *Ring* is not retroactive to cases final on direct review, and Ray's direct appeal was final before the Supreme Court issued the *Ring v. Arizona* opinion. (*Id.*, ¶ 218.)  Petitioner did not appeal this issue to the Alabama Court of Criminal Appeals, except by stating in conclusory terms in a footnote as follows: "The trial court's replacement of its judgment for that of the jury in imposing a death sentence on Ray is, moreover, contrary to

---

[110]      Specifically, Ray argued in his Rule 32 petition that the jury "did not *unanimously* determine that the aggravating circumstances exist beyond a reasonable doubt *and* that the aggravating circumstances outweigh the mitigating circumstances. … Because their decision was not unanimous, the sentence was unlawfully imposed under *Ring* and *Apprendi*." (Vol. 10, R-45 at 70, ¶ 176.)  The Rule 32 Petition did <u>not</u> assert (or even hint at) the Eighth Amendment "coin flip" argument that is featured prominently in Ray's § 2254 Petition.

*Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985); *Ring v. Arizona*, 536 U.S. 584, 609 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 498 (2000)."  (Vol. 27, R-54 at 89 n.20.)

On this procedural posture, the Court readily finds that Claim IV flunks the "fair presentment" requirement for federal review.  It is hornbook law that "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review."  *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted).  Fair presentation requires that "the petitioner must make the state court aware that the claims asserted present federal constitutional issues."  *Lucas v. Secretary, Dep't of Corrections*, 682 F.3d 1342, 1352 (11th Cir. 2012).  Where a trial court enters a Rule 32 denial of a claim, a habeas petitioner is required to appeal that ruling to the Alabama appellate courts in order for it to be exhausted.  *Hunt*, 666 F.3d at 740 ("the prisoner must appeal the Rule 32 court's denial of his claim to the court of criminal appeals in order to satisfy the exhaustion requirement"); *Mancill v. Hall*, 545 F.3d 935, 939 (11th Cir. 2008) (habeas exhaustion requirement "is not satisfied if the petitioner fails to present his claims to the state's highest court").

Petitioner did not satisfy that threshold requirement.  The Eighth Amendment arbitrariness component of Claim IV was never presented by Ray to the state courts at all, at any time, on any level of review.  Moreover, as to the *Ring* issue, petitioner admits that sum total of his presentment of this issue to Alabama appellate courts was a one-sentence footnote in an unrelated discussion of an unrelated ineffective assistance of counsel claim that petitioner was pursuing on his Rule 32 appeal.  In that footnote, petitioner did nothing more than name-check *Caldwell*, *Ring* and *Apprendi* in quick succession.  The footnote did not allege (as Ray now does in his § 2254 Petition) that the jury made no finding of aggravating circumstances, much less that such omission violated *Ring* or specific federal constitutional guarantees.  The footnote did not allege (as Ray now does in his § 2254 Petition) that allowing the death penalty to be imposed on a less-than-unanimous jury recommendation violates *Ring*, the Sixth Amendment or the Eighth Amendment.  The footnote instead spoke in general terms about the "trial court's replacement of its judgment for that of the jury," which is not the same as the claim that Ray now brings in his § 2254 Petition.  And such footnote was buried in a 121-page appellant's brief that did not otherwise reference any federal constitutional challenge that Ray might be pursuing on state

postconviction review against Alabama's system for factfinding of statutory aggravating circumstances and allowing less-than-unanimous recommendations of death sentences.

"[T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005) (citations omitted). A federal claim is not exhausted unless it is "presented face-up and squarely," with the federal question "plainly defined" for the state court. *Hunt*, 666 F.3d at 731 (citations omitted). Yet all petitioner did to exhaust this claim on Rule 32 appeal to the state courts was to scatter a makeshift needle in a footnote of his voluminous brief. That is simply not enough. Considering all attendant facts and circumstances, the Court concludes that Ray did not fairly present to the Alabama appellate courts his *Ring* claim or his related Sixth and Eighth Amendment claims pertaining to Alabama's capital sentencing scheme. Stated differently, Claim XII of Ray's Amended Rule 32 Petition was that "the death penalty was unconstitutionally imposed under *Ring v. Arizona*." (Vol. 10, R-45 at 69-70, ¶¶ 175-77.) Nothing in Ray's appellate brief in the Rule 32 proceedings referenced Claim XII or otherwise did anything that would reasonably place the Alabama Court of Criminal Appeals on notice that he was appealing the Rule 32 trial court's denial of relief on Claim XII. Thus, the fair presentment requirement is not satisfied here, and Claim IV of Ray's Amended § 2254 Petition is not exhausted.

"A petitioner who fails to exhaust his claim is procedurally barred from pursuing that claim on habeas review in federal court unless he shows either cause for and actual prejudice from the default or a fundamental miscarriage of justice from applying the default." *Lucas*, 682 F.3d at 1353. Since Ray has made no showing of either (and indeed, he has not even attempted to do so), this claim is procedurally barred.[111]

---

[111]    Even if this claim were properly considered on the merits, which it is not, the result would remain the same. Eighteen years ago, the Supreme Court found that Alabama's capital sentencing scheme did not unconstitutionally permit arbitrary imposition of the death penalty, reasoning that the Constitution is "not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight." *Harris v. Alabama*, 513 U.S. 504, 515, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). Moreover, petitioner's reliance on *Ring* is misplaced because the Supreme Court has held that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). *Ring* was decided on June 24, 2002. The U.S. Supreme Court denied Ray's petition for (Continued)

## VII.    Alleged Denial of Impartial Factfinder.

Claim V challenges the Rule 32 trial court's adoption of a 107-page order prepared by the State.  According to the Amended § 2254 Petition, the trial court's act of adopting this proposed order (as opposed to drafting a comprehensive order itself) runs afoul of the "elemental" principle that "justice must satisfy the appearance of justice."  (Doc. 32-1, at 133, 135.)  Ray sharply criticizes the trial judge's decision to sign off on the State's proposed order denying his

<hr>

writ of certiorari on direct appeal on February 19, 2002.  (*See* vol. 30, R-64.)  It is bedrock law that, for purposes of *Teague* retroactivity, "[a] state conviction and sentence become final … when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."  *Glock v. Singletary*, 65 F.3d 878, 883 (11th Cir. 1995) (citation omitted).  "[A] petitioner may not appeal a conviction or bring a habeas attack based on *Ring* violations that occurred before *Ring* was handed down."  *Sibley v. Culliver*, 377 F.3d 1196, 1208 (11th Cir. 2004).  Such is the case here; therefore, Ray's *Ring* claim is unavailable to him, as a matter of law.  Petitioner's other theories enumerated in Claim IV are devoid of legal support.  With regard to the absence of a specific jury finding concerning aggravating circumstances, binding precedent refutes Ray's position.  Indeed, the Eleventh Circuit has held that "the Sixth Amendment does not prohibit a hybrid sentencing system in which findings authorizing a death sentence are implicit in the advisory jury verdict recommending that sentence."  *Grim v. Secretary, Florida Dep't of Corrections*, 705 F.3d 1284, 1287 (11th Cir. 2013) (no Sixth Amendment violation in capital case where jury, finding that aggravating circumstances outweighed mitigating circumstances, recommended imposition of death sentence, and court imposed it).  That is precisely what Alabama law does.  *See* Ala. Code § 13A-5-45(e) ("any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing"); Ala. Code § 13A-5-50 ("the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40").  As for the lack of unanimity, petitioner cites no law, and the Court is aware of none, finding that the Eighth Amendment is violated where the death penalty is imposed after a jury recommendation of 11-1.  Certainly, there appears to be no clearly established federal law requiring that advisory jury recommendations in capital cases be unanimous before a judge may impose the death sentence.  As the Supreme Court recognized in *Harris*, Alabama's capital sentencing scheme – which vests final decision-making authority in a judge based on an advisory jury recommendation – does not violate the Eighth Amendment, and is hardly sort of arbitrary coin flip that Ray now characterizes it as being.  *See Harris*, 513 U.S. at 512 (holding that "the Eighth Amendment does not require the State to define the weight the sentencing judge must accord an advisory jury verdict").

Rule 32 petition, insisting that by doing so "[t]he circuit court abdicated its responsibility to afford Ray meaningful review of his postconviction claims." (*Id.* at 135.)

Ray presented this issue on appeal of the denial of his Rule 32 petition. The Alabama Court of Criminal Appeals gave short shrift to this contention, citing state decisional authority for the proposition that "the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Ray II*, 80 So.3d at 971 (citation omitted). The appellate court further observed that Alabama courts have "repeatedly upheld the practice of adopting the State's proposed order when denying a Rule 32 petition for postconviction relief." *Id.* (citations omitted). Based on its determination that Judge Jones (who, again, both presided over Ray's trial and signed the order denying him postconviction relief) had not made "clearly erroneous" findings, the Alabama Court of Criminal Appeals rejected this assignment of error. *Id.* at 972.

The Eleventh Circuit takes a dim view of arguments such as this. In *Rhode v. Hall*, 582 F.3d 1273 (11th Cir. 2009), a state habeas petitioner in a death penalty case "complain[ed] that the state habeas court adopted verbatim the State's proposed order as its own," reasoning that the result was a "partisan final order" that denied him "fair and impartial assessment of the facts and law." *Id.* at 1281. The *Rhode* panel opined that "[t]he state habeas court's verbatim adoption of the State's facts would not rise to a substantial showing of the denial of a constitutional right, … and thus cannot be certified as an issue in a COA." *Rhode*, 582 F.3d at 1281 n.4 (citation and internal quotation marks omitted). More broadly, the Supreme Court and Eleventh Circuit have "consistently upheld" the use of proposed orders adopted verbatim by trial judges "as long as they were adopted after adequate evidentiary proceedings and are fully supported by the evidence." *Brownlee v. Haley*, 306 F.3d 1043, 1067 n.19 (11th Cir. 2002) (citations omitted).[112]

---

[112]    *See generally United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) (where district judge adopted verbatim proposed findings of fact and conclusions of law submitted by prevailing party after trial, such findings "are not to be rejected out-of-hand, and they will stand if supported by evidence"); *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1030 (11th Cir. 1989) (ghostwriting of judicial order by a litigant is not *per se* invalid, and the resulting order "will be vacated only if a party can demonstrate that the process by which the judge arrived at [it] was fundamentally unfair") (citation and internal quotation marks omitted); *State of Fla. Bd. of Trustees of Internal Improvement Trust Fund v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 703 (5th Cir. 1975) (district court's practice of adopting party's proposed findings of fact and conclusions of law at the close of trial "is not (Continued)

The point is simple:  In light of the foregoing authorities, it was neither contrary to, nor an unreasonable application of, clearly established federal law for the Alabama Court of Criminal Appeals to reject Ray's claim.  The Rule 32 trial court's act of adopting the State's proposed order is not inherently improper or unlawful, much less a violation of Ray's federal constitutional rights.[113]  Fair-minded jurists could agree with the state court's adjudication of this claim; therefore, federal habeas relief is unavailable.

## VIII.   Prosecutorial Misconduct: Comment on Defendant's Decision Not to Testify.

At trial, Ray invoked his privilege under the Fifth Amendment not to take the stand to testify on his own behalf.  In Claim VI of his Amended § 2254 Petition, Ray argues that, during closing arguments in the guilt/innocence phase of trial, the State impermissibly commented on that decision.  The purportedly offending comment was as follows: "I'd like to think … from what you've heard in this case and what I've heard here today and seeing both of these men on the stand and knowing how brassy this man right over here [indicating Ray] is.  Marcus Owden told us the truth."  (Vol. 5, R-15 at 680.)  Defense counsel objected contemporaneously.  (*Id.* at 684, 698.)  After review of the court reporter's notes, the trial court overruled the objection, opining, "I think that the comment that was made by the District Attorney does not rise to that level that there is a commentary about the failure of the Defendant to testify.  I don't believe that this jury would infer that from that comment. … And I further find that the argument … was a comment upon the comparison of Mr. Owden's testimony with that of Mr. Ray's which came by

---

reversible error," but is instead subject to "clearly erroneous" standard of review); *Federal Trade Com'n v. Enforma Natural Products, Inc.*, 362 F.3d 1204, 1215 (9th Cir. 2004) ("verbatim adoption of a prevailing party's proposed findings is not automatically objectionable if the findings are supported by the record").

[113]    To the extent that Ray's position is that certain particular findings in the Rule 32 Order entered by Judge Jones are clearly erroneous or otherwise not worthy of deference, the Court will consider those arguments in the context of the specific substantive claims in which they are raised.  For purposes of Claim V, it suffices to hold that the mere act of a state trial court in postconviction proceedings adopting verbatim one side's proposed findings does not amount to a substantial showing of violation of a constitutional right, and does not constitute a distinct, viable claim for § 2254 habeas relief.  The Alabama Court of Criminal Appeals' determination that Ray is not entitled to relief on such a claim is neither contrary to nor an unreasonable application of clearly established federal law.

way of the statement which in fact did come from the witness stand." (Vol. 5, R-17 at 700-01.)[114]

On direct appeal, the Alabama Court of Criminal Appeals rejected Ray's assignment of error alleging that the State had commented on his failure to testify. After carefully examining the offending comment, and the context in which it was made, the Alabama appellate court concluded that "the jury would not have taken the prosecutor's statement as a comment on the appellant's failure to testify because the context of the closing argument made such an interpretation unreasonable." *Ray*, 809 So.2d at 883. Petitioner now asserts the same claim in his federal habeas petition.

Without question, prosecutors are prohibited from commenting to the jury on a defendant's exercise of his Fifth Amendment privilege not to testify. *See, e.g., United States v. Bernal-Benitez*, 594 F.3d 1303, 1315 (11th Cir. 2010) ("Nor may the prosecution comment on the defendant's failure to testify."); *United States v. Knowles*, 66 F.3d 1146, 1162 (11th Cir. 1995) ("The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify.") (citation omitted). "A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Isaacs v. Head*, 300 F.3d 1232, 1270 (11th Cir. 2002) (citation omitted). "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so." *Id.*

The fundamental problem with Ray's claim is that the prosecutor's comment was ambiguous. It was not a direct, clear comment on Ray's failure to testify. If anything, it inaccurately suggested that Ray had testified. Moreover, the context in which that statement was made reveals that the prosecutor repeatedly, on numerous occasions, addressed Ray's tape-recorded statement during closing arguments. (Vol. 5, R-15 at 678, 679, 681.) An entirely reasonable (and, most likely, accurate) interpretation of the prosecutor's comment, then, was that

---

[114]    Antecedent to this ruling, the prosecutor explained that his comment was "inadvertent," and that his intention had been to compare Owden's live testimony to Ray's tape-recorded statement to Lt. Freine. (Vol. 5, R-17 at 699.) There was and is no reason to doubt the sincerity and good faith of the prosecutor on this point.

he was comparing Owden's live testimony to Ray's tape-recorded statement.  Certainly, on this record, a jury would not naturally and <u>necessarily</u> have taken the remark to be a comment on Ray's failure to testify.  And the prosecutor credibly provided an innocuous explanation for his comment, such that it was not manifestly intended to be a comment on Ray's decision not to testify.  For these reasons, the Alabama courts' determination that there was no violation of Ray's Fifth Amendment right not to testify was neither contrary to, nor an unreasonable application of, clearly established federal law.  Thus, petitioner's objection in his § 2254 petition to the state courts' resolution of this issue is meritless.[115]

## IX.   Prosecutorial Misconduct: Notification that Penalty-Phase Decision was Not Final.

As Claim VII of his Amended § 2254 Petition, Ray alleges prosecutorial misconduct in connection with the State's closing argument at the penalty phase.  In particular, petitioner maintains that the prosecutor violated *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by informing jurors that their sentencing decision was not final, but was simply a recommendation.  Specifically, petitioner takes issue with the prosecutor's explanation to the jury as follows: "[Y]ou will go back and weigh those matters that have been presented to you and then vote as to what you think should be the recommendation to this Court.  And the Court at a later date will then hold a sentencing hearing and make its decision.  But the ultimate decision does not fall on you.  What falls on you is to make a recommendation.  The ultimate

---

[115]    Even if the challenged statement was an improper comment on Ray's failure to testify, the trial court took appropriate curative measures.  In that regard, Judge Jones expressly charged the jury "that the fact that the Defendant did not testify in this case cannot be considered in determining the Defendant's guilt or innocence.  No inference or conclusion should be drawn by the jury from the fact that the Defendant, Dominique Ray, was not sworn and put on the witness stand as a witness in his own behalf, nor should this fact have any weight with the jury in reaching a verdict."  (Vol. 5, R-18 at 714-15.)  "We presume that juries follow the instructions given to them."  *United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011); *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009) ("If the district court takes a curative measure, we will reverse only if the evidence is so prejudicial as to be incurable by that measure.") (citation omitted).  Petitioner has not and cannot overcome the presumption that the jurors followed Judge Jones' instruction not to draw any inferences or conclusions, or otherwise to consider, Ray's failure to testify.  To the extent, then, that there is any valid concern about the prosecutor's "seeing both of these men on the stand" remark somehow commented on Ray's decision not to testify, that concern is dispelled or otherwise alleviated by the trial court's appropriate curative instruction that the jury was not to consider Ray's failure to testify at trial in determining his guilt or innocence.

decision as the Judge told you falls on him as the law provides."  (Vol. 5, R-21 at 731-32.)
Petitioner does not contend that any of these statements were inaccurate or misleading; however,
he insists that those remarks nonetheless violated his constitutional rights under *Caldwell* by
leading the jury to believe that responsibility for determining the appropriateness of a death
sentence lay elsewhere.[116]

Petitioner presented this argument to the Alabama Court of Criminal Appeals on direct
appeal.  The appellate court reasoned that, under state and federal law, comments accurately
explaining the functions of judge and jury in the sentencing process in capital cases are
permissible, provided that the significance of the jury's role must be stated.  Considering the
particular objected-to comments in this case, the Alabama Court of Criminal Appeals concluded
that "the prosecutor correctly stated the role of the jury and the role of the judge in the sentencing
procedure.  His statements did not minimize the importance of the jury's role.  Therefore, the
comment by the prosecutor was not improper."  *Ray I*, 809 So.2d at 883.  The appellate court
further reasoned that *Caldwell* is not violated where the jury is accurately informed of the extent
of its sentencing authority.  *Id.*

Ray's reliance on *Caldwell* in his federal habeas petition is misplaced.  The Supreme
Court has explained that in order "to establish a *Caldwell* violation, a defendant necessarily must
show that the remarks to the jury improperly described the role assigned to the jury by local
law."  *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (citation
omitted); *see also Carr v. Schofield*, 364 F.3d 1246, 1258 (11th Cir. 2004) ("a *Caldwell* violation
is not established where the jury was not affirmatively misled regarding its role in the sentencing
process") (citation and internal quotation marks omitted); *Davis v. Singletary*, 119 F.3d 1471,
1482 (11th Cir. 1997) (prosecutor's "references to and descriptions of the jury's sentencing
verdict in this case as an advisory one, as a recommendation to the judge, and of the judge as the
final sentencing authority are not error under *Caldwell* … because they accurately characterize

---

[116]     In framing this argument, petitioner hews closely to *Caldwell*'s holding "that it is
constitutionally impermissible to rest a death sentence on a determination made by a sentencer
who has been led to believe that the responsibility for determining the appropriateness of the
defendant's death rests elsewhere."  472 U.S. at 328-29; *see also Darden v. Wainwright*, 477
U.S. 168, 183 n.15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ("*Caldwell* is relevant only to certain
types of comment – those that mislead the jury as to its role in the sentencing process in a way
that allows the jury to feel less responsible than it should for the sentencing decision.").

the jury's and judge's sentencing roles under Florida law").  Petitioner does not allege, and cannot show, that the objected-to statements by the prosecutor were affirmatively misleading or otherwise inaccurate.  As such, it is pellucidly clear that the Alabama state courts have correctly understood and applied *Caldwell* to the circumstances of this case.  This is not a close question, and it cannot reasonably be asserted that the state court's determination of Ray's *Caldwell* claim is either contrary to or an unreasonable application of clearly established federal law.  Accordingly, habeas relief is unwarranted and unavailable on Count VII.[117]

**X.      Admission of Defendant's Purportedly Involuntary Statements.**

As his eighth and final habeas claim, Ray asserts that his statements to law enforcement officers were improperly admitted at trial.  Specifically, Ray contends that "[p]rior to obtaining the statements from Ray, officers did not inform him of his rights as required by *Miranda*," that "officers used improper methods to coerce Ray into giving statements," and that "officers deprived Ray of his Sixth Amendment right to counsel during the interrogation."  (Doc. 32-1, at 139.)  Neither this Claim VIII of Ray's § 2254 Petition nor his accompanying brief elaborates on these allegations.  Multiple permutations of this claim have already been considered and rejected *supra*, in the context of Ray's ineffective assistance claims.  The reasoning set forth in analysis of those claims applies with equal force here.

On direct appeal, Ray objected that his statements to law enforcement officials were involuntary and therefore inadmissible.  In examining this claim, the Alabama Court of Criminal

---

[117]      Besides, the tenor of Ray's objection (*i.e.*, that the State somehow minimized the jury's role in Alabama capital sentencing scheme) cannot be reconciled with the record facts. The penalty-phase sentencing transcript reflects that the prosecutor stressed to the jurors their critically important, weighty role in the process, notwithstanding the reality that their input consisted of a recommendation rather than a final sentencing decision.  In that regard, the prosecutor told the jury, "[Y]ou're called upon now to make a choice between the type of punishment to recommend to this Court for the Court to consider.  It's a very important recommendation of great seriousness.  Each of you have to make a personal and very serious decision."  (Vol. 5, R-25 at 748.)  Far from minimizing the jurors' role, the prosecutor's remarks highlighted the importance of the jurors' sentencing-phase responsibility.  And Judge Jones' instructions at the penalty phase reinforced the gravity of the situation, as follows:  "Before you vote, you should carefully weigh, sift and consider the evidence and all of it realizing that a human life is at stake."  (Vol. 5, R-28 at 777.)  Looking at the objected-to comment in context, the Court finds that no reasonable juror would have been misled or confused into thinking that the jury's penalty-phase role was unimportant, inconsequential, or something to be taken lightly. There was no *Caldwell* error.

Appeals identified four statements at issue: (i) an oral statement on April 18, 1997; (ii) a typewritten statement on April 18, 1997; (iii) a typewritten statement on April 24, 1997; and (iv) a tape-recorded statement on August 19, 1997. The Alabama court found that statements (ii), (iii) and (iv) were properly admitted because "Investigator Freine's uncontested testimony is sufficient to establish that the appellant's last three statements were voluntary and that the proper *Miranda* predicate was laid." *Ray I*, 809 So.2d at 887. As for Ray's oral statement (i), the state appellate court concluded that it "was admissible without *Miranda* warnings because [it was] not given in response to interrogation," but was instead a spontaneous statement that Ray made voluntarily. *Id.* at 888. The Alabama Court of Criminal Appeals specifically noted that there was "no evidence to support his claim" of coercion and involuntariness. *Id.* at 887.

At this juncture, the Court is at a loss to understand the factual and legal basis for petitioner's request for federal habeas corpus relief on his *Miranda* / coercion claim. With regard to the state court's findings of fact (*i.e.*, that Lt. Freine administered *Miranda* warnings before Ray's second, third and fourth statements; that Ray's first statement was a spontaneous statement not given in response to interrogation; that there was no evidence of coercion; and so on), such findings are presumed correct on habeas review, and Ray "bears the burden of rebutting that presumption by clear and convincing evidence." *Sochor v. Secretary Dep't of Corrections*, 685 F.3d 1016, 1028 (11th Cir. 2012). Petitioner has not met, and indeed has not even attempted to meet, this burden. With regard to the state court's legal determination that Ray's *Miranda* rights were not violated, petitioner has not shown that such decision was contrary to federal law then clearly established in the holdings of the Supreme Court. On the evidence, record and arguments presented, the undersigned concludes that fair-minded jurists would not necessarily disagree with the Alabama courts' *Miranda* analysis in this case. Habeas relief is thus unavailable on this claim.[118]

---

[118]    Petitioner has not explained why he never proffered evidence of involuntariness and coercion to the state courts, nor has he suggested that an evidentiary hearing is needed to allow him to develop and present such evidence here. Even if he had, a habeas petitioner does not get an evidentiary hearing as a matter of course, but must instead make threshold allegations of specific facts that, if proven, might warrant relief. *See, e.g., Chavez v. Secretary Florida Dep't of Corrections*, 647 F.3d 1057, 1060 (11th Cir. 2011) ("if a habeas petition does not allege enough specific facts that, if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing"); *Valle v. Secretary for Dep't of Corrections*, 459 F.3d 1206, 1216 (11th (Continued)

-110-

XI.     **Evidentiary Hearing.**

In his merits brief, Ray argues that this Court should conduct an evidentiary hearing for two purposes.  First, petitioner maintains, an evidentiary hearing should be held on unspecified "controlling and controverted factual issues surrounding" his procedural default of various claims.  (Doc. 31, at 57-58.)  Petitioner has not identified what those facts are; indeed, most of the procedurally defaulted issues set forth herein concern claims that petitioner's counsel chose to present either to the Rule 32 trial court or to the Rule 32 appellate court, but not both, or claims that they did not present to the state courts at all.  Petitioner has not pointed to any facts (much less controlling and controverted facts) that might warrant an evidentiary hearing on the issue of procedural default.  It is, of course, black-letter law that "[a] district court is not required to hold an evidentiary hearing … if the record refutes the applicant's factual allegations or otherwise precludes habeas relief."  *Allen v. Secretary, Florida Dep't of Corrections*, 611 F.3d 740, 745 (11th Cir. 2010) (citation omitted).  "Having alleged no specific facts that, if true, would entitle him to federal habeas relief, [Ray] is not entitled to an evidentiary hearing.  *Id.* at 763.[119]

Second, petitioner requests an evidentiary hearing to develop evidence of his steroid-abuse defense and particularly to introduce the testimony of Dr. Pope that the Rule 32 court excluded.  "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations which, if true, would entitle the applicant to federal habeas relief."  *Chavez v. Secretary Florida Dep't of Corrections*, 647 F.3d 1057, 1060 (11th Cir. 2011) (citation omitted).  Here, even if

---

Cir. 206) ("in order to obtain an evidentiary hearing, Valle must demonstrate that his factual allegations, if proven, would indicate that the state courts acted contrary to, or unreasonably applied, clearly established federal law").  Petitioner has not done so in Claim VIII.

[119]     Petitioner's position is that "[e]ven though the Alabama courts have made a record on the source and effect of the alleged default, a hearing is still required because cause and prejudice are federal questions on which this Court has a duty to make an independent determination."  (Doc. 31, at 58.)  But petitioner does not explain why or in what respects he thinks the Alabama courts' factual record on procedural default is inadequate or incomplete, much less why supplementation is necessary or permissible under AEDPA via additional facts presented at an evidentiary hearing in federal court.  If a complete record on procedural default has already been made, there is no reason to duplicate the exercise in federal court merely because petitioner believes "this Court has a duty to make an independent determination."

petitioner is correct that Dr. Pope would opine that there is a link between the Harville slaying and steroid abuse by Ray, petitioner would still not be entitled to federal habeas relief.  Recall that Ray's constitutional claim is that his lawyers rendered ineffective assistance at trial by not developing a steroid-abuse defense in mitigation.  Clear record facts, however, show that trial counsel had no knowledge and no reason to suspect that Ray was abusing steroids at the time he murdered Harville.  Ray never told them that, even when counsel inquired.  His mother never told them that.  No fact witnesses ever told them that.  Ray told one psychologist that he had been addicted to steroids at the age of 16, but said nothing about continuing or resuming use of steroids at the age of 19 (when the Harville slaying took place).  He told another psychologist that he used steroids for two months at the age of 16, then discontinued use.  On this record, trial counsel had no inkling that steroid abuse was a pertinent consideration for Ray's trial.  There were no "red flags" and no reasons to investigate further.  Thus, even if Dr. Pope's testimony were exactly as petitioner has advertised, an evidentiary hearing to develop such testimony would be a futile and pointless endeavor because the underlying *Strickland* claim would remain devoid of merit, and the state courts' denial of that claim on the merits would not be rendered objectively unreasonable, so as to allow federal habeas relief.

Inasmuch as it is clear that an evidentiary hearing would not affect the resolution of Ray's claims, and in light of the strong AEDPA policy discouraging the submission of new evidence to federal courts in habeas proceedings,[120] the undersigned exercises its discretion to deny petitioner's request for evidentiary hearing.  *See Allen*, 611 F.3d at 745 ("In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court.") (citation omitted).

---

[120]      *See, e.g., Ryan v. Gonzales*, --- U.S. ----, 133 S.Ct. 696, 709, 184 L.Ed.2d 528 (2013) (claims adjudicated on the merits in state postconviction proceedings are subject to review under § 2254(d), such that "[a]ny extrarecord evidence that [petitioner] might have concerning these claims would therefore be inadmissible"); *Cullen v. Pinholster*, --- U.S. ----, 131 S.Ct. 1388, 1401, 179 L.Ed.2d 557 (2011) ("Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so.").

**XII.   Conclusion.**

For all of the foregoing reasons, Ray's Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by Person in State Custody under Death Sentence (doc. 32-1) is **denied** in its entirety.  A separate judgment will enter.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts,[121] the Court **denies** a Certificate of Appealability to Ray on all claims, grounds, and issues presented, because Ray has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).

DONE and ORDERED this 26th day of September, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[121]     That Rule provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  *Id.*